PATRICK M. SOLURI (State Bar No. 210036)
OSHA R. MESERVE (State Bar No. 204240)
SOLURI MESERVE, A LAW CORPORATION
510 8th Street, Sacramento, California 95814
Telephone: (916) 455-7300
Facsimile: (916) 244-7300
Emails: patrick@semlawyers.com;
osha@semlawyers.com

*Attorneys for Plaintiffs and Petitioners*
*American River Trees and Save the American River Association*

JUSTIN AUGUSTINE (State Bar No. 235561)
MEREDITH STEVENSON (State Bar No. 328712)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375, Oakland, California 94612
Telephone: (510) 844-7100
Facsimile: (510) 844-7150
Emails: jaugustine@biologicaldiversity.org;
mstevenson@biologicaldiversity.org

*Attorneys for Plaintiff and Petitioner*
*Center for Biological Diversity*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN RIVER TREES, SAVE THE AMERICAN RIVER ASSOCIATION, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs and Petitioners, <br><br> v. <br><br> CENTRAL VALLEY FLOOD PROTECTION BOARD, U.S. ARMY CORPS OF ENGINEERS, and U.S. NATIONAL PARK SERVICE, <br><br> Defendants and Respondents. | No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF MANDATE; ELECTION TO PREPARE THE RECORD OF PROCEEDINGS** <br><br> (Administrative Procedure Act, 5 U.S.C. §§ 701 et seq.; Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 et seq.; National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq.; California Wild and Scenic Rivers Act, Cal. Pub. Resources Code, §§ 5093.50 et seq.; California Environmental Quality Act, Cal. Pub. Resources Code §§ 21000 et seq.; Cal. Code Civ. Proc., §§ 1060, 1085, 1088.5, 1094.5) |

Petitioners and Plaintiffs American River Trees, Save the American River Association, and Center for Biological Diversity (collectively, "Plaintiffs" or "Petitioners") hereby allege as follows:

**JURISDICTION AND VENUE**

1.      This is a civil suit brought pursuant to the federal Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 et seq.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq.; the California Environmental Quality Act ("CEQA"), California Public Resources Code, §§ 21000 et seq.; the California Wild and Scenic Rivers Act, California Public Resources Code, §§ 5093.50 et seq.; and the California Code of Civil Procedure, §§ 1060, 1085, 1088.5, and 1094.5.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory relief), 28 U.S.C. § 2202 (injunctive relief), and the APA, 5 U.S.C. §§ 701-706.

3.      This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are related to the federal law claims and form part of the same case or controversy. Such state law claims include claims under the California Environmental Quality Act, the California Wild and Scenic Rivers Act, and California Code of Civil Procedure.

4.      Venue is appropriate in the Eastern District of California pursuant to 28 U.S.C. § 1391(e) because defendant United States Army Corps of Engineers is located in Sacramento County, and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred and will continue to occur in this judicial district.

5.      Pursuant to Local Rule 3-120, intradistrict venue is proper in Sacramento, California because the source of the violations is located within Sacramento County.

6.      This complaint is timely filed within any and all applicable statutes of limitations.

**INTRODUCTION**

7.      Plaintiffs challenge the environmental review and approvals by Defendants United States Army Corps of Engineers ("Army Corps"), Central Valley Flood Protection Board ("Flood

2

Board"), and United States National Park Service ("National Park Service") regarding Contracts 3B and 4B of the American River Common Features Project ("Project"). The Project's purposes include the laudable goal of increasing flood protection; however, this goal can feasibly be achieved with dramatically reduced impacts to the environmental resources in the Project area.

8.    Should Contracts 3B and 4B proceed as planned, one of the most beautiful stretches of the Lower American River ("River") would lose much of the mature riparian forest that lines the River's banks. This forest, which contains numerous large trees, many over one-hundred years old, is one of the core reasons the River is protected under both the federal and California Wild and Scenic Rivers Acts. For example, the "riparian vegetation acts as a buffer between the Lower American River and the surrounding urban development. This vegetation, together with the river itself, are the most prominent features of the [Lower American River], and contribute greatly to the recreational experiences there." *EDF, Inc. v. EBMUD*, 1990 Cal. Super. LEXIS 7, *14-15. The following picture shows the forest, as seen looking east from the Watt Avenue Bridge:



Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

9.     Contracts 3B and 4B would impact the heart of the American River Parkway ("Parkway"), an open space greenbelt which extends approximately 29 miles from Folsom Dam to the American River's confluence with the Sacramento River. Often referred to as "the jewel" of the Sacramento Region, the Parkway exists to help preserve the River and its riparian forest and wildlife, as well as the recreational, archaeological, and scenic values the area supports. The Parkway contains a mix of trails (paved and unpaved) that wind through the lush forest canopy, and past the River's shores, drawing over 8 million visits per year, and providing multiple benefits, including driving approximately $365 Million per year to the local, region, and state economy.

10.    Contracts 3B and 4B would impact approximately 3.3 miles of mature riparian forest located on the north side of the Lower American River between Howe Avenue and Harrington Way, and on the south side of the River between Watt Avenue and the Mayhew Drain. In this stretch of the River, the Project seeks to install erosion protection measures by first removing the existing mature forest in specific locations within the Project area, and then replacing the forest with riprap (i.e., boulder-sized rocks). In some areas, the riprap would remain exposed on the surface of the ground, while in other areas the riprap would be buried, covered with soil, and then planted with vegetation.

11.    The federal and California Wild and Scenic River Acts exist to protect, "for the benefit and enjoyment of present and future generations," any designated river's "free-flowing state" and the "values" that caused the river to be designated under the Acts. 16 U.S.C. § 1271; Cal. Pub. Resources Code § 5093.50. Here, the Lower American River received the Acts' protections in order to preserve the River's "extraordinary" and "outstandingly remarkable" anadromous fish and recreational values. *Id.* Those values cannot persist in the absence of the River's mature forest. The fish will lose the habitat they need to survive, and the recreational activities that make this stretch of the River so endearing will no longer be available to the public in the areas where the forest is removed.

12.    The section of the Parkway where the Project would occur is one of the most highly-visited areas of the Parkway, used daily by people who live or travel here, seeking scenic

4

views, nature trails, fishing, wildlife-watching, exercise, relaxation, a chance to visit and explore a rare riparian forest, or the opportunity to simply find a moment alone in a beautiful natural setting. The individuals, families, and community groups that use and enjoy the 3B section of the Parkway depend on it for their health and well-being.

13.    Despite the devastation that the Project will cause to the River's values, Defendants deemed it consistent with the federal and state Wild and Scenic River Acts. Plaintiffs therefore respectfully ask this Court to find the Project in violation of the federal and state Wild and Scenic River Acts, and to enjoin the Project unless and until Defendants come into compliance with these Acts.

14.    The environmental impacts of the Project were also purportedly assessed in an "Environmental Impact Statement/Environmental Impact Report" ("EIS/EIR") prepared pursuant to both NEPA and CEQA. The EIS/EIR, however, failed to consider any potentially feasible alternatives to the Project, instead only examining the proposed Project or no action. The EIS/EIR also lacks a sufficient project description, fails to properly describe the environmental setting, falls short in its analysis of Project impacts, neglects to avoid impacts where feasible and adequately mitigate impacts which cannot be avoided, and is based on flawed assumptions and erroneous findings, which render the EIS/EIR fatally defective as an informational document under both statutes. Plaintiffs therefore respectfully ask this Court to find the Project in violation of NEPA and CEQA, and to enjoin the Project unless and until Defendants come into compliance with these Acts.

**PARTIES**

15.    Plaintiff and Petitioner AMERICAN RIVER TREES ("ART") is a California unincorporated association whose members recreate in the portion of the American River impacted by the Project. ART's members routinely visit the American River and its riparian forests for hiking, swimming, birding, fishing, and photography, and other recreational, scientific, and educational activities. ART's members include more than 3,500 Parkway users from Sacramento County and beyond who have called upon the Army Corps, and federal, state, and local agency representatives, to give utmost priority to preserving and conserving the American

5

River Parkway's unique and irreplaceable environmental, recreational, and wildlife corridor assets, in their flood protection and erosion control deliberations.

16.    Plaintiff and Petitioner SAVE THE AMERICAN RIVER ASSOCIATION ("SARA") is a California non-profit, public benefit, corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for public purposes. SARA is a grassroots organization founded in 1961 to spearhead establishment of the American River Parkway and adoption of the American River Parkway Plan. SARA's mission is to protect and preserve in perpetuity the wildlife habitat, fishery, and recreational resources of the American River Parkway. SARA's volunteer non-profit group of over 400 members and board of directors work to ensure that the American River Parkway will survive and prosper for the benefit of future generations, fighting, when necessary, for the public interest in land and water issues concerning the Lower American River and Parkway. SARA advocates in partnership with and on behalf of the public to protect, preserve, and enhance the publicly owned Parkway property and benefits it provides. SARA and its members have a direct and substantial beneficial interest in ensuring that Respondents comply with the laws relating to environmental protection along with the Parkway Plan.

17.    Petitioner and Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national, nonprofit conservation organization that works through science, law, and policy to protect wild places, public lands, and imperiled species and their habitats, including throughout California. The Center has more than 93,000 active members across the country, including members who recreate in the Project area.

18.    Defendant and Respondent CENTRAL VALLEY FLOOD PROTECTION BOARD ("Flood Board") is a California agency that has authority to regulate the erection, maintenance and protection of levees, embankments, and channel rectification in California. The Flood Board is the CEQA lead agency for the Project.

19.    Defendant and Respondent UNITED STATES ARMY CORPS OF ENGINEERS ("Army Corps") is an agency of the federal government. The Army Corps has the primary authority for construction and maintenance of federal navigation and flood control projects

6

throughout the nation, including the Project. The Army Corps is the NEPA lead agency for the Project.

20.    Defendant and Respondent UNITED STATES NATIONAL PARK SERVICE ("National Park Service") is an agency of the federal government, and is the Project's lead agency under Section 7 of the federal Wild and Scenic Rivers Act, acting on behalf of the Secretary of the Interior.

21.    The true names and capacities, whether individual, corporate, associate or otherwise, of the Defendants sued in this Complaint under the fictitious names of Does 1 through 20, inclusive, are unknown to Plaintiffs who therefore sue each such defendant by such fictitious name. Plaintiffs will ask leave of court to amend this complaint to show the true name and capacity of each defendant when these facts are discovered.

## FACTUAL BACKGROUND

22.    Contracts 3B and 4B are components of the American River Common Features 2016 Flood Risk Management Project, which was approved at a programmatic level in 2016. The overall project addresses flood protection measures on the Sacramento River, Natomas East Main Drainage Canal, Arcade Creek, Magpie Creek, Sacramento Weir and Bypass, and Lower American River.

23.    The erosion control measures occurring on the Lower American River are subdivided into specific Contracts (1, 2, 3A, and 3B), as shown in the following map where Contract 3B is depicted in yellow (Contract 4B is not shown on the map, but occurs in the same stretch of the River as Contract 3B). Contracts 1 and 2 were approved in 2021, and Contract 3A was approved in 2022.

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

Lower American River Levee Upgrades
(adapted from USACE)

24.     In December of 2023, a draft of the supplemental/subsequent environmental analysis ("SEIS/SEIR") inclusive of Contracts 3B and 4B was issued, and the public comment period ended on February 23, 2024. For Contract 3B, the intent of the SEIS/SEIR was to provide a project-level, site-specific analysis of 3B's impacts, whereas for Contract 4B, the SEIS/SEIR conducted a programmatic level analysis because not enough information was yet available to accurately describe 4B's impacts at a project level of analysis.

25.     Contract 3B includes constructing approximately 1.8 miles of erosion control measures on the north side of the River, and 1.5 miles on the south side of the River, as shown in the map below. The erosion control measures include what are referred to in the Project as "launchable rock toe, launchable trench, bank protection, and tie backs." All of these measures require the removal of mature forest to allow for the installation of riprap, i.e., large rocks. Depending on the measure, the riprap is either left exposed, or buried in soil.

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

Figure 3.6.2-3. American River Erosion Contract 3B Project Footprint

26.     Contract 4B would remove up to 50 trees, all of which are 18 inches in diameter or greater. Each of these trees is still being assessed by the Army Corps to determine whether the tree will be removed. In addition, Contract 4B includes installation of rock tiebacks to address erosion.

27.     Over 900 public comments were submitted during the Project's formal comment period, as well as additional comments during the 15-month period before the lead agencies issued the Final SEIS/SEIR in May of 2025. Nearly all the comments opposed the forest destruction the Project would cause.

28.     The comments described numerous issues regarding the SEIS/SEIR's analysis of Contracts 3B and 4B, including but not limited to the following:

- Tree surveys were performed in the Project area at the behest of the lead agencies, but this data was not disclosed in the Project documents. As a result, the public remains in the dark as to the site-specific Project impacts. For example, the public is unable to ascertain which trees will be removed from, and which trees will remain in, each segment of the Project footprint.

9

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

- Heritage trees (i.e., native oak trees greater than 19.1 inches in diameter) are identified in the Project documents as an important issue. However, despite the importance of these trees to the public and to wildlife, the lead agencies never disclosed any baseline data showing where heritage trees are located in the Project's footprint. The lead agencies also failed to disclose how many heritage trees would be removed by the Project, or where such removal would occur within each segment of the Project footprint.

- The recreational value of the 3B area is the primary reason it is protected under both the federal and state Wild and Scenic River Acts. The 3B area provides free access to the public for swimming, fishing, walking, running, wildlife-watching, biking, boating, tubing, and relaxing amongst the tall trees. But that recreational enjoyment is predicated on the presence of the mature riparian forest—it is the forest that makes the 3B area's recreational experience so special. The lead agencies assert that there will not be long-term impacts to the recreational experience because some of the forest that gets cut down will be replanted and eventually grow back. But many of the trees to be removed are decades or even centuries old, and therefore it is not possible to mitigate their loss in a short amount of time. The lead agencies failed to acknowledge this temporal reality and thus failed to properly address the Project's significant impacts to recreation.

- The lead agencies similarly failed to adequately assess the Project's impacts to the vegetation and wildlife of the 3B area, or the cumulative effects of riparian forest loss in the Lower American River (such as from the degradation that has already occurred downstream in the completed areas of Contracts 1 and 2). The lead agencies assert that mitigation will reduce the impacts to less than significant, but once again, none of the mitigation measures can return riparian forest to its current status within the 10 year time-frame the lead agencies rely upon. It will instead take decades to centuries to return the 3B area to its current status as mature forest. Moreover, the off-site mitigation area suffers from the same fundamental problem—any planting of trees in

10

that location will likewise take decades to centuries to bring to maturity. That is a significant, long-term impact that must be acknowledged and addressed, whereas thus far the Army Corps has failed to incorporate the importance of large, mature trees to the wildlife of the River.

- The lead agencies failed to properly assess the Project's significant air quality impacts as well. The Project's construction activities and associated air quality impacts, such as with respect to nitrogen dioxide (NO2), fine particulate matter (PM2.5), diesel particulate, and other toxics, can cause substantial health risks, especially to children, such as those attending the nearby Title 1 O.W. Erlewine Elementary School next to the staging area at Larchmont Park. Yet the lead agencies have not conducted a Health Impacts Assessment, and there remains a high likelihood of significant underestimation of the risk for air pollution-related health effects that could result from Contract 3B.

- The lead agencies failed to adequately disclose, avoid, and/or mitigate to the extent feasible, the Project's noise and vibration impacts on sensitive receptors.

- The Army Corps' failure to account for the site-specific aspects of the 3B area in their environmental analysis pervades the SEIS/SEIR's alternatives analysis as well. For example, the Army Corps only considered riprap as an option for constructing the 3B area's erosion control measures, even though the agency's Erosion Protection Analysis found that in the Contract 3B area "the shear stress . . . is below the critical stress for erosion of moderately resistant materials (clay and cemented sand with silt) [and] [t]herefore, significant scour below this erosion resistant material/surface is not anticipated," and even though the specific river velocities in the Contract 3B area allow for the use of far less-damaging bioengineering materials/methods. According to the Army Corps' own data (see table 4-4 excerpted below), bioengineering methods are feasible when riverbank flow velocities range from 3-10 fps (or even 12 fps when vegetation is mature), and the use of cobble (small rocks) for bank stabilization is similarly feasible within the velocity ranges of 2 to 12 fps. In the 3B area, near

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1    Larchmont Community Park, where the Project authorizes extensive use of riprap, the

2    Army Corps' velocity maps show 0-2 fps along the levee and the bank, and off the toe

3    of the bank, velocities only increase to 3-4 fps, which is within the range for

4    bioengineering methods (see table 4-4 below). Similarly, in another segment of the 3B

5    footprint—the Claybanks along the south side of the River at river miles 10.0-10.3,

6    where the Project authorizes extensive riprap—velocities reach 6-8 fps, which again

7    means alternative materials to riprap are feasible for erosion protection (such as using

8    6 inch cobble for velocities at 4-7.5 fps).

9    *Erosion Protection Report*                                    *American River Common Features GRR*

10    **Table 4-4.** Permissible shear and velocity for selected lining materials (Fischenich 2001)

| Permissible Shear and Velocity for Selected Lining Materials[1] | | | |
|---|---|---|---|
| Boundary Category | Boundary Type | Permissible Shear Stress (lb/sq ft) | Permissible Velocity (ft/sec) | Citation(s) |
| Soils | Fine colloidal sand | 0.02 - 0.03 | 1.5 | A |
| | Sandy loam (noncolloidal) | 0.03 - 0.04 | 1.75 | A |
| | Alluvial silt (noncolloidal) | 0.045 - 0.05 | 2 | A |
| | Silty loam (noncolloidal) | 0.045 - 0.05 | 1.75 – 2.25 | A |
| | Firm loam | 0.075 | 2.5 | A |
| | Fine gravels | 0.075 | 2.5 | A |
| | Stiff clay | 0.26 | 3 – 4.5 | A, F |
| | Alluvial silt (colloidal) | 0.26 | 3.75 | A |
| | Graded loam to cobbles | 0.38 | 3.75 | A |
| | Graded silts to cobbles | 0.43 | 4 | A |
| | Shales and hardpan | 0.67 | 6 | A |
| Gravel/Cobble | 1-in. | 0.33 | 2.5 – 5 | A |
| | 2-in. | 0.67 | 3 – 6 | A |
| | 6-in. | 2.0 | 4 – 7.5 | A |
| | 12-in. | 4.0 | 5.5 – 12 | A |
| Vegetation | Class A turf | 3.7 | 6 – 8 | E, N |
| | Class B turf | 2.1 | 4 - 7 | E, N |
| | Class C turf | 1.0 | 3.5 | E, N |
| | Long native grasses | 1.2 – 1.7 | 4 – 6 | G, H, L, N |
| | Short native and bunch grass | 0.7 - 0.95 | 3 – 4 | G, H, L, N |
| | Reed plantings | 0.1-0.6 | N/A | E, N |
| | Hardwood tree plantings | 0.41-2.5 | N/A | E, N |
| Temporary Degradable RECPs | Jute net | 0.45 | 1 – 2.5 | E, H, M |
| | Straw with net | 1.5 – 1.65 | 1 – 3 | E, H, M |
| | Coconut fiber with net | 2.25 | 3 – 4 | E, M |
| | Fiberglass roving | 2.00 | 2.5 – 7 | E, H, M |
| Non-Degradable RECPs | Unvegetated | 3.00 | 5 – 7 | E, G, M |
| | Partially established | 4.0-6.0 | 7.5 – 15 | E, G, M |
| | Fully vegetated | 8.00 | 8 – 21 | F, L, M |
| Riprap | 6 – in. d₅₀ | 2.5 | 5 – 10 | H |
| | 9 – in. d₅₀ | 3.8 | 7 – 11 | H |
| | 12 – in. d₅₀ | 5.1 | 10 – 13 | H |
| | 18 – in. d₅₀ | 7.6 | 12 – 16 | H |
| | 24 – in. d₅₀ | 10.1 | 14 – 18 | E |
| Soil Bioengineering | Wattles | 0.2 – 1.0 | 3 | C, J, J, N |
| | Reed fascine | 0.6-1.25 | 5 | E |
| | Coir roll | 3 - 5 | 8 | E, M, N |
| | Vegetated coir mat | 4 - 8 | 9.5 | E, M, N |
| | Live brush mattress (initial) | 0.4 – 4.1 | 4 | B, E, I |
| | Live brush mattress (grown) | 3.90-8.2 | 12 | B, C, E, I, N |
| | Brush layering (initial/grown) | 0.4 – 6.25 | 12 | E, I, N |
| | Live fascine | 1.25-3.10 | 6 – 8 | C, E, I, J |
| | Live willow stakes | 2.10-3.10 | 3 – 10 | E, N, O |
| Hard Surfacing | Gabions | 10 | 14 – 19 | D |
| | Concrete | 12.5 | >18 | H |

[1] Ranges of values generally reflect multiple sources of data or different testing conditions.

A. Chang, H.H. (1988).    F. Julien, P.Y. (1995).    K. Sprague, C.J. (1999).
B. Florineth, (1982).    G. Kouven, N.; Li, R. M.; and Simons, D.B., (1980).    L. Temple, D.M. (1980).
C. Gerstgraser, C. (1998).    H. Norman, J. N. (1975).    M. TXDOT (1999)
D. Goff, K. (1999).    I. Schiechtl, H. M. and R. Stern. (1996).    N. Data from Author (2001)
E. Gray, D.H., and Sotir, R.B. (1996).    J. Schoklitsch, A. (1937).    O. USACE (1997).

ERDC TN-EMRRP SR-29

43                                    April 2014

12

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1    The Army Corps' failure to consider any alternatives to riprap in the SEIS/SEIR also

2    flies in the face of the agency's own promises, as well as the recommendations and

3    requests from other federal agencies. When the Army Corps issued its programmatic

4    EIS/EIR in 2016, the agency explicitly promised that "bioengineering measures will

5    be analyzed" as part of future site-specific analysis for Contract 3B. Other federal

6    agencies, such as the Environmental Protection Agency ("EPA"), National Marine

7    Fisheries Service, and National Park Service, specifically asked that bioengineering

8    methods be used because it better protects the 3B area's mature riparian forest. In

9    2021, and again in 2025, the National Marine Fisheries Service, the agency that

10    oversees salmonid conservation, asked that the Project "[u]tilize bio-technical

11    techniques that integrate riparian restoration for riverbank stabilization instead of

12    conventional riprap in the American River." In 2022, the EPA recommended "that the

13    Corps explore and objectively consider a full range of alternatives and evaluate in

14    detail all reasonable alternatives that fulfill the project's purpose and need [including]

15    present[ing] . . . bio-technical techniques that integrate riparian restoration for

16    riverbank stabilization [in order to] provide a clear basis for choice among options by

17    decision-makers." The National Park Service's recommendations and best

18    management practices for flood control include "[u]tiliz[ing] bioengineering

19    techniques [and] cobblestone."

20    • The lead agencies relied on mitigation measures that are unlawfully deferred, lack

21    performance standards, or are otherwise unenforceable and ineffective.

22    • The lead agencies' conclusions that numerous significant impacts are unavoidable are

23    not supported by substantial evidence or rational explanation.

24    29.    Despite the public comments expressing well-supported concerns, Contracts 3B

25    and 4B were approved by the Army Corps on June 18, 2025, and by the Flood Board on July 18,

26    2025. In addition, the National Park Service, on July 7, 2025, approved Contract 3B pursuant to

27    section 7 of the federal Wild and Scenic Rivers Act.

28

13

30.     As approved, Contract 3B authorizes the removal of 675-715 of the area's trees, and Contract 3B further states that an additional "5 percent" of protected trees "might nevertheless require removal," which means an additional 79 trees could be removed. Contract 4B authorizes the removal of up to 50 trees, all of which are in the same general area as Contract 3B and therefore will further add to the loss of mature forest in the same stretch of the River.

31.     This massive loss of trees and wildlife habitat would occur in a mature riparian forest that is already depleted, consisting of a narrow strip along the River's banks. The following picture shows part of the 3B Project area, between the Watt Avenue Bridge and the Mayhew Drain, where Contract 3B would remove a substantial portion of the trees on the south side of the River from a mature forest that is already extremely small and narrow:



32.     However, despite being depleted as compared to its historical size, the existing forest's features allow it to support a wide array of wildlife. The larger trees, along with the forest's well-developed canopy, provide cover and shelter for many species, including otters, bobcats, beavers, deer, turtles, fish (including salmon and steelhead), coyotes, rabbits, raccoons, turkeys, squirrels, opossum, and numerous species of birds and waterbirds (resident and migratory), such as great blue herons, egrets, geese, ducks, mergansers, woodpeckers, hummingbirds, swallows, owls, hawks, falcons, kites, quail, eagles, and many more:

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

33.     The Project as approved, on the other hand, would decimate these forest features, as has already occurred in the Contracts to the west along the Lower American River, such as the following pictures showing a massive loss of vegetation at "Site 2-2 within Contract 2" (near the Howe Ave. Bridge):





16

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

34.    Furthermore, in addition to the tree removal that Contract 3B authorizes, over 1,100 trees are marked for trimming, meaning that while these trees will not be formally removed, they must still be trimmed to make way for the construction equipment and vehicles that the Army Corps intends to use to install the extensive riprap. Any time a tree must be trimmed is an instance where vehicles will very likely be moving through or over the tree's root protection zone, thereby potentially harming or killing the tree, yet the lead agencies nowhere address this.

35.    Contracts 3B and 4B will remove trees that are of great significance in the 3B area due to their ecological and recreational value. For example, the significance of oak trees is described in a Sacramento County Ordinance: "[N]ative oak trees existed as dominant and magnificent features in the landscape of the Central Valley of California. These trees provided a predominant food staple for original Indian inhabitants, and a major source of firewood and building material for early explorers and settlers. Over the years, the vast majority of these trees have been cleared to accommodate agriculture, burned as firewood and removed to facilitate urban development. Only a small vestige of the original oak woodland forests remains today. The removal of oak trees continues to the present time, and occurs at a much faster pace than natural regeneration. Thus, it has become imperative that an ordinance be established to preserve and protect remaining native oak trees as significant, integral, and outstanding examples of the historical heritage of Sacramento County." Sacramento County Tree Preservation Ordinance, § 19.12.020.

36.    Sacramento County has also stated its intent "to provide for the special protection of heritage and landmark trees within the unincorporated area of the County." Sacramento County Tree Ordinance, § 19.04.010. A heritage tree is defined as "a California oak tree growing on any land in Sacramento County, including privately owned land, with a trunk sixty inches or greater in girth measured four and one-half feet above the ground [i.e., 19.1 inches dbh (diameter at breast height)]." *Id.* at § 19.04.030.

37.    Despite the significance of native oak trees in the area, especially heritage oaks, the publicly available Project documents for Contracts 3B and 4B (i.e., the SEIS/SEIR and its

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

appendices) nowhere disclose how many heritage oaks will be removed, or potentially harmed, by the Project, nor even where they are located within the Project footprint. Instead, it was not until May 23, 2025, during a presentation to the Flood Board, that the Army Corps first asserted how many heritage oaks would be removed by Contracts 3B and 4B, telling the Board that three such trees would be removed.

38.    This assertion, however, turned out to be false. On July 10, 2025, the Army Corps disclosed for the first time that the agency was using an incorrect definition of heritage oak when determining Project impacts. Specifically, the Army Corps explained that it assumed "the definition [of] 'heritage oak' to be a native oak sixty inches or greater in diameter at breast height (dbh)," rather than the County's definition of 19.1 inches dbh or greater. This contradicts the SEIR's statement that the County's Tree Ordinance is "applicable" and was "taken into consideration." Furthermore, rather than provide a corrected number of heritage trees to be removed by Contracts 3B and 4B in light of the term's proper definition, the Army Corps was silent.

39.    In addition to not providing any information or data about the Project's impacts to heritage oaks, and despite requests from the public that the Project-specific tree data be disclosed, the Project documents do not include the tree survey data that was collected by the lead agencies in 2019 and 2020. Instead, the only tree data Plaintiffs are aware of that is specific to the Contract 3B area was obtained by Plaintiffs via a records request to the Sacramento Area Flood Control Agency ("SAFCA"), a non-federal local sponsor of the Project, in 2024. Plaintiffs asked for the same information from the Army Corps, but it was withheld by the Army Corps in response to Plaintiffs' Freedom of Information Act ("FOIA") request.

40.    This tree data that Plaintiffs obtained from SAFCA shows which trees in the 3B footprint were determined by the Army Corps to be "protected" or "not protected." The data also shows, for each individual tree, its species (e.g., valley oak), its size (i.e., diameter at breast height), and location (i.e., latitude and longitude).

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

41.     This tree data also divulges that when the correct definition of heritage oak is used, as many as 37 heritage oaks in the 3B area are "not protected." The following are pictures of some of these heritage oak trees the Project will remove:

 

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1

**LEGAL FRAMEWORK**

2

**Administrative Procedure Act**

3        42.      The APA confers a right of judicial review on any person that is adversely affected

4  by federal agency action. *See* 5 U.S.C. § 702; *Dep't of Homeland Sec. v. Regents of the Univ. of*

5  *Cal.*, 591 U.S. 1, 16 (2020) (APA "establishes a basic presumption of judicial review [for] one

6  suffering legal wrong because of agency action").

7        43.      The APA provides that the reviewing court "shall . . . hold unlawful and set aside

8  agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of

9  discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction,

10  authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

11        44.      Under the APA, a court may not uphold a decision "that runs counter to the

12  evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*.

13  ("*State Farm*"), 463 U.S. 29, 43 (1983). The agency "must offer 'a satisfactory explanation for its

14  action, including a rational connection between the facts found and the choice made' and cannot

15  simply ignore 'an important aspect of the problem.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024)

16  (quoting *State Farm*, 463 U.S. at 43).

17        45.      While the reviewing court may not "substitute its judgment for that of the agency,"

18  *id.*, the court likewise "may not rubber-stamp . . . administrative decisions that they deem

19  inconsistent with a statutory mandate or that frustrate the congressional policy underlying a

20  statute[.]" *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003).

21        46.      Here, claimed violations of the federal Wild and Scenic Rivers Act and NEPA are

22  reviewed under the APA.

23

**Wild and Scenic Rivers Act**

24        47.      Congress enacted the Wild and Scenic Rivers Act because "certain selected rivers

25  of the Nation [], with their immediate environments, possess outstandingly remarkable scenic,

26  recreational, geologic, fish and wildlife, historic, cultural, or other similar values," and therefore

27  "shall be preserved in free-flowing condition, and [] they and their immediate environments shall

28  be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271.

48. The Act defines free-flowing condition as "existing or flowing in natural condition without impoundment, diversion, straightening, rip-rapping, or other modification of the waterway." 16 U.S.C. § 1286(b). Moreover, while the "existence . . . of low dams, diversion works, and other minor structures at the time any river is proposed for inclusion in the national wild and scenic rivers system shall not automatically bar its consideration for such inclusion . . . this shall not be construed to authorize, intend, or encourage future construction of such structures within components of the national wild and scenic rivers system." *Id.*; *see also Ctr. for Biological Diversity v. Delgado*, No. C 01-4835 PJH, 2003 U.S. Dist. LEXIS 21885, *41-43 (N.D. Cal. June 19, 2003) (noting that while "the existence of minor modifications to a river's free flow should not prevent designation of the river [under the Act], . . . once a river is designated no further modifications should be constructed").

49. Congress designates a river for inclusion in the Act's system if it possesses "outstandingly remarkable . . . values." 16 U.S.C. §§ 1273, 1271. These values may include "scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar value." *Id.*

50. Section 7 of the Act mandates that "no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the [outstandingly remarkable] values for which such river was established, as determined by the Secretary charged with its administration." 16 U.S.C. § 1278.

51. The National Park Service's Reference Manual-46 (April 12, 2021) discusses implementation of section 7 of the Act, and states that "direct and adverse effects on [Wild and Scenic River] values must be avoided or eliminated."

### National Environmental Policy Act

52. The Project is subject to the environmental review process of NEPA, 42 U.S.C. § 4321 et seq. NEPA requires the Federal government to use all practicable means to improve and coordinate federal activities to create and maintain conditions in which people and nature can exist in "productive harmony." 42 U.S.C. § 4331. Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment and . . . to enrich the understanding of

22

1    the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

2    53.    "NEPA . . . makes environmental protection a part of the mandate of every federal

3    agency and department." *Calvert Cliffs' Coord. Com. v. United States*, 440 F.2d 1109, 112 (D.C.

4    Cir. 1971). Among other things, NEPA requires all agencies of the federal government to prepare

5    a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to,

6    all "major Federal actions significantly affecting the quality of the human environment." 42

7    U.S.C. § 4332(2)(C). This statement is commonly known as an environmental impact statement

8    ("EIS"). An EIS must describe: (1) the "environmental effects of the proposed agency action"; (2)

9    any "adverse environmental effects which cannot be avoided should the proposal be

10    implemented"; and (3) a "range of alternatives to the proposed agency action." *Id*.

11    54.    Federal courts have underscored the essential role of NEPA's detailed statement

12    requirement: "The detailed statement required by § 4332(2)(C) serves at least three purposes.

13    First, it permits the court to ascertain whether the agency has made a good faith effort to take into

14    account the values NEPA seeks to safeguard . . . . Second, it serves as an environmental full

15    disclosure law, providing information which Congress thought the public should have concerning

16    the particular environmental costs involved in a project . . . . Finally, and perhaps most

17    substantively, the requirement of a detailed statement helps insure the integrity of the process of

18    decision by precluding stubborn problems or serious criticism from being swept under the rug. A

19    conclusory statement unsupported by empirical or experimental data, scientific authorities, or

20    explanatory information of any kind not only fails to crystallize issues, but affords no basis for a

21    comparison of the problems involved with the proposed project and the difficulties involved in

22    the alternatives." *Silva v. Lynn*, 482 F.2d 1282, 1284-85 (1st Cir. 1973).

23    55.    To comply with NEPA, federal agencies must take a "hard look" at available

24    information, analysis, and potential environmental impacts in order to make an informed decision

25    to proceed with a proposed action or alternative. *See, e.g., Native Ecosystems Council v. U.S.

26    Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). To that end, agencies must "ensure the

27    professional integrity, including scientific integrity, of the discussion and analysis in an

28    environmental document" and "make use of reliable data and resources." 42 U.S.C. § 4332(2)(D)

23

and (E); *see also Native Ecosystems Council*, 418 F.3d at 964 ("To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS.")

56.     Federal courts have also consistently emphasized that an agency's duty to rigorously evaluate reasonable alternatives lies at the heart of NEPA's procedural requirements. *See, e.g., California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) ("the touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation"); *Monroe County Conservation Council v. Volpe*, 472 F.2d 693, 697-98 (2d Cir. 1972) ("The requirement for a thorough study and a detailed description of alternatives . . . is the linchpin of the entire impact statement.").

**California Environmental Quality Act**

57.     CEQA has two purposes: environmental protection and informed self-government. *Woodward Park Homeowners Assn., Inc. v. City of Fresno*, 150 Cal.App.4th 683, 690-691 (2007). CEQA is "to be interpreted to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." *Mountain Lion Foundation v. Fish & Game Com.*, 16 Cal.4th 105, 134 (1997). CEQA requires agencies to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state." Pub. Resources Code, § 21001(a).

58.     Prior to approving any discretionary project, CEQA requires a lead agency to fully disclose and analyze all of the project's potentially significant direct, indirect, and cumulative environmental effects. *See, e.g.,* Cal. Code Regs., tit. 14, § 15002(f)). Public agencies must also avoid or minimize such environmental damage where feasible. Cal. Code Regs., tit. 14, § 15021(a). Pursuant to this duty, no public agency may approve or carry out a project where one or more significant effects on the environment may occur if the project is approved, unless certain narrow findings are made. Cal. Code Regs., tit. 14, §§ 15091, 15093.

59.     CEQA mandates that lead agencies analyze and adopt feasible and enforceable mitigation measures that would reduce or avoid any of a project's significant environmental impacts. Cal. Pub. Resources Code, §§ 21081, 21081.6(b). If any of a project's significant

24

impacts cannot be mitigated to a less than significant level, CEQA bars the lead agency from approving a project if a feasible alternative is available that would meet the project's objectives while avoiding or reducing its significant environmental impacts. Cal. Pub. Resources Code, § 21002.

60.    CEQA requires that substantial evidence in the administrative record support all the agency's findings and conclusions, including those contained in the EIR, and that the agency explain how the evidence in the record supports the conclusions the agency has reached. Cal. Pub. Resources Code, § 21168.5.

**California Wild and Scenic Rivers Act**

61.    The California Wild and Scenic Rivers Act declares that designated rivers "possess extraordinary scenic, recreational, fishery, or wildlife values," and "shall be preserved in their free-flowing state, together with their immediate environments, for the benefit and enjoyment of the people of the state." Cal. Pub. Resources Code § 5093.50. Furthermore, "such use of these rivers is the highest and most beneficial use." *Id*.

62.    In achieving its intent, the Act mandates that "[a]ll departments and agencies of the state shall exercise their powers granted under any other provision of law in a manner that protects the free-flowing state of each component of the system and the extraordinary values for which each component was included in the system." Cal. Pub. Resources Code § 5093.61.

**STANDING**

63.    Plaintiffs bring this action on their own behalf and on behalf of their adversely affected members.

64.    Plaintiffs' members have standing to bring the claims asserted in this Petition and Complaint. Plaintiffs' members have used, and intend to continue to use, the 3B area for observation, aesthetic enjoyment, hiking, swimming, birding, wildlife-watching, fishing, and photography, and other recreational, scientific, and educational activities. These activities depend on an intact and healthy mature riparian forest in the 3B area. Where elements of that forest and its associated ecosystem are reduced or eliminated, Plaintiffs' members' recreational uses and aesthetic enjoyment of this area are likewise reduced or eliminated. This includes, but is not

25

1   limited to, William Avery, who visits the area impacted by Contracts 3B and 4B on an almost

2   daily basis, and intends to continue to do so.

3        65.    The above-described recreation, aesthetic, conservation, scientific and wildlife

4   preservation interests of Plaintiffs and their members would be adversely affected and irreparably

5   injured by Defendants' violations of the federal Wild and Scenic Rivers Act, the California Wild

6   and Scenic Rivers Act, NEPA and CEQA.

7        66.    The relief sought herein will redress the harms to Plaintiffs and their members

8   caused by Defendants' failure to comply with the law. Plaintiffs have no other adequate remedy

9   at law, and they bring this action on behalf of their adversely affected members.

10       67.    Plaintiffs are within the class of persons beneficially interested in, and aggrieved

11  by, the acts of Defendants as alleged below. Plaintiffs and their members have a beneficial

12  interest in challenging the Defendants' unlawful approval of the Project.

13                    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

14       68.    Plaintiffs have performed all conditions precedent to this filing and participated in

15  the administrative process. Plaintiffs actively participated in the administrative process by

16  submitting comments, along with other public agencies, organizations, and members of the

17  public, outlining the claims contained herein. As such, Plaintiffs have fully exhausted their

18  administrative remedies, to the extent such remedies exist and to the extent that exhaustion of

19  administrative remedies is legally necessary.

20       69.    Plaintiffs possess no other remedy to challenge Defendants' abuses of discretion

21  and failures to comply with applicable laws and regulations. Plaintiffs possess no other remedy to

22  address Defendants' violations of law as alleged in this Petition and Complaint other than by

23  means of this lawsuit. If Defendants' actions concerning the Project are effectuated, Plaintiffs,

24  their members, and the environment will be irreparably harmed. No money damages could

25  adequately compensate for that harm.

26                          **NOTICE OF CEQA SUIT**

27       70.    Plaintiffs have complied with California Public Resources Code section 21167.5

28  by providing written notice of commencement of this action to the Flood Board prior to filing this

26

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1  Complaint. A true and correct copy of the notice provided pursuant thereto, with proof of service

2  thereof, is attached hereto as Exhibit A.

3  **ELECTION TO PREPARE RECORD**

4  71.    Pursuant to Public Resources Code, section 21167.6, subdivision (b)(2), and any

5  other applicable authority, Plaintiffs elect to prepare the record of proceedings in this action.

6  72.    Pursuant to this election, Plaintiffs request that the Flood Board, upon service of

7  this election, gather and transmit its administrative files to Plaintiffs for preparation of the

8  administrative record. The Flood Board is required to provide its administrative files free of

9  charge.

10  **FIRST CLAIM FOR RELIEF**

11  **VIOLATION OF WILD AND SCENIC RIVERS ACT**

12  **(By Plaintiffs against the Army Corps, National Park Service, and Does 1 through 10)**

13  73.    Plaintiffs incorporate by reference each and every allegation contained in the

14  foregoing paragraphs as though fully set forth herein.

15  74.    The federal Wild and Scenic Rivers Act exists in part to protect a river's "free-

16  flowing condition." 16 U.S.C. § 1271.

17  75.    "Free-flowing" means "existing or flowing in natural condition without

18  impoundment, diversion, straightening, *rip-rapping*, or other modification of the waterway." 16

19  U.S.C. § 1286(b) (emphasis added). Moreover, while the "existence" of riprap structures "at the

20  time [the] river is proposed for inclusion in the national wild and scenic rivers system shall not

21  automatically bar its consideration for such inclusion, . . . [t]hat . . . shall not be construed to

22  authorize, intend, or encourage future construction of such structures . . . ." *Id.*

23  76.    In light of the plain language of the Act, the Army Corps and National Park

24  Service's conclusion that Contract 3B's extensive reliance on riprap does not violate the Act is

25  arbitrary, capricious, and not in accordance with law.

26  77.    Section 7 of the Act states that "no department or agency of the United States shall

27  assist by loan, grant, license, or otherwise in the construction of any water resources project that

28  would have a direct and adverse effect on the values for which such river was established, as

27

1   determined by the Secretary charged with its administration." 16 U.S.C. § 1278. The National

2   Park Service's Reference Manual-46 further states that "direct and adverse effects on [Wild and

3   Scenic River] values must be avoided or eliminated."

4         78.    Here, the National Park Service itself acknowledges in its findings that the

5   Project's extensive riprap "will result in effects to fisheries, particularly juvenile salmonid rearing

6   and migratory habitat due to hardened bank treatments."

7         79.    Likewise, the National Marine Fisheries Service described numerous direct and

8   adverse effects to anadromous fish as a result of Contract 3B, including, but not limited to:

9
10
11   ▪ "Riprapping . . . decreases near-shore roughness, which causes stream velocities to increase more rapidly with increasing discharge, further eliminating critical refugia areas for fish and other aquatic organisms during high flows and causing accelerated erosion downstream, which can in turn result in riprap creating the need for more riprap."

12
13
14
15   ▪ "[P]ermanent degradation of salmonid and green sturgeon critical habitat from riprap placement . . . will result in reduced growth, reduced survival, and reduced fitness of the species. Permanent habitat loss is expected to occur at sites where rock is being placed within existing riparian habitat and where rock is replacing or being added onto existing levee banks."

16
17
18   ▪ "Harm to rearing juvenile spring-run Chinook salmon, winter-run Chinook salmon, steelhead, and adult and juvenile green sturgeon from the loss of . . . riparian habitat . . . will affect juveniles through displacement, increased predation, and loss of food, resulting in decreased fitness, growth, and survival."

19         80.    Direct and adverse effects to the recreational value of the 3B area will also be

20   substantial. Most significantly, to insert the riprap to construct Contract 3B's erosion control

21   measures, mature riparian forest must first be cut down, thereby precluding the ability of the 3B

22   area to continue to provide a high-quality recreational experience, whether for walking, biking,

23   running, hiking, wildlife-watching, swimming, fishing, boating, or enjoying the forest shade

24   amongst the tall trees and canopy cover. Moreover, these adverse effects to recreation will last for

25   over a century because the forest being cut down includes trees over 100 years old, and it will

26   therefore take over a century to replace them, if they are replaced at all.

27         81.    The Wild and Scenic Rivers Act exists to preserve a designated river's

28   "outstandingly remarkable values"—losing the 3B area's recreational value for decades to

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

centuries is not compatible with that purpose. Furthermore, the SEIS/SEIR acknowledges that parts of the 3B area will lose their recreational value forever, such as the "large and popular informal river access area near the most upstream portion of the American River Erosion Contract 3B area (extending eastward from Larchmont Park) where the project will substantially change the character at the shoreline compared to existing conditions."

82.     The Project's destruction of mature riparian forest is not consistent with protecting the River's fish and recreational values for the benefit and enjoyment of present and future generations. *See, e.g., Wilderness Watch v. U.S. Forest Serv.*, 143 F. Supp. 2d 1186, 1206 (D. Mont. 2000) ("permeating the provisions of the WSRA is an emphasis on protection, which the court must give a broad rather than a narrow perspective"). Because Contract 3B causes direct and adverse effects that are not avoided or eliminated, Contract 3B violates the Wild and Scenic Rivers Act, and the Army Corps' and National Park Service's conclusion that Contract 3B "will not directly and adversely affect the LAR's free-flowing character, water quality, anadromous fishery, or recreational values" is arbitrary, capricious, and not in accordance with law, and is subject to judicial review under the APA, 5 U.S.C. §§ 701-706.

WHEREFORE, Plaintiffs pray for relief as hereinafter stated.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA WILD AND SCENIC RIVERS ACT

#### (By Plaintiffs against the Flood Board and Does 1 through 10)

83.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

84.     The California Wild and Scenic Rivers Act declares that "certain rivers which possess extraordinary scenic, recreational, fishery, or wildlife values shall be preserved in their free-flowing state, together with their immediate environments, for the benefit and enjoyment of the people of the state," and "such use of these rivers is the highest and most beneficial use and is a reasonable and beneficial use of water within the meaning of Section 2 of Article X of the California Constitution." Cal. Pub. Resources Code § 5093.50.

85.    The Act further mandates that "[a]ll departments and agencies of the state shall exercise their powers granted under any other provision of law in a manner that protects the free-flowing state of each component of the system and the extraordinary values for which each component was included in the system." Cal. Pub. Resources Code § 5093.61.

86.    The River is designated a "recreational river" pursuant to the California State Wild and Scenic Rivers Act, and was included in the California Wild and Scenic Rivers System due to its extraordinary scenic, recreational, fishery, and wildlife values.

87.    The modification of miles of River shoreline with riprap, and consequent loss of mature riparian forest, substantially harms the River's extraordinary values, and is thus inconsistent with the Act's mandate that those values be protected.

88.    The Project will eliminate numerous trees and the canopy cover and shade they provide, will harm or eliminate beaches, swimming areas, and trails, and will damage wildlife habitat and thus the ability of visitors to enjoy the area's wildlife and mature forest aesthetics. This harm to the River's extraordinary values is substantial and will occur in a popular, heavily recreated area.

89.    The Flood Board has a mandatory, non-discretionary duty to comply with the California Wild and Scenic Rivers Act, and here, is in violation of the Act because the Board has exercised its powers in a manner that damages, rather than protects, the River's free-flowing state and extraordinary values. Cal. Pub. Resources Code § 5093.61.

WHEREFORE, Plaintiffs pray for relief as hereinafter stated.

## THIRD CLAIM FOR RELIEF

### VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT

#### (By Plaintiffs against the Army Corps and Does 1 through 10)

90.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

91.    The Army Corp has violated NEPA, 42 U.S.C. § 4331 et seq., by issuing a Record of Decision, and approving a Final Supplemental EIS, for Contracts 3B and 4B that fail to meet the Act's requirements.

30

92.     An EIS must provide a detailed statement of: (1) the environmental effects of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) a reasonable range of alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C). The Record of Decision and Final SEIS failed to comply with these requirements.

93.     The Army Corps failed to analyze "a reasonable range of alternatives" to the proposed action because the Army Corps did not analyze a single action alternative in its Final SEIS, and thus did not analyze any alternative that would better protect the existing mature riparian forest.

94.     Contract 3B's purpose is to "reduce the overall flood risk within the study area by addressing the failure risks due to seepage and erosion." A viable alternative that meets Contract 3B's purpose is bioengineering. Bioengineering can reduce flood risk and can do so in ways that, unlike riprap, is compatible with natural processes, such as protecting the existing forest.

95.     Moreover, the Army Corps promised it would consider bioengineering. Specifically, when it issued its programmatic EIS/EIR in 2016, the Army Corps stated that "bioengineering measures will be analyzed" as part of future site-specific analysis for Contract 3B.

96.     Furthermore, other federal agencies, such as the Environmental Protection Agency ("EPA"), National Marine Fisheries Service, and National Park Service have asked that bioengineering be used because it better protects the existing forest. For example, in 2021, and again in 2025, the National Marine Fisheries Service asked that the Project "[u]tilize bio-technical techniques that integrate riparian restoration for riverbank stabilization instead of conventional riprap in the American River." In 2022, the EPA stated that it "recommends that the Corps explore and objectively consider a full range of alternatives and evaluate in detail all reasonable alternatives that fulfill the project's purpose and need [including] present[ing] . . . bio-technical techniques that integrate riparian restoration for riverbank stabilization [in order to] provide a

clear basis for choice among options by decision-makers." The National Park Service's best management practices for flood control are to "[u]tilize bioengineering techniques."

97.     In 2024, upon seeing that the Draft SEIS/SEIR for 3B failed to include bioengineering as an alternative, many members of the public submitted comments asking that the Army Corps do what it had promised and address bioengineering.

98.     Rather than meet this NEPA obligation, in May 2025, the Army Corps issued an appendix G to the Final SEIS/SEIR that arbitrarily asserts bioengineering is infeasible, despite also acknowledging that the programmatic EIS/EIR issued in 2016 contained a final alternatives array that included bioengineering solutions as effective methods of reducing erosion and thus carried forward bioengineering into design development.

99.     Consequently, to comply with NEPA, bioengineering must be analyzed and addressed as a feasible alternative.

100.    The Army Corps' analysis of specific resource areas in its Record of Decision and Final SEIS—including, but not limited to, the analysis of vegetation, wildlife, recreation, and air quality—was inadequate and/or incomplete, including the analysis of cumulative impacts.

101.    NEPA requires that the Army Corps take a "hard look" at the environmental effects of projects. For instance, to take the requisite hard look, an agency may not rely on incorrect assumptions or data in arriving at its conclusions and must ensure the professional integrity, including scientific integrity, of their analyses and make use of reliable data and resources.

102.    Here, with respect to its conclusions regarding 3B's significant impacts, the Army Corps incorrectly assumes, for example, that there will not be "a long-term diminishment of the recreation experience [because] . . .[e]ight to ten years after planting, vegetation is expected to be sufficiently developed to obscure most of the underlying ground surface." Similarly, the Army Corps asserts that post-project, (1) "the visual character of the area would be similar to existing conditions," (2) "[t]he general characteristics and recreational possibilities of this reach of the river . . . would be similar to existing conditions," (3) "[t]he recreational options and quality of this reach of the river would not be substantially changed," and (4) "[t]rees are expected to reach

32

1  a mature canopy within about 15 to 20 years [at which] point the aesthetic will blend with, and be

2  similar to, existing forest and woodland in the Parkway."

3          103.    These assumptions and associated conclusions are contrary to law and not

4  supported by substantial evidence. Contract 3B will result in a massive loss of trees and even the

5  data the Army Corps relies upon shows that any trees planted to make up for this loss will only

6  begin to reach maturity in at least 20-45 years.

7          104.    Furthermore, the SEIS makes no effort to analyze and address the loss of larger

8  trees, especially the older trees, and their associated canopy cover. It can take many decades to

9  centuries for planted trees to again provide the features of the trees they are replacing.

10         105.    In short, unsubstantiated assumptions, and a failure to make use of reliable data

11  and resources, led to arbitrary and unlawful conclusions that Project impacts would be less than

12  significant when in fact they will be significant. The Army Corps' adoption of the Record of

13  Decision and Final SEIS is thus arbitrary, capricious, and not in accordance with law as required

14  by NEPA and the APA, and is subject to judicial review under the APA, 5 U.S.C. §§ 701-706.

15         WHEREFORE, Plaintiffs pray for relief as hereinafter stated.

16                              **FOURTH CLAIM FOR RELIEF**

17              **VIOLATION OF CALIFORNIA ENVIRONMENTAL QUALITY ACT**

18            **(By Plaintiffs against the Flood Board and Does 1 through 10)**

19         106.    Plaintiffs incorporate by reference each and every allegation contained in the

20  foregoing paragraphs as though fully set forth herein.

21         107.    The Flood Board prejudicially abused its discretion in certifying the EIR. The

22  Flood Board did not proceed in the manner required by law and its decisions in approving the

23  Project and certifying the EIR are not supported by substantial evidence. Cal. Pub. Resources

24  Code, § 21168.5; *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova*, 40

25  Cal.4th 412, 426 (2007). These legal deficiencies include, without limitation, the following:

26

27

28

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1    **The EIR Fails to Adequately Describe the Project and Environmental Setting**

2    108.    "An accurate, stable and finite project description is the sine qua non of an

3    informative and legally sufficient EIR." *County of Inyo v. City of Los Angeles*, Cal.App.3d 185,

4    193 (1977).

5    109.    Furthermore, the EIR "must delineate environmental conditions prevailing absent

6    the project, defining a 'baseline' against which predicted effects can be described and quantified."

7    *Neighbors for Smart Rail v Exposition Metro Line Constr. Auth.*, 57 C4th 439, 447 (2013). These

8    existing conditions "will normally constitute the baseline physical conditions by which a lead

9    agency determines whether an impact is significant." *Id.* at 448.

10    110.    An EIR should contain a "sufficient degree of analysis to provide decision-makers

11    with information which enables them to make a decision which intelligently takes account of

12    environmental consequences." Cal. Code Regs., tit. 14, § 15151.

13    111.    The EIR's project description and explanation of baseline environmental

14    conditions is deficient because it lacks the adequate specificity required to analyze project

15    impacts, is shifting and unstable, and fails to include the whole of the project. As one example,

16    the EIR fails to adequately disclose the number of heritage trees that would be removed as part of

17    the Project; the EIR's failure to adequately describe and disclose this aspect of the Project

18    prevents decision-makers and the public from meaningfully considering the Project's impacts

19    within the actual, accurate context of its implementation. *San Joaquin Raptor Rescue Center v.*

20    *County of Merced,* 149 Cal.App.4th 645, 655 (2007); Cal. Code Regs., tit. 14, § 15151.

21    **The EIR Fails to Adequately Identify and Analyze the Project's Significant Impacts**

22    112.    CEQA requires that an EIR describe the proposed project's significant

23    environmental effects; each impact must be revealed and fully analyzed in the EIR. Cal. Pub.

24    Resources Code, § 21100, subd. (b); Cal. Code Regs., tit. 14, § 15126.2, subd. (a). "[T]he

25    adequacy of an EIR's discussion of environmental impacts is an issue distinct from the extent to

26    which the agency is correct in its determination whether the impacts are significant." *Sierra Club*

27    *v. County of Fresno*, 6 Cal.5th 502, 514 (2018). "[W]hether a description of an environmental

28    impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a

34

1   substantial evidence question. A conclusory discussion of an environmental impact that an EIR

2   deems significant can be determined by a court to be inadequate as an informational document

3   without reference to substantial evidence." *Id.* at 514. To "comport with its intended function" an

4   EIR must include "detail sufficient to enable those who did not participate in its preparation to

5   understand and to consider meaningfully the issues raised by the proposed project." *Id.* (internal

6   quotations omitted). "Whether or not the alleged inadequacy is the complete omission of a

7   required discussion or a patently inadequate one-paragraph discussion devoid of analysis, the

8   reviewing court must decide whether the EIR serves its purpose as an informational document."

9   *Id.*

10      113.    The EIR lacks the adequate analysis and omits an adequate discussion of the

11   magnitude of the Project's impacts, including cumulative impacts, and therefore fails to provide

12   decision makers with sufficient analysis for the Project's individual and cumulative impacts. The

13   EIR's informational deficiencies apply to several different resource areas including, but not

14   limited to, biological resources, air quality and resulting human health, climate impacts,

15   recreational impacts, environmental justice impacts, and visual impacts.

16   **Mitigation Measures are Improperly Deferred, Unenforceable, Vague, and Inadequate**

17      114.    An agency may not approve a project that will have significant environmental

18   impacts if there are feasible mitigation measures that would substantially lessen those effects. Cal.

19   Pub. Resources Code, § 21002; Cal. Code Regs., tit. 14, §§ 15002, subd. (a)(3), 15021, subd.

20   (a)(2).

21      115.    An agency must provide that mitigation measures are fully enforceable through

22   permit conditions, agreements, or other measures. Cal. Pub. Resources Code, § 21081.6, subd.

23   (b).

24      116.    Further, agencies cannot defer the formulation, review, or finalization of the

25   performance standards specific to the proposed mitigation measures intended to reduce projects'

26   potentially significant environmental impacts. *Preserve Wild Santee v. City of Santee*, 210

27   Cal.App.4th 260, 272 (2012) (holding EIR improperly deferred formulating mitigation measures

28   because it did not describe specific actions or specify performance standards). CEQA prohibits

1    deferral of mitigation measures except in narrow circumstances. Cal. Code Regs., tit. 14, §

2    15126.4, subd. (a)(1)(B) ("Formulation of mitigation measures shall not be deferred until some

3    future time.").

4         117.    Here, the EIR impermissibly relies upon unenforceable, impermissibly vague and

5    deferred, and inadequate mitigation measures. As one example, mitigation measures VEG-2 and

6    VIS-1 expressly limit specific control measures to "to the . . . extent practicable." Such limitation

7    is improperly deferred and unenforceable because the EIR is required to identify the extent of

8    "practicable" mitigation strategies and not leave that determination for a later date.

9    **Inadequate Alternatives Analysis**

10         118.    The EIR fails to adequately set forth and analyze a reasonable range of

11    alternatives. CEQA requires that a reasonable range of alternatives to the proposed project be

12    considered in the environmental review process, including a no project alternative. Cal. Pub.

13    Resources Code, §21002, 21061, 21100; Cal. Code Regs., tit. 14, § 15126.6. "While the lead

14    agency may ultimately determine that the potentially feasible alternatives are not actually feasible

15    due to other considerations, the actual infeasibility of a potential alternative does not preclude the

16    inclusion of that alternative among the reasonable range of alternatives." *Watsonville Pilots Assn.*

17    *v. City of Watsonville,* 183 Cal.App.4th 1059, 1087 (2010) (emphasis added); *see also Banning*

18    *Ranch Conservancy v. City of Newport Beach,* 2 Cal.5th 918, 936-937 (2017); *Habitat and*

19    *Watershed Caretakers v. City of Santa Cruz,* 213 Cal.App.4th 1277, 1300-1306 (2013).

20         119.    Here, for example, and as noted, the EIR impermissibly declined to evaluate a

21    bioengineering alternative, which was suggested by numerous commenters and agencies and

22    would have dramatically reduced the Project's impacts to biological resources. An appendix to

23    the Final SEIS/SEIR impermissibly dismissed this project alternative as infeasible despite it

24    satisfying most project objectives.

25    **Inadequate Responses to Comments**

26         120.    CEQA requires that the Final EIR include a "detailed" written response to all

27    "significant environmental issues" raised by commenters. *City of Long Beach v. LAUSD*, 176

28    Cal.App.4th 889, 904 (2009).

121.    Commenters submitted extensive comments on the Draft SEIS/SEIR. Cal. Code Regs., tit. 14, § 15088, subd. (c). The Final SEIS/SEIR provides inadequate, perfunctory, or false and inaccurate responses to these comments that fail to comply with CEQA's standards. Among other deficiencies, the Final SEIS/SEIR failed to provide detailed responses to individual comments by preparing so-called "master responses" that did not, in fact, provide individual responses to individual comments as required by CEQA, and in some instances provided the public no answers at all to formal written questions asked and submitted to the Draft SEIS/SEIR, as well as requests for additional supporting information and complete copies of studies supporting answers. The Final SEISSEIR also unlawfully failed to provide detailed responses by instead referring the public to its responses to other comments raising related but different issues. The effect of these strategies is to avoid addressing troublesome environmental issues associated with the Project, such as with respect to impacts to heritage trees and loss of riparian forest in the Project area.

**Findings Unsupported by Substantial Evidence**

122.    CEQA requires a public agency that approves a project for which there will be significant environmental impacts to make findings justifying those impacts. The lead agency may also set forth overriding considerations to justify the approval of a project having significant and unavoidable impacts. Both CEQA Findings and any Statement of Overriding Considerations must be supported by substantial evidence in the record.

123.    Defendant Flood Board's CEQA findings and statement of overriding considerations are not supported by substantial evidence. Accordingly, they fail to provide the appropriate basis for certification of the EIR and approval of the Project.

WHEREFORE, Plaintiffs pray for relief as hereinafter stated.

## PRAYER

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Enter a declaratory judgment that the Army Corps and National Park Service violated the federal Wild and Scenic Rivers Act;

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

2.      Enter a declaratory judgment that the Army Corps violated the National Environmental Policy Act;

3.      Vacate the Army Corps' approvals for the Project;

4.      Issue a peremptory writ of mandate commanding the Flood Board to vacate and set aside its certification of the SEIS/SEIR, its approval of the Project, and any and all approvals rendered pursuant to and/or in furtherance of all or any part of the Project;

5.      Preliminarily and permanently enjoin Defendants from engaging in any construction activity encompassed by the Project, including but not limited to any tree removal or trimming, unless and until Defendants comply with the requirements of the federal Wild and Scenic Rivers Act, the California Wild and Scenic Rivers Act, NEPA and CEQA;

6.      Award Plaintiffs the costs of this action, including their reasonable attorneys' fees; and,

7.      Grant other such relief as the Court deems just and proper.

                        Respectfully submitted,

Dated: August 21, 2025         SOLURI MESERVE, A LAW CORPORATION

By: _____

                            Patrick M. Soluri
                            Attorney for Plaintiffs and Petitioners
                            American River Trees and
                            Save the American River Association
                             510 8th Street
                             Sacramento, California 95814
                             Email: patrick@semlawyers.com
                             Telephone: (916) 455-7300

Dated: August 21, 2025         CENTER FOR BIOLOGICAL DIVERSITY

By: /s/ Justin Augustine (as authorized on 8/21/25)

                            Justin Augustine
                            Attorney for Plaintiff and Petitioner
                            Center for Biological Diversity
                             2100 Franklin Street, Suite 375
                             Oakland, California 94612
                             Email: jaugustine@biologicaldiversity.org
                             Telephone: (510) 844-7100

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1

**VERIFICATIONS**

2      I, Justin Augustine, am counsel of record for Petitioner and Plaintiff Center for Biological

3  Diversity. I sign for Center for Biological Diversity absent from the county of counsel and

4  because these matters are within my knowledge. I have read the foregoing Complaint and Petition

5  and know the contents thereof. The same is true of my own knowledge, except as to those matters

6  that are alleged on information and belief, and as to those matters, I believe them to be true.

7      I declare under penalty of perjury under the laws of the State of California that the

8  foregoing is true and correct.

9      Executed this 21st day of August 2025, in Sacramento, California.

10

11                                 */s/ Justin Augustine (as authorized on 8/21/25)*

12                                 Justin Augustine
                                   Attorney for Plaintiff and Petitioner

13                                 Center for Biological Diversity

14

15

16      I, Pete Spaulding, am a member of American River Trees. I have read the foregoing

17  Complaint and Petition and know the contents thereof. The same is true of my own knowledge,

18  except as to those matters that are alleged on information and belief, and as to those matters, I

19  believe them to be true.

20      I declare under penalty of perjury under the laws of the State of California that the

21  foregoing is true and correct.

22      Executed this 21st day of August 2025, in Sacramento, California.

23                                 */s/ Pete Spaulding (original signature retained*

24                                 *by attorney Patrick M. Soluri)*

                                   Pete Spaulding
25

26

27

28

39

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

1       I, Warren Truitt, am the President of Save the American River Association. I have read

2  the foregoing Complaint and Petition and know the contents thereof. The same is true of my own

3  knowledge, except as to those matters that are alleged on information and belief, and as to those

4  matters, I believe them to be true.

5       I declare under penalty of perjury under the laws of the State of California that the

6  foregoing is true and correct.

7       Executed this 21st day of August 2025, in Sacramento, California.

8                    */s/ Warren Truitt (original signature retained by*

9                    *attorney Patrick M. Soluri)*

10                   Warren Truitt

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief and Petition for Writ of Mandate

# **<u>EXHIBIT A</u>**



SOLURI
MESERVE
a law corporation

tel: 916.455.7300 · fax: 916.244.7300
510 8th Street · Sacramento, CA 95814

August 20, 2025

<u>SENT VIA EMAIL and U.S. MAIL</u>

Central Valley Flood Protection Board
Chris Leif, Executive Office
    Email: Questions@cvflood.ca.gov
Kanwarjit Dua, General Counsel
    Email: Jit.Dua@cvflood.ca.gov
3310 El Camino Avenue, Suite 170
Sacramento, California 95821

      **RE:**    **Notice of Commencement of Action against the**
                **Central Valley Flood Protection Board**

Dear Central Valley Flood Protection Board:

      Please take notice, under Public Resources Code section 21167.5, that American River Trees, Save the American River Association, and Center for Biological Diversity (collectively, "Petitioners") intend to file a petition for writ of mandate under the provisions of the California Environmental Quality Act (Cal. Pub. Resources Code, § 21000 et seq. ["CEQA"]), among other legal claims, against the Central Valley Flood Protection Board ("Flood Board"). Petitioners challenge the Flood Board's CEQA review and approvals regarding Contracts 3B and 4B of the American River Common Features Project ("Project").

      The lawsuit will be based on violations of CEQA and other federal and state environmental laws, as discussed more fully in the Projects' administrative and environmental review proceedings. The exact nature of the allegations and relief sought is described in the Petition and Complaint that Petitioners plan to file on or before August 21, 2025.

      Very truly yours,

      **SOLURI MESERVE**
      A Law Corporation

    By:
              Patrick M. Soluri

cc:    Josh Brown, Senior Environmental Scientist, Supervisor, Department of Water Resources
        josh.brown@water.ca.gov

Attachment: Proof of Service

Central Valley Flood Protection Board
August 20, 2025
Page 2 of 2

## **PROOF OF SERVICE**

I hereby declare that I am employed in the City of Sacramento, County of Sacramento, California. I am over the age of 18 years and not a party to the action. My business address is 510 8th Street, Sacramento, California 95814.

On August 20, 2025, I served the attached document:

### **NOTICE OF COMMENCEMENT OF ACTION AGAINST THE CENTRAL VALLEY FLOOD PROTECTION BOARD**

on the following parties or attorneys for parties, as shown below:

> Central Valley Flood Protection Board
> Chris Leif, Executive Office
>     Email: Questions@cvflood.ca.gov
> Kanwarjit Dua, General Counsel
>     Email: Jit.Dua@cvflood.ca.gov
> 3310 El Camino Avenue, Suite 170
> Sacramento, California 95821

Service was caused as follows:

✓ **BY FIRST-CLASS MAIL**: I am readily familiar with this business's practice for collecting and processing correspondence for mailing with the U.S. Postal Service. In the ordinary course of business, correspondence would be deposited with the U.S. Postal Service on the day on which it is collected. On the date written above, following ordinary business practices, I placed for collection and mailing at my place of business the attached document in a sealed envelope, with postage fully prepaid, addressed as shown above.

✓ **VIA ELECTRONIC MAIL**: I caused the document to be sent by electronic mail to the recipients at the e-mail addresses listed above. The document was served electronically from my place of business at 510 8th Street, Sacramento, California 95814 from my electronic service address at legal@semlawyers.com.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Sacramento, California on August 20, 2025.

_____
Mae Ryan Empleo