PATRICK M. SOLURI (State Bar No. 210036)
OSHA R. MESERVE (State Bar No. 204240)
SOLURI MESERVE, A LAW CORPORATION
510 8th Street, Sacramento, California 95814
Telephone: (916) 455-7300
Facsimile: (916) 244-7300
Emails: patrick@semlawyers.com;
osha@semlawyers.com

*Attorneys for Plaintiffs and Petitioners*
*American River Trees and Save the American River Association*

JUSTIN AUGUSTINE (State Bar No. 235561)
MEREDITH STEVENSON (State Bar No. 328712)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin Street, Suite 375, Oakland, California 94612
Telephone: (510) 844-7100
Facsimile: (510) 844-7150
Emails: jaugustine@biologicaldiversity.org;
mstevenson@biologicaldiversity.org

*Attorneys for Plaintiff and Petitioner*
*Center for Biological Diversity*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN RIVER TREES, SAVE THE AMERICAN RIVER ASSOCIATION, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs and Petitioners, <br><br> v. <br><br> CENTRAL VALLEY FLOOD PROTECTION BOARD, U.S. ARMY CORPS OF ENGINEERS, and U.S. NATIONAL PARK SERVICE, <br><br> Defendants and Respondents. | No. 2:25-cv-02384-DC-CSK <br><br> **Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction** <br><br> Date:  November 7, 2025 <br> Time:  1:30 p.m. <br> Judge:  Honorable Dena M. Coggins <br> Courtroom:  10 <br><br> Action Filed:  August 21, 2025 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... 3

I.     INTRODUCTION ....................................................................................................... 6

II.    FACTUAL BACKGROUND ....................................................................................... 6

III.   ARGUMENT ............................................................................................................... 8

    A.   Plaintiffs are Likely to Succeed on the Merits or, Alternatively, Have Raised
       Serious Questions Going to the Merits of Their Claims........................................... 9

       1.   The Project Violates the Federal Wild and Scenic Rivers Act ................... 9

          a.   NPS's Determination that Contract 3B will not impact the River's
             "free-flowing" condition is arbitrary and capricious and not in
             accordance with WSRA's plain language..................................... 10

          b.   NPS's Determination that Contract 3B will not cause adverse
             effects to the River's recreational value runs contrary to the Record.
             .................................................................................................... 11

          c.   NPS's determination regarding direct and adverse impacts on
             anadromous fish runs contrary to the evidence............................ 14

       2.   The Project Violates the California Wild and Scenic Rivers Act ............. 16

       3.   The SEIS/SEIR Violates the National Environmental Policy Act ........... 17

       4.   The SEIS/SEIR Violates the California Environmental Quality Act ........ 20

          a.   The SEIS/SEIR Fails to Analyze a Reasonable Range of
             Alternatives .................................................................................. 20

             i.   The Draft SEIS/SEIR Failed to Analyze a Bioengineering
                Alternative ........................................................................ 21

             ii.   The Final SEIS/SEIR Does Not Cure the Draft SEIS/SEIR's
                Omission........................................................................... 22

          b.   The SEIS/SEIS Fails as an Informational Document Regarding the
             Project's Impacts on Heritage Trees............................................. 24

             i.   The Draft SEIS/SEIR Omits Necessary Information Related
                to Removal of Heritage Trees........................................... 24

             ii.   The Final SEIS/SEIR Fails to Cure the Draft SEIS/SEIR's
                Omission of Essential Information ................................... 25

             iii.   The SEIS/SEIR's Failure to Address Heritage Trees Taints
                its Findings Regarding Long-Term Impacts..................... 27

    B.   Injunctive Relief Is Needed to Prevent Imminent Irreparable Harm.................... 28

    C.   The Balance of Equities Support an Injunction .................................................... 29

    D.   The Requested Preliminary Injunction is in the Public Interest............................ 30

    E.   The Court Should Impose No Bond or Nominal Bond ......................................... 30

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary
Injunction

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ...........................................................28, 29, 30

*Amoco Production Co. v. Village of Gambell*
    480 U.S. 531 (1987) ........................................................................... 29, 30

*Banning Ranch Conservancy v. City of Newport Beach*
    2 Cal.5th 918 (2017) ................................................................................. 26

*Berkeley Keep Jets Over the Bay Committee v. Board of Port Commissioners*
    91 Cal.App.4th 1344 (2001) ...................................................................... 27

*California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*
    766 F.2d 1319 (9th Cir. 1985) ................................................................... 30

*California Oak Foundation v. City of Santa Clarita*
    133 Cal.App.4th 1219 (2005) ..................................................................... 22

*California v. Block*
    690 F.2d 753 (9th Cir. 1982) ..................................................................... 17

*Center for Biological Diversity v. Delgado*
    No. C 01-4835 PJH, 2003 U.S. Dist. LEXIS 21885 (N.D. Cal. June 19, 2003) .............. 11

*Center for Biological Diversity v. U.S. BLM*
    141 F.4th 976 (9th Cir. 2025) ............................................................... 17, 19

*City of San Diego v. Board of Trustees of California State University*
    61 Cal.4th 945, 957 (2015) ....................................................................... 24

*Communities for a Better Environment v. South Coast Air Quality Management District*
    48 Cal.4th 310 (2010).............................................................................. 24

*EDF, Inc. v. EBMUD*
    1990 Cal. Super. LEXIS 7 (1990) ........................................................... 7, 11

*Encino Motorcars, LLC v. Navarro*
    579 U.S. 211 (2016)................................................................................. 19

*Environmental Protection Information Center v. Carlson*
    968 F.3d 985 (9th Cir. 2020) ..................................................................... 29

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*
    98 F.4th 1180 (9th Cir. 2024) ...................................................................... 8

*Friends of the Earth v. Brinegar*
    518 F.2d 322 (9th Cir. 1975) ..................................................................... 30

*Friends of Yosemite Valley v. Norton*
    348 F.3d 789 (9th Cir. 2003) ....................................................................... 9

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction

*Johnson v. Couturier*
    572 F.3d 1067 (9th Cir. 2009) ................................................................. 30

*Khan v. Los Angeles City Employees' Retirement System*
    187 Cal.App.4th 98 (2010) ......................................................................... 9

*Laurel Heights Improvement Association v. Regents of University of California*
    47 Cal.3d 376 (1988) ................................................................................ 26

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*
    752 F.3d 755 (9th Cir. 2014) ................................................................... 28

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Insurance Co.*
    463 U.S. 29 (1983) ......................................................................... 9, 14, 15

*Nelson v. County of Kern*
    190 Cal.App.4th 252 (2010) ..................................................................... 24

*Oregon Natural Desert Association v. Singleton*
    47 F.Supp.2d 1182 (D. Or. 1998) ............................................................. 11

*Preservation Action Council v. City of San Jose*
    141 Cal.App.4th 1336 (2006) ................................................................... 20

*Rotkiske v. Klemm*
    589 U.S. 8 (2019) ..................................................................................... 13

*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus*
    27 Cal.App.4th 713 (1994) ....................................................................... 25

*Seven County Infrastructure Coalition v. Eagle County*
    145 S. Ct. 1497 (2025) ............................................................................. 18

*Sierra Club N. Star Chapter v. Pena*
    1 F.Supp.2d 971 (D. Minn. 1998) ............................................................ 16

*Sierra Club v. County of Fresno*
    6 Cal.5th 502 (2018) ..................................................................... 9, 24, 26, 27, 28

*Sierra Club v. Tahoe Regional Planning Agency*
    916 F.Supp.2d 1098 (E.D.Cal. 2013) ....................................................... 24

*Tennessee Valley Authority v. Hill*
    437 U.S. 153 (1978) ................................................................................. 14

*Watsonville Pilots Association v City of Watsonville*
    183 Cal.App.4th 1059 (2010) ............................................................. 20, 22

*Wilderness Watch v. U.S. Forest Service*
    143 F.Supp.2d 1186 (D. Mont. 2000) ...................................................... 12

*Winter v. Natural Resources Defense Council*
    555 U.S. 7 (2008) ................................................................................. 8, 29

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction

**FEDERAL STATUTES**

5 U.S.C. § 706(2) ................................................................................................ 8

16 U.S.C. § 1271 ................................................................................................. 9

16 U.S.C. § 1274 ............................................................................................... 10

16 U.S.C. § 1278(a) ............................................................................... 10, 12, 13

16 U.S.C. § 1286(b) .................................................................................... 10, 11

42 U.S.C. § 4321 ............................................................................................... 30

42 U.S.C. § 4331 ............................................................................................... 17

42 U.S.C. § 4332 (C)(iii) .............................................................................. 17, 19

42 U.S.C. § 4332(2)(C) ..................................................................................... 17

**CALIFORNIA REGULATIONS**

Code of Regulations, title 14, § 15064 .............................................................. 25

Code of Regulations, title 14, § 15092 .............................................................. 20

Code of Regulations, title 14, § 15125 .............................................................. 25

Code of Regulations, title 14, § 15126.2 ........................................................... 25

Code of Regulations, title 14, § 15126.6 .............................................. 9, 20, 22

Code of Regulations, title 14, § 15360 .............................................................. 24

**CALIFORNIA STATUTES**

Code of Civil Procedure, § 1085 ......................................................................... 9

Public Resources Code, § 21002 ....................................................................... 20

Public Resources Code, § 21002.1 .................................................................... 20

Public Resources Code, § 21065 ....................................................................... 24

Public Resources Code, § 5093.50 et seq. ......................................................... 26

Public Resources Code, § 5093.50 ............................................................. 16, 30

Public Resources Code, § 5093.61 .................................................................... 16

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary
Injunction

# I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65(a), American River Trees, Save the American River Association and Center for Biological Diversity (collectively, "Plaintiffs") request a preliminary injunction to prevent irreparable harm from imminent vegetation clearing of scores of acres of high-quality riparian habitat, including removal of literally hundreds of large trees, many of which are heritage oaks,[1] located along the American River Parkway – which has been designated special-status under both the federal and state Wild and Scenic Rivers Acts.

Unless enjoined by this Court, defendants U.S. Army Corps of Engineers ("USACE") and Central Valley Flood Protection Board ("Flood Board") will commence vegetation clearing activities at an unspecified date in November 2025. The effect of this vegetation clearing is recognized by defendants in the environmental review documents as causing significant environmental impacts under both the National Environmental Policy Act ("NEPA") and the California Environmental Quality Act ("CEQA"), and will also destroy natural features of the Lower American River ("River") that led to its designation under both the federal Wild and Scenic Rivers Act ("WSRA") and the California Wild and Scenic Rivers Act ("CWSRA").

Plaintiffs therefore respectfully request a preliminary injunction from this Court in order to avoid irreparable harm to Plaintiffs and the environment, and also to preserve the status quo pending resolution of the merits of Plaintiffs' claims.

# II.    FACTUAL BACKGROUND

The project challenged in this action includes Contracts 3B and 4B[2] ("Project") of the American River Common Features 2016 Flood Risk Management Project ("ARCF"), which was approved at a programmatic level in 2016. The overall project addresses flood protection measures on the Sacramento River, Natomas East Main Drainage Canal, Arcade Creek, Magpie Creek, Sacramento Weir and Bypass, and Lower American River.

In December of 2023, the Project's draft of the supplemental/subsequent environmental

---

[1]    *See* Complaint (ECF No.1) at 19-20 (showing pictures of heritage oaks in the Contract 3B area that will be removed by the Project).

[2]    Implementation of Contract 4B is not imminent and this brief therefore addresses only Contract 3B.

analysis ("Draft SEIS/SEIR") was issued pursuant to NEPA and CEQA. Exh. 7.[3] For Contract 3B, the intent of the Draft SEIS/SEIR was to provide a project-level, site-specific analysis of 3B's impacts associated with constructing approximately 1.8 miles of erosion control measures on the north side of the River, and 1.5 miles on the south side of the River. Exh. 7 at 83-88. The erosion control measures include what are referred to in the Project as "launchable rock toe, launchable trench, bank protection, and tie backs." All of these measures include the removal of mature riparian forest to allow for the installation of rip-rap, i.e., large rocks. Exh. 9 at 90. Depending on the measure, the rip-rap is either left exposed, or buried in soil.

As approved, Contract 3B authorizes the removal of 675-715 of the area's trees, and Contract 3B further states that an additional "5 percent" of protected trees "might nevertheless require removal," which means an additional 79 trees could be removed. Exh. 9 at 270. Furthermore, over 1,100 trees are marked for trimming, meaning that while these trees will not be formally removed, they could still potentially be harmed or even killed, such as due to impacts to their roots. Exh. 19 at 52-70 (comment calculating tree-trimming effects).

Should Contract 3B proceed as planned, one of the most beautiful stretches of the River would imminently lose much of the mature riparian forest that lines the River's banks. This forest, which contains numerous large trees, many over one-hundred years old, is one of the core reasons the River is protected under both the federal and California Wild and Scenic Rivers Acts. "This vegetation, together with the river itself, are the most prominent features of the [Lower American River], and contribute greatly to the recreational experiences there." *EDF*, *Inc. v. EBMUD*, 1990 Cal. Super. LEXIS 7, *14-15 (January 2, 1990).

The Project's Final SEIS/SEIR was released in May 2025, which purported to respond to the hundreds of public comments that were received in response to the Draft SEIS/SEIR, including many sharp criticisms by federal, state and local agencies. Exh. 9.

On June 18, 2025, USACE issued its record of decision ("ROD") adopting the SEIS/SEIR pursuant to NEPA. Exh. 14. On July 18, 2025, the Flood Board certified the SEIS/SEIR pursuant

---

[3]     Exhibit references are to the exhibits attached to the concurrently-filed Declaration of Patrick M. Soluri in Support of Plaintiffs' Motion for Preliminary Injunction.

1  to CEQA and issued its notice of determination on July 22, 2025. Exh. 15. Plaintiffs timely

2  commenced this action on August 21, 2025. Beginning on September 5, 2025, Plaintiffs

3  attempted to confer with defendants regarding the proposed timeline for vegetation clearing and

4  to seek a stipulation ensuring that a noticed motion could be ruled upon by this Court prior to that

5  work. Although never disclosing a specific commencement date, federal defendants declined to

6  agree to stay vegetation clearing until this Court ruled on a notice motion. Plaintiffs' best

7  information is that such activity is scheduled for early November 2025. With the goal of seeking

8  to avoid the need for a temporary restraining order, Plaintiffs notified defendants that they would

9  file this Motion by October 3, 2025 for a hearing on November 7, 2025.

10                                    **III.    ARGUMENT**

11         This Court should issue a preliminary injunction to prohibit the clearing of mature riparian

12  forest until Plaintiffs' claims can be adjudicated. To obtain a preliminary injunction, Plaintiffs

13  must show: (1) a likelihood of success on the merits; (2) that they are likely to suffer irreparable

14  harm in the absence of injunctive relief; (3) that the balance of equities favors an injunction; and

15  (4) that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

16  Alternatively, Plaintiffs need only raise "serious questions going to the merits" so long as they

17  demonstrate that the balance of hardships tips sharply in their favor and satisfy other injunction

18  requirements. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190-91

19  (9th Cir. 2024). Here, Plaintiffs prevail under either standard.

20         When assessing the merits of Plaintiffs' federal claims (WSRA and NEPA), the

21  Administrative Procedure Act provides that the reviewing court "shall . . . hold unlawful and set

22  aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of

23  discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction,

24  authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Agency action is

25  "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to

26  consider, entirely failed to consider an important aspect of the problem, offered an explanation for

27  its decision that runs counter to the evidence before the agency, or is so implausible that it could

28  not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

8

1  *Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983).

2  Moreover, "the agency must examine the relevant data and articulate a . . . rational connection

3  between the facts found and the choice made." *Id.* While the reviewing court may not "substitute

4  its judgment for that of the agency," *id.*, the court likewise "may not rubber-stamp . . .

5  administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the

6  congressional policy underlying a statute[.]" *Friends of Yosemite Valley v. Norton*, 348 F.3d 789,

7  793 (9th Cir. 2003).

8       When assessing Plaintiffs' CEQA claims, "The foremost principle under CEQA is that the

9  Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible

10  protection to the environment within the reasonable scope of the statutory language.'" *Sierra*

11  *Club v. County of Fresno* (*Sierra Club*), 6 Cal.5th 502, 514 (2018) ("[W]hether a description of

12  an environmental impact is insufficient because it lacks analysis or omits the magnitude of the

13  impact is not a substantial evidence question"). Similarly, the nature and scope of the alternatives

14  to be studied are governed by the rule of reason. CEQA Guidelines, § 15126.6 (a).

15       Claims under the CWSRA are reviewed for whether the action is "arbitrary, capricious,

16  entirely lacking in evidentiary support, unlawful, or procedurally unfair." Cal. Code Civ. Proc., §

17  1085; *Khan v. Los Angeles City Employees' Retirement System*, 187 Cal.App.4th 98, 106 (2010).

18
19  **A.    Plaintiffs are Likely to Succeed on the Merits or, Alternatively, Have Raised Serious Questions Going to the Merits of Their Claims**

20       **1.    *The Project Violates the Federal Wild and Scenic Rivers Act***

21       Congress enacted the Wild and Scenic Rivers Act because "certain selected rivers of the

22  Nation [], with their immediate environments, possess outstandingly remarkable scenic,

23  recreational, geologic, fish and wildlife, historic, cultural, or other similar values," and therefore

24  "*shall be preserved in free-flowing condition*, and [] they and their immediate environments *shall*

25  *be protected* for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271

26  (emphasis added). To achieve the Act's purposes, section 7 of the Act mandates that "no

27  department or agency of the United States shall assist . . . in the construction of any water

28  resources project that would have a direct and adverse effect on the values for which such river

1  was established . . . ." 16 U.S.C. § 1278(a). Section 7 of WSRA requires the federal agency

2  seeking to assist with a water resources project to receive a "consistency determination" that

3  explains how the project at issue does or does not meet section 7's directive.[4]

4    Here, the River was designated under WSRA to protect its free-flowing condition, as well

5  as its outstandingly remarkable anadromous fish[5] and recreation values. The NPS' consistency

6  determination concludes that Contract 3B "will not directly and adversely affect the River's free-

7  flowing character, water quality, anadromous fishery, or recreational values," but in so doing,

8  NPS ignored WSRA's plain language, as well as overwhelming evidence of Contract 3B's

9  adverse effects. Exh. 17 at 3. Consequently, the consistency determination is arbitrary and

10  capricious and not in accordance with WSRA.

11      a. <u>NPS's Determination that Contract 3B will not impact the River's "free-
    flowing" condition is arbitrary and capricious and not in accordance with
12  WSRA's plain language.</u>

13    NPS's conclusion that placing miles of rip-rap within the River will not impact its free-

14  flowing condition contradicts the WSRA's plain language. The statute explicitly defines "free-

15  flowing" as "existing or flowing in natural condition *without* impoundment, diversion,

16  straightening, *rip-rapping*, or other modification of the waterway." 16 U.S.C. § 1286(b)

17  (emphasis added).[6] Adding extensive rip-rap to the River thus plainly violates this provision.

18    Even without this express statutory language, the record further explains how rip-rap will

19  impede the River's "free-flow." The National Marine Fisheries Service ("NMFS"), the federal

20  agency that oversees anadromous fish conservation, explains that "[r]iprapping alters the future

21  channel planform of the river at the rip-rapped site as well as downstream from the site." Exh. 18

22  at 69. This modification to the River's free-flow also "halts the meander migration and reworking

23  of floodplains." *Id.* at 68, 93. NPS itself admits that rip-rap will "modify the structure and

---

24  [4]  Here, the National Park Service, acting on behalf of the Secretary of the Interior, issued its
    "consistency determination" for Contract 3B on July 7, 2025. *See* Exh. 17.
25  [5] "Anadromous fish" refers to species, especially salmonids, that migrate from the ocean,
    up rivers like the American, to spawn.
26  [6]  If Congress sought to exempt the River from WSRA's rip-rap prohibition, it would have
    done so. Congress added an exception for the Skagit River, stating: "Riprapping related to natural
27  channels with natural rock along the shorelines of the Skagit segment to preserve and protect
    agricultural land shall not be considered inconsistent with the values for which such segment is
28  designated," 16 U.S.C. § 1274, language that nowhere appears for the River.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary
Injunction

1    stability of the River's levee-bounded banks." Exh. 17 at 3. Accordingly, the record and NPS's

2    own statements contradict NPS's conclusions, and so are arbitrary and capricious.

3         NPS argues that Contract 3B's blatant modifications to the River's free-flowing condition

4    are allowed because the River's existing levee system *already* modifies its free-flow. *Id*. For

5    example, NPS cites to an EIS from 1980 to suggest that because the levees existed when the

6    River was designated, that somehow authorizes the future use of massive amounts of rip-rap. *Id*.

7    But this assertion misses a key aspect of WSRA designation and protection—the Act carefully

8    explains that while past modifications to a River's free-flowing condition do not prevent its

9    *designation* under the Act, the statute "shall not be construed to authorize, intend, or encourage

10   *future* construction of such structures" following designation. 16 U.S.C. § 1286(b). In short, NPS

11   cannot rely on the existence of a leveed system prior to designation as a basis to authorize post-

12   designation rip-rap, as NPS did here. *See also Ctr. for Biological Diversity v. Delgado*, No. C 01-

13   4835 PJH, 2003 U.S. Dist. LEXIS 21885, *41-43 (N.D. Cal. June 19, 2003) ("[O]nce a river is

14   designated no further modifications should be constructed."); *Or. Nat. Desert Association v.

15   Singleton*, 47 F.Supp.2d 1182, 1192 (D. Or. 1998) ("[T]o the extent that the 1979 [Environmental

16   Statement] appears to assume that grazing will continue, that assumption is overridden by the

17   explicit 'protect and enhance' language of the WSRA.").

18        Consequently, because Contract 3B's purpose is to introduce large amounts of rip-rap into

19   the River, NPS's conclusion that Contract 3B will not adversely affect the River's free-flowing

20   condition is arbitrary and capricious and contrary to WSRA's plain language.

21                    b.    NPS's Determination that Contract 3B will not cause adverse effects to the
22                          River's recreational value runs contrary to the Record.

23        The River's "riparian vegetation, . . . together with the river itself, are the most prominent

24   features of the Parkway, and contribute greatly to the recreational experiences there." *EDF, Inc.*,

25   1990 Cal. Super. LEXIS at *14-15. In other words, the recreational value of the 3B area cannot

26   exist without the mature riparian forest—for example, the public enjoys the 3B area because of

27   the shade, aesthetics, and wildlife habitat that the forest provides, especially its large trees and

28   heritage oaks and the canopy cover they provide.

To install the rip-rap to construct Contract 3B's erosion control measures, however, mature riparian forest will first be cut down, thereby precluding the ability of the 3B area to continue to provide the high-quality recreational experience for which it was designated under WSRA. Indeed, not only will the forest's recreational value cease to exist in the short-term, it will not return for *decades to centuries*—the current forest includes many large trees over 100 years old, and it will therefore take over a century to replace them, if they are replaced at all. Exh. 13 at 18. Furthermore, some of the adverse effects are forever—for example, as the USACE acknowledges, Contract 3B will permanently scar the "large and popular informal river access area near the most upstream portion of the American River Erosion Contract 3B area (extending eastward from Larchmont Park) where the project will substantially change the character at the shoreline compared to existing conditions." Exh. 10 at 38. These outcomes are exactly what WSRA guards against: direct, adverse impacts to the River's recreational values. 16 U.S.C. § 1278(a); *see also Wilderness Watch v. U.S. Forest Serv.*, 143 F.Supp.2d 1186, 1206 (D. Mont. 2000) ("[P]ermeating the provisions of the WSRA is an emphasis on protection, which the court must give a broad rather than a narrow perspective.").

NPS appears to admit 3B's long-term adverse effects, noting that "trees and associated aesthetic quality" will only "*begin* to be established and have aesthetic value in eight to ten years,"[7] and that "full maturity will take longer." Exh. 17 at 5. And the USACE admits that 3B will have "short-term significant unavoidable impacts related to recreational resources," Exh. 9 at 200. The record further establishes that not only will 3B eliminate trails, beaches and swimming areas, Exh. 10 at 36 to 39, it will remove hundreds of trees that currently allow for wildlife observation and shade (as well as aesthetics) to enjoy activities such as swimming, fishing, hiking, running, walking, and biking. Indeed, the USACE admits to "substantial degradation of

---

[7]    NPS fails to acknowledge what will exist "in eight to ten years." Appendix I explains that "native trees, shrubs, grasses and forbs will be planted or seeded[,] [and] [e]ight to ten years after planting, vegetation is expected to be sufficiently developed *to obscure most of the underlying ground surface*." Exh. 10 at 99 (emphasis added). Visually obscuring the underlying ground surface is fundamentally different than reestablishing a mature forest. Again, many of the trees to be removed, especially heritage oaks, are large and old, some over a hundred years old—it therefore takes over a hundred years to restore the value of that tree, such as with respect to the shade it provides, and the wildlife habitat it provides.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction

1    the existing visual character or quality of public views of the site," Exh. 9 at 32, and "substantial

2    adverse effect[s] on . . . riparian habitat," Exh. 9 at 43, both of which result in adverse effects to

3    recreation because it is the views and riparian habitat that allow for meaningful recreation.

4        Yet, despite these admissions and the numerous short-term and long-term adverse effects

5    to the area's recreational values, NPS concluded that "there will not be direct and adverse effects

6    on the recreation value with the inclusion of the avoidance and reduction measures found in the

7    Conditions." Exh. 17 at 4. These Conditions, however, do nothing to avoid or eliminate Contract

8    3B's adverse effects. The only Condition that purports to eliminate adverse effects provides:

9    "Restore riparian areas to pre-disturbance conditions immediately after construction activities are

10   completed." Exh. 17 at 8. But that is obviously impossible—once cut down, a mature riparian

11   forest cannot be immediately restored, and thus this Condition is an empty gesture.

12       Furthermore, NPS's own Reference Manual-46 discusses implementation of section 7 of

13   the Act, and states that "direct and adverse effects on [Wild and Scenic River] values *must be*

14   *avoided or eliminated*." Exh. 22 at 88 (emphasis added). It further explains that "[m]itigation is

15   not an option." *Id.* at 188. Yet here, large stretches of mature riparian forest will cease to exist and

16   NPS offers no conditions that would avoid or eliminate that outcome. Even the Conditions that

17   seek to address Contract 3B's short-term impacts are largely meaningless, such as "[m]inimize

18   impacts to recreational access during construction." Exh. 17 at 2. The fact of the matter is that,

19   during construction, the 3B area will be closed to the public (such as for safety reasons), and this

20   lack of access is itself an adverse effect that should have been avoided, yet was not. At bottom,

21   NPS's Conditions do nothing to meaningfully avoid the short and long-term adverse effects to

22   recreation resulting from loss of mature riparian forest.

23       In sum, WSRA flatly prohibits "direct and adverse effect on" the River's recreational

24   values. 16 U.S.C. § 1278(a). "It is a fundamental principle of statutory interpretation" that "absent

25   provision[s] cannot be supplied by the courts." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (citation

26   omitted). Here, WSRA contains no provisions before "direct and adverse effect"—the statute thus

27   expressly prohibits *any* "direct and adverse effect" on a River's values, 16 U.S.C. § 1278(a),

28   whether short-term or long-term. "Congress has spoken in the plainest of words, making it

13

1    abundantly clear that the balance has been struck in favor of" protecting designated rivers like the

2    River from projects that will cause adverse effects to the river's values. *Tenn. Valley Auth. v. Hill*,

3    437 U.S. 153, 194 (1978). Consequently, because NPS has ignored "important aspect[s] of the

4    problem," *State Farm*, 463 U.S. at 43, as well as the plain language of WSRA, NPS's conclusion

5    that Contract 3B will not adversely affect the River's recreational value is arbitrary and capricious

6    and not in accordance with WSRA.

7           c.    NPS's determination regarding direct and adverse impacts on anadromous
                  fish runs contrary to the evidence.
8

9           NPS's determination that Contract 3B will not adversely affect the River's outstandingly

10   remarkable anadromous fish values is arbitrary and capricious because it runs counter to the

11   evidence. The Project's removal of mature riparian forest will eliminate canopy cover and

12   increase water temperatures, Exh. 18 at 91; hardened bank treatments will remove juvenile

13   salmonid rearing and migratory habitat; and rip-rap will reduce habitat complexity, diversity, and

14   connectivity. *Id.* at 55. NPS itself even acknowledges that the Project's extensive rip-rap "will

15   result in effects to fisheries, particularly juvenile salmonid rearing and migratory habitat due to

16   hardened bank treatments." Exh. 17 at 4. NPS dismissed these concerns in its determination, but

17   without explaining how the adverse effects will be avoided or eliminated.

18          First, NPS overlooks the permanent nature of rip-rap placement and associated habitat

19   loss. NMFS explains that "[w]ithin the lower American River, approximately 28 acres will have

20   permanent [salmonid] habitat degradation due to rock placement." Exh. 18 at 90. This is because

21   rip-rapping "decreases near-shore roughness, which causes stream velocities to increase more

22   rapidly with increasing discharge, further eliminating critical refugia areas for fish and other

23   aquatic organisms during high flows." *Id.* at 69. This, in turn, results in "permanent degradation"

24   of salmonid and green sturgeon critical habitat, reducing the species' growth, fitness, and

25   survival. *Id.* at 96. NMFS expects "[p]ermanent habitat loss" to occur at sites where rock replaces

26   existing riparian habitat and where rock is replacing or being added onto existing levee banks. *Id.*

27   at 92. In particular, riparian habitat loss will harm rearing juvenile spring-run Chinook salmon,

28

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary
Injunction

1    winter-run Chinook salmon, steelhead, and adult and juvenile green sturgeon due to displacement,

2    increased predation, and loss of food. *Id*. at 106.

3        Second, NPS reasons that loss of mature riparian forest, and thus decreased canopy cover

4    and increased water temperatures, will only result in short-term impacts. But as discussed *supra*,

5    WSRA prohibits both short and long-term adverse effects, and here, decades of lost and reduced

6    shade will directly impact fish, as increased water temperatures "will affect migrating and rearing

7    fish through loss of food input, cover, and cooling from shade." Exh. 18 at 91. NMFS expects

8    that, over time, increased water temperatures will "result in reduced feeding/growth, increased

9    predation, and reduced survival," *id*, adversely affecting the River's fishery value.

10        NPS also relies on mitigation measures found in NMFS's Biological Opinion. Exh. 17 at

11    4. This is unlawful for at least two reasons. First, NPS's own guidance document regarding

12    section 7 WSRA compliance explains that "[m]itigation is not an option." Exh. 22 at App. 188.

13    Second, NPS's approach ignores an "important aspect of the problem," namely, the loss of habitat

14    in the 3B area and its impact on habitat connectivity in the River. *State Farm*, 463 U.S. at 43.

15        Finally, NPS appears to take the position that compliance with the Endangered Species

16    Act equates with WSRA compliance. But these two statutes serve different purposes. Section 7 of

17    the ESA requires NMFS to find that a project "is not likely to jeopardize the continued existence"

18    of the ESA-listed anadromous fish (*see* Exh. 18 at 38), while section 7 of the WSRA requires

19    NPS to find that a project will not cause "direct and adverse effects" to the anadromous fish that

20    live *in* the designated River. In other words, the ESA is species-specific, seeking to protect the

21    overall species from extinction, while WSRA is location-specific, seeking to protect the

22    anadromous fish that live in a particular area—the designated WSRA. Thus, a project can

23    simultaneously *not* jeopardize a species' existence (per the ESA) while causing adverse effects to

24    the species (per WSRA). And that is exactly the situation here—while NMFS has determined that

25    Contract 3B will not jeopardize the existence of anadromous fish, NMFS's findings nonetheless

26    demonstrate that there will be direct and adverse effects to the anadromous fish of the River in

27    violation of WSRA. Consequently, NPS cannot rely on NMFS's conclusion as to ESA

28    compliance to demonstrate WSRA compliance.

1    Where, as here, there will be adverse effects to the values that led to the River's

2  designation, and those impacts have not been avoided or eliminated, the agency cannot lawfully

3  authorize those impacts. *See, e.g.*, *Sierra Club N. Star Chptr. v. Pena*, 1 F.Supp.2d 971, 983 (D.

4  Minn. 1998) (finding NPS's determination that the project would have an adverse effect on the

5  recreational value of the river "a rational one" due to "the negative impact on recreationists'

6  enjoyment of the natural and historic scene, [and the] noise intrusions and multiple instream

7  obstructions that would further degrade the recreational experience"). Consequently, NPS's

8  conclusion that Contract 3B "will not directly and adversely affect the River's free-flowing

9  character, water quality, anadromous fishery, or recreational values" is arbitrary, capricious, and

10  not in accordance with law. Exh. 17 at 3.

11        **2.**    ***The Project Violates the California Wild and Scenic Rivers Act***

12    The California Wild and Scenic Rivers Act ("CWSRA") declares that "certain rivers

13  which possess extraordinary scenic, recreational, fishery, or wildlife values shall be preserved in

14  their free-flowing state." Cal. Pub. Resources Code, § 5093.50. The CWSRA mandates that "[a]ll

15  departments and agencies of the state shall exercise their powers . . . in a manner that protects the

16  free-flowing state of each component of the system and the extraordinary values for which each

17  component was included in the system." Cal. Pub. Resources Code, § 5093.61.

18    Here, as discussed above, the modification of miles of River shoreline with rip-rap, and

19  consequent loss of mature riparian forest, substantially harms the River's extraordinary values,

20  and thus also violates CWSRA's mandate that those values be protected. The Project will

21  eliminate numerous trees, and the canopy cover and shade they provide, will harm or eliminate

22  beaches, swimming areas, and trails, and will damage wildlife habitat and thus the ability of

23  visitors to enjoy the area's wildlife and mature forest aesthetics. This harm to the River's

24  extraordinary values is substantial and will occur in a popular, heavily recreated area.

25    The Flood Board is in violation of its mandatory duty to comply with CWSRA because, in

26  approving Contract 3B, the Board has exercised its powers in a manner that damages, rather than

27  protects, the River's free-flowing state and extraordinary values. Cal. Pub. Resources Code, §

28  5093.61. As explained almost 50 years ago in a 1977 California Attorney General Opinion: "Any

16

construction or project activity which alters natural state or character of protected river stretch

would constitute adverse effect with certain exceptions applying to Eel River and its tributaries."

60 Ops.Cal.Atty.Gen. 4, 4. That is exactly the situation here—Contract 3B will unequivocally

alter the mature riparian forest and so the Flood Board is in violation of the Act. *See id*. at 8

("Reading all of the foregoing sections together we believe that they evince a clear legislative

intent to prohibit a project which would cause an adverse effect upon the free-flowing or natural

characteristics of a designated stream-reach within the system."); *Id*. at 9 ("[S]ection 5093.61

makes it mandatory for agencies of the state and all local governmental agencies to exercise their

powers in a manner consistent with the purposes of the act.").

**3.      *The SEIS/SEIR Violates the National Environmental Policy Act***

NEPA requires the Federal government to use all practicable means to improve and

coordinate federal activities to create and maintain conditions in which people and nature can

exist in "productive harmony." 42 U.S.C. § 4331. Among other things, NEPA requires all

agencies of the federal government to prepare an EIS that discusses the environmental effects of,

and a "range of alternatives to," all "major Federal actions significantly affecting the quality of

the human environment." 42 U.S.C. § 4332(2)(C). Federal courts have consistently emphasized

that an agency's duty to rigorously evaluate alternatives lies at the heart of NEPA's procedural

requirements. *See, e.g., California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) ("[T]he touchstone

for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed

decision-making and informed public participation.").

The USACE failed to comply with NEPA in approving the Project without adequate

consideration of alternatives. This assessment, "the heart of the [EIS]," *Ctr. for Biological

Diversity v. U.S. BLM*, 141 F.4th 976, 990 (9th Cir. 2025), requires agencies to consider "a

reasonable range of alternatives . . . that are technically and economically feasible, and meet the

purpose and need of the proposal." 42 U.S.C. § 4332 (C)(iii). Here, the USACE's assessment of

only the "no-project" alternative and preferred alternative for Contract 3B not only lacks any

"range" at all, this approach inexplicably reversed course on the Corps' prior commitment to

consider bioengineering as a feasible alternative. Exh. 9 at 73-74. As a result, the Corps'

17

1    alternatives analysis is arbitrary and capricious in violation of the APA. *See Seven County*

2    *Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025) (finding that "arbitrary-and-

3    capricious" review, focusing on whether an agency decision was "reasonable and reasonably

4    explained" remains the governing standard).

5          As a threshold matter, the USACE's rejection of a bioengineering alternative represents a

6    dramatic reversal from its prior stance. In 2016, the USACE's EIS for the ARCF General

7    Reevaluation Report (GRR) assured that "bioengineering measures," such as using vegetation to

8    control erosion and to stabilize banks, "*will be* analyzed" as part of future site-specific analysis

9    for Contract 3B. Exh. 5 at 53. In its 2015 GRR, the USACE similarly assured that, to address

10    erosion, "[a]nother [alternative] measure being considered is bioengineering, which uses plant

11    material along with rock to stabilize the eroded slope and prevent further loss of material." Exh. 2

12    at 151. The USACE further found that bioengineering would meet the project's objectives to

13    "reduce the risk of flooding" and "reduce risk to critical infrastructure," the same objectives it

14    found the proposed project would meet. Exh. 2 at 126. The USACE included bioengineering in its

15    2016 "array of alternatives," in low velocity reaches, Exh. 2 at 154-151, and stated that

16    bioengineering was among "the alternative measures carried forward into the design development

17    phase following authorization of the ARCF16 Project in 2016." Exh. 10 at 316.

18          This consideration was for good reason: not only would bioengineering meet the project

19    purpose to reduce the chance of flooding, it would also reduce the need for tree removal and

20    "integrate the recovery and restoration of key physical processes, self-sustaining ecological

21    functions, native habitats, and species." Exh. 9 at 55. For example, NPS's "best management

22    practices" explain that "utiliz[ing] bioengineering techniques" for flood control would "avoid and

23    reduce effects on free-flow and anadromous fish and maximize habitat value." Exh. 17 at 10.

24    NPS's WSRA Consistency Determination similarly recommends "incorporat[ing] bioengineering

25    techniques" to avoid impacts on the River's free flow and anadromous fish and recreation values.

26    Exh. 17 at 2.

27          Nevertheless, the Corps did not even *mention* bioengineering as an alternative in its

28    SEIS/SEIR, contradicting its earlier representations. This fails under the "rule of reason"

1   standard: When an agency changes course, it must provide a "reasoned analysis" for that

2   decision. *Ctr. for Biological Diversity*, 141 F.4th at 999. For example, just months ago, the Ninth

3   Circuit struck down an agency's selection of a preferred alternative that did not meet a certain

4   development standard because the agency had previously declined to advance less impactful

5   alternatives simply because they did not meet that same development standard. *Id.* at 994.

6   Because the agency failed to acknowledge its previous position and provide a "reasoned

7   explanation" as to why it departed from the development standard in its preferred alternative, the

8   court found its approval was arbitrary and capricious in violation of the APA. *Id.* Similarly here,

9   the Corps did not even acknowledge its previous position, let alone adequately explain why it

10  changed course. *See Encino Motorcars*, *LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[T]he

11  agency must at least 'display awareness that it is changing position' and 'show that there are good

12  reasons for the new policy.'").

13          And, to be sure, the record supports bioengineering's "feasibility." 42 U.S.C. § 4332

14  (C)(iii). For example, the GRR's Erosion Protection Report provides that permissible riverbank

15  flow velocities for bioengineered banks range from 3-10 feet per second (fps) (12 fps when

16  plantings are mature). Exh. 3 at 52-53. In the 3B area, flow velocities are below 8 fps for most

17  segments. And the Report predicted that flow velocities at 160,000 cfs on the riverbank within

18  most project segments will range from 0-2 fps at the top of the bank to 6-7 fps at the bottom or

19  toe of the bank. Exh. 3 at 52. Thus, within 3B's boundaries, bioengineering alternatives are

20  feasible in light of the 3B area's low velocities.

21          Further, other agencies' support for a bioengineering alternative for this project indicates

22  its feasibility. In 2021, and again in 2025, NMFS asked that the Project "[u]tilize bio-technical

23  techniques that integrate riparian restoration for riverbank stabilization instead of conventional

24  rip-rap in the American River." Exh. 18 at 71. And in 2022, EPA "recommend[ed] that the Corps

25  explore and objectively consider a full range of alternatives and evaluate in detail all reasonable

26  alternatives that fulfill the project's purpose and need [including] present[ing] . . . bio-technical

27  techniques that integrate riparian restoration for riverbank stabilization [in order to] provide a

28  clear basis for choice among options by decision-makers." Exh. 8 at 48.

1    In sum, APA review requires more, and the Corps' selection of its alternative was

2    arbitrary and capricious. As such, Plaintiffs have established a likelihood to prevail or, at

3    minimum, have raised serious questions regarding their NEPA claim.

4        **4.    *The SEIS/SEIR Violates the California Environmental Quality Act***

5            a.    The SEIS/SEIR Fails to Analyze a Reasonable Range of Alternatives

6    CEQA requires that agencies adopt alternatives if they substantially reduce a proposed

7    project's significant environmental effects. The EIR is intended to assist in this process. § 21002,

8    italics added; *see* § 21002.1, subd. (a). First, potentially feasible alternatives are set forth in the

9    draft EIR. CEQA Guidelines, § 15126.6. Later, upon project approval, it cannot do so if a feasible

10   alternative would substantially reduce the project's significant effects. CEQA Guidelines, §

11   15092 (b)(2)(A).

12   Alternatives warrant study in a draft EIR if they can reduce impacts, can accomplish

13   "most" project objectives (CEQA Guidelines, § 15126.6 (a); *Preservation Action Council v. City*

14   *of San Jose*, 141 Cal.App.4th 1336, 1353 (2006)), and are "potentially feasible." CEQA

15   Guidelines, § 15126.6 (a), (c), (f); *Watsonville Pilots Association v City of Watsonville*, 183

16   Cal.App.4th 1059, 1087 (2010). Feasible alternatives are allowed to "impede to some degree the

17   attainment of the project objectives." CEQA Guidelines, § 15126.6 (b).

18   Here, the Project's objectives are to (i) reduce the chance of flooding and damages, once

19   flooding occurs, and improve public safety, preparedness, and emergency response; (ii) reduce

20   maintenance and repair requirements by modifying the flood management systems in ways that

21   are compatible with natural processes; (iii) integrate the recovery and restoration of key physical

22   processes, self-sustaining ecological functions, native habitats, and species; and (iv) implement

23   technically feasible and cost-effective solutions to maximize the flood risk reduction benefits

24   given the practical limitations of applicable funding sources. Exh. 9 at 55. As discussed below, a

25   potentially feasible option that achieves these objectives is bioengineering, a method of flood risk

26   reduction that makes use of existing natural vegetation or additional plantings, and can also

27   include the use of small rocks, such as cobble.

28

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary
Injunction

1

2

     i.  *The Draft SEIS/SEIR Failed to Analyze a Bioengineering*
        *Alternative*

3    There can be no dispute that the Corps considered bioengineering "potentially feasible."

4 The Corps itself stated in 2016 that bioengineering "*will be* analyzed" as part of future site-

5 specific analysis for Contract 3B. Exh. 5 at 53. Yet, the Corps entirely omitted this alternative

6 from the Draft SEIS/SEIR. In other words, the Corps rejected every potential bioengineering

7 solution that could be implemented, in every potential segment of 3B, without any analysis.

8    Moreover, as discussed above in the NEPA section, other federal agencies, such as NMFS

9 and EPA, urged the Corps to analyze a bioengineering alternative. In short, bioengineering is

10 what was promised by USACE, and asked for by other federal agencies, yet bioengineering was

11 not even mentioned in the Draft SEIS/SEIR at all as a project alternative.

12    During the public comment period, several agencies criticized the Draft SEIS/SEIR's

13 analysis of alternatives. The National Park Service commented that USACE should "seek ways to

14 reduce the removal of riparian vegetation and mature trees." Exh. 11 at 5. The Bureau of Land

15 Management commented that bioengineering and "nature-based solutions" were known to be

16 highly effective at reducing flood risk and were not adequately evaluated. Exh. 11 at 31. The

17 County of Sacramento discussed the need for less impactful alternatives due to the impact of tree

18 removal on recreation and aesthetics. Exh. 12 at 28. The Cordova Recreation and Park District

19 indicated that a recurring theme of public concern was the need for erosion control could be

20 achieved by less invasive measures. Exh. 12 at 14.

21    Many members of the public, including experts, submitted comments regarding the Draft

22 SEIS/SEIR's silence as to bioengineering. For example, commenters, relying on the Corps' own

23 documents regarding the relationship between river velocity and feasibility of bioengineering,

24 explained that bioengineering is feasible because the river velocities in the 3B area are low

25 enough to be compatible with bioengineering methods of flood control. Exh. 19 at 9 (permissible

26 water velocity compared to flood protection methods). Furthermore, the forest itself helps protect

27 against erosion—for example, studies of the catastrophic 1993 Missouri Flood found that where

28 riparian forest had been cleared or thinned, levees were 74-88% more likely to *fail*. Exh. 19 at 7.

1

2

      *ii.*      *The Final SEIS/SEIR Does Not Cure the Draft SEIS/SEIR's Omission*

3  Despite their earlier representations, and despite public comments, Defendants dismissed

4 bioengineering in the Final SEIS/SEIR. The Final SEIS/SEIR, however, commits legal error by

5 failing to analyze bioengineering, and fails to support its approach with substantial evidence.

6  The main body of the Final SEIS/SEIR follows the Draft SEIS/SEIR by ignoring the

7 bioengineering alternative, only discussing it in appendices. Exh. 10 at 29. This inadequate

8 disclosure alone violates CEQA. *Cal. Oak Foundation v. City of Santa Clarita*, 133 Cal.App.4th

9 1219, 1239 (2005) (information "buried" in an appendix is not good faith analysis).

10  Setting that aside, the Final SEIS/SEIR's justification for dismissing without analysis a

11 bioengineering alternative substantively violates CEQA. The Final SEIS/SIER marks the first

12 time that bioengineering was dismissed as infeasible. Exh. 10 at 29. The Final SEIS/SEIR first

13 argues that "use of bioengineering at the American River Erosion Contract 3B site will not reduce

14 ***all*** of the flood risks at that location." Exh. 10 at 29 (Emphasis added). Not only does this

15 contradict Defendants' earlier conclusions, the relevant project objective is to "reduce the chance

16 of flooding" – not "all of the flood risks."[8] Exh. 9 at 55 (Project objectives). Appendix I's

17 justification is based on transparent manipulation of the Project's objectives. And even if

18 bioengineering is somewhat less effective, alternatives may "impede to some degree the

19 attainment of the project objectives." CEQA Guidelines, § 15126.6 (b). Finally, this is just one of

20 four project objectives, and so bioengineering remains potentially feasible. *Watsonville Pilots*,

21 183 Cal.App.4th at 1087. The failure to substantiate bioengineering's dismissal is thus not lawful

22 in light of the fact that bioengineering would achieve <u>most</u> project objectives.

23  The record also fails to substantiate that bioengineering reduces flood risk less than other

24 alternatives. As explained above, the relevant flow velocities in the area are consistent with

25 bioengineering alternatives. This was confirmed by expert comments. Exh. 21 at 5. Further, the

26 newfound assertions of infeasibility set forth in the Final SEIS/SEIR's appendices have also been

27

28

---

[8]  In fact, it is nonsensical to apply a standard of reducing "all of the flood risks" at this location since the Project does not include raising the levees themselves.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction

refuted by expert comments. Exh. 21 at 5. For example, the appendices assert concerns "about longevity," such as with respect to potential fires "where vegetation was used as a method to minimize erosion," but offer no discussion as to why services could not be made readily available to put out fires. Exh. 10 at 29. The levee reaches in question occur in the urban boundaries of the City and County of Sacramento where fire response facilities are present and fire response times are low, thus reducing the risk of fire. The documents further argue infeasibility due to "Probable Failure Mode (PFM) 3, or failure of the levee foundation due to erosion at the riverbank or riverbank toe," but once again, no actual explanation is provided to demonstrate that bioengineering cannot address this concern. Exh. 10 at 30. This conclusion is also contradicted by both the protective effect of riparian forests and the compatibility of bioengineering with predicted water velocities for the 3B area. Exh. 19 at 7-9. Moreover, while Defendants dismiss bioengineering as relying solely on vegetation, in fact, bioengineering can also include the use of small rock such as cobble as an erosion resistant material to address both scour along the river bottom and erosion along the toe of the riverbank. See Exh. 2 at 122. (USACE noting that bioengineering "uses plant material along with rock to stabilize the eroded slope"). The vegetation portion of the alternative would then provide additional erosion resistance along the riverbank toe by growing roots between the cobbles and into the otherwise relatively erosive soil underneath. The amount of cobble and the sizing and gradation of the cobble can be adjusted as necessary to meet engineering needs. And likewise, the assertion that "using living plants below the permanently wetted surface of the river is not possible," Exh. 10 at 30, does not explain why bioengineering is infeasible or cannot be used at any 3B site—the riverbank toes in many locations are not below the permanently wetted surface and any locations that are below that level could have the primary erosion handled with properly graded cobble and limit the bioengineering vegetation to areas that are above the permanently wetted surface. Nor do the documents establish why "bioengineering solutions were only considered viable in areas where a wide natural bank exists on the river, but it could not be used on levee slopes." Exh. 21 at 1-2.

"[S]ignificant gaps" in an agency's assessment of an alternative's feasibility "render meaningful comparison between the proposed project and the reduced alternative impossible."

1    *Sierra Club v. Tahoe Reg'l Planning Agency*, 916 F.Supp.2d 1098, 1129 (E.D.Cal. 2013).

2    Accordingly, to reduce significant environmental effects, feasible solutions that use

3    bioengineering should have been studied in detail, Exh. 19 at 7, and the Corps' failure to include

4    a bioengineering alternative in the EIR shows that the EIR's range of alternatives was "manifestly

5    unreasonable" and "[did] not contribute to a reasonable range of alternatives" (*Fed'n of Hillside*

6    *and Canyon Ass'ns*, 83 Cal.App.4th at 1265), let alone contribute to "informed decision-making

7    and informed public participation." *Cal. Native Plant Soc'y*, 177 Cal.App.4th at 988.

8
                b.    <u>The SEIS/SEIS Fails as an Informational Document Regarding the</u>
9                    <u>Project's Impacts on Heritage Trees</u>

10         CEQA requires that an EIR evaluate, and that public agencies mitigate or avoid,

11   significant effects of projects in the "area which will be affected by a proposed project." *City of*

12   *San Diego v. Bd. of Trustees of Cal. State Univ.*, 61 Cal.4th 945, 957 (2015); CEQA Guidelines, §

13   15360. The project description is the activity the EIR must evaluate for environmental impact,

14   while the environmental setting (i.e., baseline) is the condition of the environment against which

15   the EIR will evaluate project changes for environmental harm. *Nelson v. County of Kern,* 190

16   Cal.App.4th 252, 271-272 (2010); § 21065 (project description); *Communities for a Better Env't*

17   *v. South Coast Air Quality Mgmt. Dist.*, 48 Cal.4th 310, 315 (2010) (baseline). Here, the

18   SEIS/SEIR violates CEQA by failing to provide the public with information necessary to evaluate

19   the Project's impacts from removal of heritage trees located within the American River Parkway.

20
                i.    *The Draft SEIS/SEIR Omits Necessary Information Related to*
21                   *Removal of Heritage Trees*

22         The Draft SEIS/SEIR fails to accurately describe the heritage oaks that are key physical

23   components of the environmental setting. Failure to provide essential information is reviewed de

24   novo. *Sierra Club*, 6 Cal.5th at 516. The Final SEIS/SEIR fails to cure this error.

25         The Draft SEIS/SEIR acknowledges the significant role played by heritage trees, as well

26   as the significant impacts associated with removing those heritage trees. Exh. 7 at 62. "[H]eritage

27   oaks . . . are considered an important part of the visual character of the area. If ***any of these trees***

28   ***have to be removed***, there would be a significant degradation of the visual character of the area."

1   Exh. 7 at 578. Further, the SEIR/SEIS recognizes that it is important to preserve heritage trees in

2   order to "preserve high quality riparian habitat." Exh. 9 at 116. Thus, the SEIS/SEIR

3   acknowledges that the removal of "any of these trees" would result in a significant impact under

4   CEQA. Exh. 7 at 578. Moreover, the Project's removal of heritage trees is relevant to

5   environmental impacts in resource areas including recreational effects Exh. 9 at 201,

6   aesthetics/visual resource effects Exh. 9 at 223-224, vegetation and wildlife effects Exh. 9 at 269,

7   special status species effects Exh. 9 at 288, and water quality Exh. 23 at 293 (shading effect on

8   water reduced which increases temperature).

9         Notwithstanding the acknowledged importance of preserving large, heritage trees, the

10   Draft SEIS/SEIR never discloses (i) the number or location of heritage trees under existing

11   conditions, (ii) what a heritage tree is, much less a standard upon which to determine whether the

12   loss of heritage trees would be considered a significant impact under CEQA, or (iii) the number

13   and location of heritage trees that would be removed by the Project. CEQA requires all of this

14   information. CEQA Guidelines, § 15125 (a), (c) (environmental setting), § 15064 (significance

15   standard), § 15126.2, subd. (a) (discussion of project impacts). An EIR's omission of any of these

16   informational requirements is unlawful; the failure to disclose all three deprives the public and

17   decision makers of key information on important effects. *San Joaquin Raptor/Wildlife Rescue*

18   *Center v. County of Stanislaus*, 27 Cal.App.4th 713, 722-730 (1994).

19         While the Draft SEIS/SEIR discloses that 675-715 trees are proposed for removal in the

20   3B area (Table 4.1-5, App. B), the Draft SEIS/SEIR provides <u>no disclosure</u> regarding (a) how

21   many of these hundreds of trees are heritage trees – for which "any" removal would constitute a

22   significant impact, or (b) the significance standard regarding loss of heritage trees, or (c) or the

23   number or location of heritage trees to be removed. The SEIR/SEIS's failure to document

24   baseline conditions, project impacts and a significance standard against which to measure project

25   impacts renders the SEIS/SEIR unlawful.

26              ii.      *The Final SEIS/SEIR Fails to Cure the Draft SEIS/SEIR's Omission*

27                    *of Essential Information*

28        Due to the volume of comments, the Final SEIS/SEIR addressed heritage tree loss in

1  Master Response 3-1 and MR 15-1, but these responses failed to cure the Draft SEIS/SEIR's

2  omission of essential information. Exh. 10 at 27, 174. The master responses repeat the

3  information deficits and legal errors of the draft SEIS/SEIR.

4  Master Response 3-1 explains, "In 2021, County Parks and NPS told the Project Partners

5  that the American River Erosion Contract 3B design at that time was too impactful to heritage

6  oaks and will likely be considered inconsistent with the National Wild and Scenic Rivers Act."

7  Exh. 10 at 27. The final SEIR/SEIR then states, "Since 2021, the Project Partners have been

8  optimizing and redefining the project based on the outcome of the design charrette and have

9  worked to minimize the project footprint and ***minimize tree removal*** as much as feasible." Exh.

10  10 at 27. This fails to satisfy CEQA's basic informational mandate to "include[] enough detail 'to

11  enable those who did not participate in its preparation to understand and to consider meaningfully

12  the issues raised by the proposed project.'" *Sierra Club*, 6 Cal.5th at 516, quoting *Laurel Heights*

13  *Improvement Ass'n v. Regents of Univ. of Cal.*, 47 Cal.3d 376, 405 (1988). "Minimize tree

14  removal as much as feasible" provides no objective information to the public about the actual

15  number of heritage trees that would be removed by the Project, much less the n, umber of

16  removed heritage trees that would not be considered "too impactful" under the Wild and Scenic

17  Rivers Act.[9] Cal. Pub. Resources Code, § 5093.50 et seq. Thus, Master Response 3-1 wholly fails

18  to inform the public regarding the number of heritage trees under baseline conditions or the

19  number of remaining heritage trees upon implementation of the Project.

20  Master Response 3-1 refers the public to Master Response 15-1, which purports to provide

21  quantified information regarding the Project's removal of heritage trees. Exh. 10 at 175-178.

22  Master Response 15-1, however, does not describe the existing number of heritage trees, the

23  quantity to be removed, or the significance of the loss. Exh. 10 at 175-178.

24  The SEIS/SEIR only identifies the number of trees that would be removed based upon

25  purely arbitrary size class categories, i.e. less than or equal to 10" dbh, less than or equal to 30"

26  dbh, and greater than 30" dbh. Exh. 10 at 176. No clarity regarding heritage status is provided;

---

[9]    CEQA's informational mandates require an EIR to discuss a project's compliance with other applicable environmental statutes. *Banning Ranch Conservancy v. City of Newport Beach*, 2 Cal.5th 918, 936 (2017).

neither the Draft or Final SEIS/SEIR even define a "heritage tree." The Sacramento County Tree Ordinance, which the SEIS/SIER purports to apply Exh. 7 at 50, defines a "heritage tree" as "a California oak tree growing on any land in Sacramento County, including privately owned land, with a trunk sixty inches or greater in girth measured four and one-half feet above the ground." Exh. 19 at 2, quoting Sacramento County Code, § 19.04.030, subd. (5). This corresponds to a diameter (dbh) of 19.1 inches. Thus, all that Master Response 15-1 tells the public is that the Project would remove some number less than 355 heritage trees for Contract 3B. Exh. 10 at 175. The Final SEIS/SEIR provides no information upon which to assess the severity of this significant impact. *Berkeley Keep Jets Over the Bay Comm. v. Bd. of Port Comm'rs.*, 91 Cal.App.4th 1344, 1371 (2001) (failure to explain an impact by designating it significant without analysis is insufficient); *Sierra Club,* 6 Cal.5th at 514.

> iii.    *The SEIS/SEIR's Failure to Address Heritage Trees Taints its Findings Regarding Long-Term Impacts*

The SEIS/SEIR fails as an informational document regarding the environmental setting and Project impacts related to removal of heritage trees. This error, in turn, taints the SEIS/SEIR's findings that various long-term Project impacts are less than significant.

The SEIS/SEIR distinguishes "short-term" impacts from "long-term" impacts and, for several resource areas, concludes that the Project's "short-term" impact is significant but the "long-term" impact is less than significant by claiming that replanted trees would reach "maturity" in eight to ten years. Exh. 9 at 202 (recreation), Exh. 9 at 226 (aesthetics and visual impacts; Exh. 23 at 293 (water quality), Exh. 9 at 270 (vegetation and wildlife). With respect to vegetation and wildlife, for example the SEIS/SEIR asserts, "Any trees planted onsite would take 8 to 10 years to mature to provide the same value as those removed." Exh. 9 at 271. Similarly, the water quality impacts are characterized as "Short Term Significant and Unavoidable, Long Term Less than Significant" because the trees would eventually shade the river. Exh. 23 at 293.

The SEIS/SEIR's conclusions that these long-term impacts are less than significant because maturity is achieved in "8 to 10" years lacks essential information because the number and definition of heritage trees removed is not defined. Because the SEIS/SEIR's analyses of

27

long-term impacts fails to account for the fact that some significant (although unspecified)

number of these removed trees are also heritage trees, the SEIR/SEIR does not accurately account

for the time required for regrowth. Exh. 9 at 271. The SEIS/SEIR does not demonstrate that

planted trees would reach heritage quality within eight to ten years. The SEIS/SEIR explains that

it uses eight years to distinguish short-term from long-term impacts because "this is the typical

timeframe required for habitat to reach a level of maturity and vigor *to be self-sustaining* in the

long-term." Exh. 10 at 184. "Self-sustaining" is unrelated to heritage quality. The SEIS/SEIR

itself explains that a valley oak tree will typically reach only 12 feet in height after eight years;

but height for a mature valley oak is 70 feet. Exh. 10 at 185. Eight years is inadequate to achieve

heritage quality. It will thus take longer than eight years for planted trees to "provide the same

value as those removed." Heritage trees take decades to centuries to mature. Exh. 13 at 18. This

error is an unlawful information gap regarding the full nature of the project's effects. *Sierra Club*,

6 Cal.5th at 519-522 (informational deficiency is legal error reviewed de novo).

**B.      Injunctive Relief Is Needed to Prevent Imminent Irreparable Harm**

Plaintiffs satisfy this requirement when a project will harm plaintiffs' members' ability to

"view, experience, and utilize the areas in their undisturbed state," and will "prevent [their] use

and enjoyment . . . of the forest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

(9th Cir. 2011). For the purposes of establishing irreparable harm, "undisturbed" refers to the

state of the forest before the challenged activities occur. *See id.* Here, irreversible harm to the

mature riparian forest, and to Plaintiffs and wildlife that use and enjoy it, is unequivocally likely

in the absence of an injunction. *See* concurrently-filed Declarations of William Avery, William

Brattain, Peter Spaulding, and Joshua Thomas in Support of Plaintiffs' Motion for Preliminary

Injunction. Once the trees and vegetation are cut and removed from the 3B area, that damage is

permanent and cannot be undone. *See League of Wilderness Defs./Blue Mts. Biodiversity Project

v. Connaughton*, 752 F.3d 755, 764-65 (9th Cir. 2014) ("The logging of mature trees, if indeed

incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the

paying of money damages can normally remedy such damage").

**C.    The Balance of Equities Support an Injunction**

A plaintiff seeking an injunction must show the "balance of equities" is in its favor. *Winter,* 555 U.S. at 20. This means that courts must consider the effect on each party of the granting or withholding of the requested relief and find this balance favors the plaintiff. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Here because the harm that Plaintiffs seek to avoid is loss of riparian vegetation and heritage oak trees that contribute substantially to the values of the Lower American River's designation as a Wild and Scenic River, and which the FEIS/FEIR concedes would constitute significant environmental impacts, the balance of equities favors plaintiffs and petitioners. The harm associated with loss of mature riparian forest and heritage oaks is acknowledged by the defendants and certain. Exh. 9 at 201 [recreation]; Exh. 9 at 223-224 [aesthetics and visual impacts]; Exh. 23 at 293 [water quality]; Exh. 9 at 269 [vegetation and wildlife].) Balanced against this certain, irreparable harm to Plaintiffs is USACE's anticipated argument that granting the requested injunction would increase the risk of flooding and property damage in the area due to erosion during the short time period (9-12 months) while this case can be heard in its merits. Expert comments establish that granting the requested injunction is unlikely to result in increased flooding impacts over the next 9-12 months. Declaration of Cheryl Bly-Chester in Support of Plaintiffs' Motion for Preliminary Injunction. In fact, the USACE's proposal to denude the levee benches of vegetation during the winter actually increases the risk of erosion. *Id.*

The real, certain, and irreparable harm to Plaintiffs and the environment resulting from destruction of riparian forests thus outweighs any speculative harm associated with short-term flood risk and temporary project delay associated with the time required to resolve the case on the merits. *Alliance,* 632 F.3d at 1135-1139; *see also Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) ("If irreparable environmental injury is sufficiently likely, as in this case, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *League of Wilderness Defs./Blue Mts. Biodiversity Project*, 752 F.3d at 765 ("We conclude that the balance of equities tips toward the LOWD plaintiffs, because the harms they face are permanent, while the intervenors face temporary delay.").

29

1    **D.    The Requested Preliminary Injunction is in the Public Interest**

2         A plaintiff seeking a preliminary injunction must show the injunction is in the public

3    interest. *Alliance*, 632 F.3d at 1131. A court may look to the statutory scheme for which a

4    violation is alleged in assessing harm to the public interest. *Amoco*, 480 U.S. at 542. Where, as

5    here, the alleged harm that would occur is the type intended to be prevented by an underlying

6    statutory scheme, the public interest test favors granting an injunction. *Id.* at 540. The statutory

7    policy of NEPA is in part to "prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

8    The policy of CEQA is to reduce environmental effects. Cal. Pub. Resources Code, § 21003.1,

9    subd. (a)(1). Finally, the federal and California Wild and Scenic Rivers Act establish policies of

10   protecting selected rivers "and their immediate environments" for the benefit and enjoyment of

11   present and future generations. 16 U.S.C. § 1271; Cal. Pub. Resources Code, § 5093.50. Issuance

12   of an injunction preserving heritage oaks and riparian forest is thus in the public interest. As noted

13   by the Ninth Circuit, "This court has also recognized the public interest in careful consideration

14   of environmental impacts before major federal projects go forward, and we have held that

15   suspending such projects until that consideration occurs comports with the public interest."

16   *Alliance*, 632 F.3d at 1138. Injunctive relief would serve the "well established public interest in

17   preserving nature and avoiding irreparable environmental injury." *Id.*

18   **E.    The Court Should Impose No Bond or Nominal Bond**

19        In issuing the requested injunctive relief, the Court should require no or only nominal

20   bond. See Fed. R. Civ. Proc. 65(c) (plaintiff must generally post a bond "in an amount that the

21   court considers proper"); *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("Rule 65(c)

22   invests the district court with discretion as to the amount of security required, if any." (citation

23   and internal quotation marks omitted). Where, as here, plaintiffs are nonprofit organizations

24   seeking to vindicate an established public interest in environmental protection, courts routinely

25   waive the bond requirement or impose a nominal bond. See *Cal. ex rel. Van De Kamp v. Tahoe*

26   *Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (no bond); *Friends of the Earth*

27   *v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) (reversing unreasonably high bond because it

28   served to thwart citizen actions). This Court should do likewise here.

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary
Injunction

1    Respectfully submitted,

2    Dated: October 3, 2025                SOLURI MESERVE, A LAW CORPORATION

3                                          By: _____

4                                               Patrick M. Soluri
                                                 Attorney for Plaintiffs and Petitioners
5                                                American River Trees and
                                                 Save the American River Association
6                                                    510 8th Street
7                                                    Sacramento, California 95814
                                                     Email: patrick@semlawyers.com
8                                                    Telephone: (916) 455-7300

9    Dated: October 3, 2025                CENTER FOR BIOLOGICAL DIVERSITY

10                                         By: _/s/ Justin Augustine (as authorized on 10/3/25)_

11                                              Justin Augustine
                                                Attorney for Plaintiff and Petitioner
12                                              Center for Biological Diversity
                                                    2100 Franklin Street, Suite 375
13                                                  Oakland, California 94612
14                                                  Email: jaugustine@biologicaldiversity.org
                                                    Telephone: (510) 844-7100

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction