1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    AMERICAN RIVER TREES, et al.,              No. 2:25-cv-02384-DC-CSK

12              Plaintiffs,

13        v.                                     ORDER GRANTING PLAINTIFFS' MOTION
                                                 FOR PRELIMINARY INJUNCTION
14    CENTRAL VALLEY PROTECTION
      BOARD,  et al.,                            (Doc. No. 19)
15
              Defendants.
16

17        This matter came before the court on November 7, 2025, for a hearing on Plaintiffs'

18    motion for preliminary injunction. (Doc. Nos. 19; 36.) Attorney Patrick Soluri appeared on behalf

19    of Plaintiff American River Trees and Plaintiff Save the American River Association, and

20    Attorneys Justin Augustine and Meredith Stevenson appeared on behalf of Plaintiff Center for

21    Biological Diversity. Attorneys Devon McCune and Daniel Luecke appeared on behalf of

22    Defendant U.S. Army Corps of Engineers ("USACE") and Defendant U.S. National Parks

23    Service ("NPS"). Attorneys Matthew Struhar and Isabella Panicucci appeared on behalf of

24    Defendant Central Valley Flood Protection Board ("Flood Board"). For the reasons explained

25    below, Plaintiffs' motion for preliminary injunction will be granted.

26                                      **BACKGROUND**

27        This action arises from the federal and California state government approval and

28    implementation of the American River Common Features 2016 Flood Risk Management Project

1    (the "Project"). (Doc. No. 19-1 at 6.) The Project is a flood risk management effort to "address[]

2    flood protection measures on the Sacramento River, Natomas East Main Drainage Canal, Arcade

3    Creek, Magpie Creek, Sacramento Weir and Bypass, and Lower American River." (Doc. No. 19-

4    1 at 6.) Plaintiffs in this action challenge the review and approval of Contracts 3B North and

5    South ("Contract 3B") and 4B[1] of the Project. (*Id.*) These Contracts will impact approximately

6    3.3 miles of mature riparian forest located on the American River Parkway, a greenbelt that

7    extends twenty-nine (29) miles from Folsom Dam in Folsom, California to the American River's

8    confluence with the Sacramento River in Sacramento, California. (Doc. No. 1 at ¶¶ 9–10.)

9    Contract 3B will primarily affect the banks of the Lower American River between Howe Avenue

10   and Harrington Way on the north side, and between Watt Avenue and the Mayhew Drain on the

11   south side, in Sacramento, California. (*Id.* at ¶ 10.) Contract 3B authorizes the removal of 675–

12   715 trees and the trimming of over 1,100 trees in the Contract area, to clear the area for the

13   installation of "riprap," an erosion protection measure that involves replacing natural vegetation

14   with boulder-sized rocks. (*Id.* at ¶¶ 10, 30, 34.)

15   **A.    Statutory Background**

16          Congress passed the National Environmental Procedure Act of 1969 ("NEPA") "to protect

17   the environment by requiring federal agencies [to] carefully weigh environmental considerations

18   and consider potential alternatives to the proposed action before the government launches any

19   major federal action." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011)

20   (citation omitted). To accomplish this purpose, "NEPA imposes procedural requirements

21   designed to force agencies to take a 'hard look' at environmental consequences." *Id.* (quoting

22   *Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d 1291, 1300 (9th Cir. 2003)). "When 'properly

23   applied, NEPA helps agencies to make better decisions and to ensure good project management.'"

24   *Cascadia Wildlands v. U. S. Bureau of Land Mgmt.*, 153 F.4th 869, 879 (9th Cir. 2025) (quoting

25   *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 177 (2025)). However,

26

27   [1] Plaintiffs' motion for preliminary injunction seeks to enjoin activity under Contract 3B only, as
     the implementation of Contract 4B is not imminent. (Doc. No. 19-1 at 6 n.1.)

28

1  NEPA is a purely procedural statute that does not impose any substantive environmental

2  obligations nor require that agencies reach a particular environmental outcome. *Cascadia*

3  *Wildlands*, 153 F.4th at 879–80 (citation omitted).

4         Among NEPA's procedural mandates is the requirement that prior to undertaking "major

5  Federal actions significantly affecting the quality of the human environment," federal agencies

6  must prepare an Environmental Impact Statement ("EIS"). *Barnes*, 655 F.3d at 1131 (quoting 42

7  U.S.C. § 4332(2)(C)). An EIS must include:

8             (i) reasonably foreseeable environmental effects of the proposed
   agency action;

9

10            (ii) any reasonably foreseeable adverse environmental effects which
   cannot be avoided should the proposal be implemented;

11            (iii) a reasonable range of alternatives to the proposed agency action,
   including an analysis of any negative environmental impacts of not

12 implementing the proposed agency action in the case of a no action
   alternative, that are technically and economically feasible, and meet

13 the purpose and need of the proposal;

14            (iv) the relationship between local short-term uses of man's
   environment and the maintenance and enhancement of long-term

15 productivity; and

16            (v) any irreversible and irretrievable commitments of Federal
   resources which would be involved in the proposed agency action

17 should it be implemented.

18 42 U.S.C. § 4332(C). "The alternatives analysis 'requires disclosure of environmental impacts of

19 the proposed action and its alternatives, including their direct, indirect, and cumulative effects.'"

20 *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir.

21 2025) (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022)). The

22 "touchstone" of the court's review of an EIS "is whether an EIS's selection and discussion of

23 alternatives fosters informed decision-making and informed public participation." *Ctr. for*

24 *Biological Diversity*, 141 F.4th at 993 (quoting *Audubon Soc'y of Portland*, 40 F.4th at 982)

25 (citation omitted)).

26 /////

27 /////

28 /////

**B.    Factual Background[2]**

In 1962, Congress passed the Flood Control Act of 1962, which gave Defendant USACE the authority to study flood risk needs in the American River basin. (Doc. No. 20-9 at 54 (citing Pub. L. No. 87-874, 76 Stat. 1173)). After the 1986 flooding in Sacramento, Congress instructed Defendant USACE to "investigate additional means to reduce flood risk in the city of Sacramento." (*Id.*) Based on Defendant USACE's analysis, Congress authorized the American River Common Features ("ARCF") Project under the Water Resources Development Act of 1996 ("WRDA"). (*Id.* (citing Pub. L. No. 104-303, § 101(a)(1), (1996)). Development of the ARCF Project revealed that additional levee improvements were needed on the American River and Sacramento River downstream of the confluence with the American River to address levee erosion issues, among other issues. (*Id.*)

In 2016, Defendant USACE completed the ARCF General Reevaluation Report and its accompanying Environmental Impact Statement/Environmental Impact Report (the "2016 FEIS/FEIR"). (Doc. No. 20-4 at 4.) The 2016 FEIS/FEIR analyzed several alternatives to address flooding concerns on the lower American and Sacramento Rivers. (Doc. No. 20-9 at 55.) The 2016 FEIS/FEIR analyzed two alternatives in detail in addition to a No Action Alternative: (1) improve levees and (2) improve levees and widen the Sacramento Weir and Bypass. (*Id.*) Defendant USACE ultimately recommended the second alternative in the 2016 FEIS/FEIR. (*Id.*) In response to the 2016 FEIS/FEIR and the Chief of Engineers' Report to Congress, Congress approved of the ARCF Project, which authorized Defendant USACE to construct and improve levees in the Sacramento area. (*Id.* (citing 2016 Water Resources Development Act, Pub. L. No. 114-322, 130 Stat. 1628, § 1401(2)(7)).

Also in response to the 2016 FEIS/FEIR, various federal, state, and local agencies and interest groups, including Plaintiff Save the American River Association, submitted comments to Defendant USACE. (Doc. No. 20-5 at 3.) These comments generally focused on concerns over (1) access to recreational features during and after construction; (2) placement and justification

---

[2] The factual background is derived from Plaintiffs' complaint, motion for preliminary injunction, and the exhibits attached thereto. (Doc. Nos. 1, 19, 20-1–20-23.)

1  for rock erosion protection along the American and Sacramento Rivers; (3) effects to vegetation

2  because of the recommended alternative; and (4) future stakeholder coordination. (*Id.* at 2.) In its

3  responses to submitted comments, Defendant USACE repeatedly represented that if "some sort of

4  bank protection is determined to be necessary, other options to reduce impacts, including

5  bioengineering[3] measures, will be analyzed." (*Id.* at 54, 56, 58, 60, 62, 64, 66, 68, 70, 72, 74, 76,

6  78, 80, 82, 84, 86.)

7       Following Congressional approval of the ARCF Project in 2016, Defendant USACE

8  "began detailed design for these erosion protection and levee improvements in the Sacramento

9  Metropolitan area." (Doc. No. 20-9 at 69.) Defendant USACE noted that "[p]rojects were

10  prioritized based upon their constructability and sequenced to provide flood risk reduction

11  benefits to communities with highest life safety risk and most costly flood-related damages." (*Id.*)

12  Several of the projects authorized as part of the ARCF Project are currently underway. (*Id.*)

13       Of particular importance to this action is the eleven (11) miles of erosion protection work

14  along the American River, levee erosion and stability, and seepage improvements along portions

15  of the American and Sacramento Rivers approved under the ARCF Project and discussed in the

16  2016 Supplemental Environmental Impact Statement/Subsequent Environmental Impact Report

17  ("SEIS/SEIR"). (*Id.* at 70.) In 2019, Defendant USACE "held an expert opinion elicitation

18  ("EOE") . . . to refine the design of the project." (*Id.*) As a result of the EOE, "designs along the

19  American River were refined to incorporate alternative erosion protection measures to minimize

20  impacts to heritage oaks, riparian habitat, and to create higher-quality onsite mitigation." (*Id.*)

21  Defendant USACE analyzed these refined designs "as part of the Proposed Action" in the draft

22  SEIS/SEIR ("2023 Draft SEIS/SEIR") and later, in the final SEIS/SEIR ("2025 Final

23  SEIS/SEIR") as American River Erosion Contract 3B North and South and 4B. (*Id.)*

24       In December 2023, Defendant USACE issued the 2023 Draft SEIS/SEIR pursuant to

25  NEPA and the California Environmental Quality Act ("CEQA"), the California state law

26

---

27  [3] As defined by Defendant USACE, bioengineering in the erosion protection context is a method that "uses plant material and minimal amounts of rock to stabilize the eroded slope and prevent

28  further loss of material." (Doc. No. 20-1 at 152.)

5

1  corollary to NEPA. (Doc. No. 20-7). The 2023 Draft SEIS/SEIR included a project-level, site

2  specific analysis of Contract 3B's impacts. (Doc. No. 1 at ¶ 24.) It also included a discussion of

3  alternatives that were considered but ultimately rejected from detailed analysis as to American

4  River Erosion Contract 3B North and South specifically. (Doc. No. 20-7 at 64.) Defendant

5  USACE indicated that three alternatives were considered as to Contract 3B North but ultimately

6  rejected due to not meeting environmental or flood risk reduction needs. (*Id.*) Likewise,

7  Defendant USACE considered but ultimately rejected one alternative as to Contract 3B South but

8  dismissed it due to its additional environmental impacts. (*Id.*) Importantly, none of the

9  alternatives identified in the 2023 Draft SEIS/SEIR were a bioengineering alternative.

10       The 2023 Draft SEIS/SEIR identified three alternatives that were analyzed with respect to

11  Contract 3B. The alternatives were the (1) No Action Alternative, (2) Proposed Action, and (3)

12  No Project Alternative. (Doc. No. 20-7 at 5–6.) The No Action Alternative is the authorized

13  project that was described in the 2016 FEIS/FEIR, which "includes 11 miles of launchable trench

14  and bank protection to be constructed on the Lower American River." (*Id.* at 71.) This alternative

15  included an analysis of launchable trench and bank protection as erosion protection methods. (*Id.*

16  at 84.) Under the Proposed Action, Contract 3B North "would include constructing approximately

17  1.8 miles of launchable rock toe, launchable trench, and bank protection," while Contract 3B

18  South "would include constructing approximately 1.5 miles of launchable rock toe [], launchable

19  trench, bank protection, and tie backs." (*Id.* at 85.) The No Project Alternative discussed the

20  baseline conditions as they existed in January 2023, which did "not include additional

21  improvements beyond those already constructed and would result in a continued risk to

22  catastrophic flooding." (*Id.* at 165.) Defendant USACE noted that under the No Project

23  Alternative, the "existing system would continue to require risk reduction measures to meet

24  current levee design criteria," and the "risk to human health and safety, property, the

25  environment" due to flooding would remain high. (*Id.* at 165–66.)

26       Following the issuance of the 2023 Draft SEIS/SEIR, a public comment period was

27  conducted from December 2023 to February 2024, during which approximately one thousand

28  categorized comments were submitted by federal and state agencies, local agencies, interest

1    groups, and approximately 900 individuals. (Doc. No. 20-9 at 21.) Additional comments were

2    also submitted during the 15-month period leading up to Defendant USACE's issuance of the

3    2025 Final SEIS/SEIR. (Doc. No. 1 at ¶ 27.) The majority of commentors expressed concern over

4    riparian habitat and tree removal impacts related to Contract 3B. (Doc. No. 20-9 at 21.)

5           In May 2025, Defendant USACE issued the 2025 Final SEIS/SEIR. (*Id.* at 2.) The 2025

6    Final SEIS/SEIR contemplated the same three alternatives as to Contract 3B as the 2023 Draft

7    SEIS/SEIR: the (1) No Action Alternative; (2) Proposed Action; and (3) No Project Alternative.

8    (*Id.* at 78–125, 192–93.) Also issued by Defendant USACE were Appendix I to the 2025 Final

9    SEIS/SEIR, which included comments and responses to the 2023 Draft SEIS/SEIR, and

10   Appendix G to the 2025 Final SEIS/SEIR, which was released in January 2025, and provided a

11   summary of engineering analyses and design efforts as to the planned erosion protection along the

12   Lower American River and Sacramento River. (Doc. No. 20-10; Doc. No. 23 at 28; Doc. No. 48-

13   1.)

14          On June 18, 2025, Defendant USACE issued its record of decision ("ROD"), approving

15   Contracts 3B and 4B and adopting the 2025 Final SEIS/SEIR pursuant to NEPA. (Doc. No. 20-

16   14.) On July 18, 2025, Defendant Flood Board certified the 2025 Final SEIS/SEIR pursuant to

17   CEQA. (Doc. No. 20-15.) Defendant Flood Board issued its notice of determination on July 18,

18   2025. (Doc. No. 20-15 at 2.)

19          As discussed, of particular concern to Plaintiffs in this action is the imminent

20   implementation of Contract 3B. The erosion control measures proposed in Contract 3B

21   necessitate the "removal of mature riparian forest to allow for the installation of rip-rap," which is

22   then left exposed or buried in soil. (Doc. No. 19-1 at 7; 20-9 at 91–92.) Contract 3B also

23   authorizes the removal of at least 675 trees in the Contract area, some of which are heritage trees.

24   (Doc. No. 20-9 at 109, 117.) Heritage trees are "California oak tree[s] growing on any land in

25   Sacramento County . . . with a trunk sixty inches or greater in girth measured four and one-half

26   feet above the ground." (Doc. No. 20-19 at 3.) Plaintiffs assert that at least thirty-seven (37)

27   heritage trees in the Contract 3B area are not protected. (*Id.*) Plaintiffs further aver that more than

28   1,100 trees are marked for trimming. (Doc. No. 19-1 at 7; 20-19 at 52–70.) Though the 2025

Final SEIS/SEIR does not disclose how many heritage trees will be removed or harmed by Contract 3B, Plaintiffs obtained this information via a record request to the Sacramento Area Flood Control Agency, a non-federal local sponsor of the Project. (Doc. No. 1 at ¶ 39; Doc. No. 20-19 at 3 n.1.) This data is limited to determinations by Defendant USACE as to which trees were "protected" or "not protected," and each marked tree's species, size, and location. (Doc. No. 1 at ¶ 40.)

Defendant USACE awarded the 3B Contract on October 23, 2025. (Doc. No. 30 at 2.) Vegetation clearing under the 3B Contract is not set to begin before November 30, 2025. (*Id.* at 3.)

**C.    Procedural Background**

On August 21, 2025, Plaintiffs filed a complaint alleging four claims against Defendants: (1) violation of the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 *et seq.* against Defendants USACE and NPS; (2) violation of California Wild and Scenic Rivers Act, California Public Resources Code, §§ 5093.50 *et seq.* against Defendant Flood Board; (3) violation of NEPA, 42 U.S.C. §§ 4321, *et seq.* against Defendant USACE; and (4) violation of CEQA, California Public Resources Code, §§ 21000 *et seq.* against Defendant Flood Board. (Doc. No. 1 at ¶¶ 73–123.)

On October 3, 2025, Plaintiffs filed a motion for preliminary injunction based on the impending implementation of Contract 3B. (Doc. No. 19-1 at 6.) Plaintiffs seek to enjoin "ground or vegetation disturbing activities" such as site preparation, vegetation removal, and tree felling in the 3B Contract area. (Doc. No. 19-2 at 2.) On October 17, 2025, Defendants USACE and NPS filed an opposition to Plaintiffs' motion for preliminary injunction.[4] (Doc. No. 23.) Also on October 17, 2025, Defendant Flood Board filed an opposition to Plaintiffs' motion for preliminary injunction. (Doc. No. 25.) On October 27, 2025, Plaintiffs filed their replies thereto. (Doc. Nos. 31, 32.) At the hearing, the court ordered Plaintiffs to file declarations regarding their ability to post a bond in the event the court granted the preliminary injunction, and Plaintiffs did

---

[4] Federal Defendants also filed a post hoc motion for additional pages for their opposition brief. (Doc. No. 34.) Though the court finds a sufficient basis to grant the motion, the court expects the parties to strictly comply with the court's Standing Order in future filings.

1    so on November 12, 2025. (Doc. Nos. 38, 39, 40.) On November 14, 2025, Federal Defendants

2    filed a response thereto. (Doc. No. 44.)

3                                    **LEGAL STANDARD**

4           "A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as

5    of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter v. Natural*

6    *Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, a plaintiff

7    must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the

8    absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an

9    injunction is in the public interest. *Winter*, 555 U.S. at 20. A plaintiff seeking a preliminary

10   injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d

11   1196, 1201 (9th Cir. 2009).

12          The Ninth Circuit has adopted a "'sliding scale test,' which allows a strong showing on

13   the balance of hardships to compensate for a lesser showing of likelihood of success." *Where Do*

14   *We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022) (quoting *All. for the*

15   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)). "[W]hen plaintiffs establish

16   that the balance of hardships tips sharply in their favor, there is a likelihood of irreparable injury,

17   and the injunction is in the public interest, they need only show 'serious questions' on the merits."

18   *Id.* (quoting *All. For the Wild Rockies*, 632 F.3d at 1135). "[T]he serious questions standard is 'a

19   lesser showing than likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot Citizen Task*

20   *Force v. Mont.*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Pena*,

21   865 F.3d 1211, 1217 (9th Cir. 2017)). "Serious questions are 'substantial, difficult and doubtful,

22   as to make them a fair ground for litigation and thus for more deliberative investigation.'"

23   *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quoting *Hamilton*

24   *Watch Co. v. Benrus Watch Co.*, 206 F.3d 738, 740 (2d Cir. 1952)). Although "[s]erious

25   questions need not promise a certainty of success, nor even present a probability of success,

26   [they] must involve a 'fair chance of success on the merits.'" *Id.* (quoting *Nat'l Wildlife Fed'n v.*

27   *Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

28   /////

                                            9

**ANALYSIS**

**A.    *Winter* Factors**

Plaintiffs seek a preliminary injunction to enjoin ground or vegetation disturbing activities including site preparation, vegetation removal, and tree felling in the Contract 3B area to preserve the status quo before the court reaches a decision on the merits. (Doc. No. 19-2 at 2.) Plaintiffs contend a preliminary injunction is warranted because they have demonstrated (1) a likelihood of success, or at least serious questions, on the merits of all four of their claims, (2) an injunction is necessary to avoid irreparable harm to the "mature riparian forest" in the Contract 3B area and to Plaintiffs themselves, (3) the balance of the equities weighs in favor of Plaintiffs, and (4) an injunction is in the public interest. (Doc. No. 19-1 at 20–32.) The court begins by addressing serious questions on the merits, before turning to the other *Winter* factors.

1.    Serious Questions on the Merits

The Administrative Procedure Act ("APA") governs the court's review of agency decisions under NEPA. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002)(citing 5 U.S.C. § 706). Pursuant to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"Under the arbitrary and capricious standard, the scope of review is deferential and narrow, and the court is not to substitute its judgment for the agency's judgment." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021) (citation omitted). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action

1   including a rational connection between the facts found and the choice made." *State Farm*, 463

2   U.S. at 43 (internal quotation marks and citation omitted). A court may not accept an agency's

3   post hoc rationalizations for its action. *Id.* at 50. "It is well-established that an agency's action

4   must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (citation omitted).

5       As discussed in the statutory background, NEPA is a procedural statute "that requires the

6   federal government to 'take a hard look at the environmental consequences' before acting." *Ctr.*

7   *for Biological Diversity*, 141 F.4th at 993 (quoting *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d

8   969, 976 (9th Cir. 2006) (citation omitted)). "NEPA does not mandate particular results . . . ." *Id.*

9   NEPA requires a federal agency to "consider every significant aspect of the environmental impact

10  of a proposed action." *Id.* (citation omitted). It also ensures that the federal agency "inform[s] the

11  public that it has indeed considered environmental concerns in its decisionmaking process." *Id.*

12  (citation omitted).

13      NEPA requires "preparation of an EIS when a 'major' federal action would 'significantly

14  affect[] the quality of the human environment.'" *Id.* (quoting 42 U.S.C. § 4332(2)(C)). NEPA also

15  mandates that federal agencies "use the EIS to analyze a reasonable range of alternatives to the

16  proposed action." *Id.* (citing 42 U.S.C. §§ 4332(2)(C)(iii), (F), (H)). When analyzing alternatives,

17  a federal agency must disclose the "environmental impacts of the proposed action and its

18  alternatives, including their direct, indirect, and cumulative effects." *Id.* (quoting *Audubon Soc'y*

19  *of Portland*, 40 F.4th at 980). However, a federal agency only needs to "briefly discuss the

20  reasons" why certain alternatives "were eliminated from detailed study." *Id.* (quoting 40 C.F.R. §

21  1502.14(a)). "In reviewing the adequacy of an EIS under NEPA, we employ a rule of reason

22  analysis to determine whether the discussion of the environmental consequences included in the

23  EIS is sufficiently thorough." *Audubon Soc'y of Portland*, 40 F.4th at 967 (internal quotation

24  marks and citation omitted). This rule of reason analysis "guides both the choice of alternatives as

25  well as the extent to which the EIS must discuss each alternative." *Id.* (citation omitted).

26      Plaintiffs argue Defendant USACE failed to comply with NEPA due to its failure to

27  adequately consider alternatives to the approved Project, and more specifically, Contract 3B.

28  (Doc. No. 19-1 at 17.) Plaintiffs contend that Defendant USACE's limited assessment of the "no-

project" alternative and preferred alternative for Contract 3B lacks "range" and "reversed course on [Defendant USACE's] prior commitment to consider bioengineering as a feasible alternative." (*Id.*) Plaintiffs aver that Defendant USACE's "rejection of a bioengineering alternative represents a dramatic reversal from its prior stance." (*Id.* at 18.) Plaintiffs conclude that Defendant USACE's alternatives analysis under NEPA and final adoption of the ROD and 2025 Final SEIS/SEIR is therefore arbitrary and capricious in violation of the APA. (*Id.*)

Federal Defendants argue in opposition that their NEPA analysis "provided a full and fair discussion of significant environmental impacts of the proposed actions and its alternatives." (Doc. No. 23 at 25.) Federal Defendants aver that their consideration of three alternatives, the No Action Alternative (constructing eleven (11) miles of launchable trench and bank protection to be constructed on the Lower American River), (2) the No Project Alternative (no additional improvements); and (3) the Proposed Action (constructing approximately 3.3 miles of launchable rock toe, launchable trench, bank protection, and tie backs on the Contract 3B site) was reasonable because "the erosion protection alternatives were responsive to design refinements needed to meet the Project's authorized flood risk reduction performance objectives." (*Id.* at 27.) Further, Federal Defendants argue they should be granted deference with respect to the alternatives they deem feasible to meet the Project's purpose. (*Id.*) Finally, Federal Defendants argue that Plaintiffs "advocate for a bioengineering alternative that uses only plant-based materials," as opposed to bioengineering techniques that use vegetation and a combination of other materials, such as rock or cobble. (*Id.*)

The court agrees with Plaintiffs that Defendants represented that certain bioengineering methods met the objective criteria of the Project, and that Defendants themselves represented that bioengineering methods would be considered specifically with respect to erosion control measures along the Lower American River. For example, the 2015 Final Report for the American River Watershed Common Features General Reevaluation Report ("2015 GRR") indicates that erosion protection measures for the American River would include placing rock protection on the bank to prevent erosion, constructing a launchable rock filled trench, and that "a bioengineering method, which uses plant material and minimal amounts of rock to stabilize the eroded slope and

1    prevent further loss of material" "would be used in lower velocity reaches." (Doc. No. 20-2 at

2    145–46.) Bioengineering armoring of slopes is also listed as one of the "Measures to Address

3    Erosion" in the 2015 GRR. (*Id.* at 123.) The 2015 GRR indicates that bioengineering armoring of

4    slopes as a measure to address erosion was screened and met the objective criteria for reduction

5    of the risk of flooding within the study area and to critical infrastructure within the study area. (*Id.*

6    at 126.) Defendant USACE also identified the bioengineering armoring of slopes as one of the

7    "retained" management measures that would be further analyzed. (*Id.* at 128–30.) Defendant

8    USACE ultimately determined it should be carried into the "final array of alternatives" for

9    erosion protection measures. (*Id.* at 144–46)

10    Further, Defendant USACE repeatedly represented that bioengineering methods would be

11    considered where bank protection measures were deemed necessary along the Lower American

12    River. Defendant USACE stated as such at least seventeen times in their 2016 responses to public

13    comments on the 2016 FEIS/FEIR. (Doc. No. 20-5 at 54, 56, 58, 60, 62, 64, 66, 68, 70, 72, 74,

14    76, 78, 80, 82, 84, 86.) Defendant USACE indicated in their responses to submitted comments

15    that future analyses would examine whether, for any particular site, "some sort of bank protection

16    is determined to be necessary," and if so, that "other options to reduce impacts, including

17    bioengineering measures, will be analyzed." *Id.*

18    Despite Defendant USACE's representations to the contrary, a bioengineering alternative

19    was not analyzed in the 2023 Draft SEIS/SEIR. (*See* Doc. No. 20-7.) Not only was a

20    bioengineering alternative not formally analyzed, it was also not identified as one of the four

21    alternatives that were considered for Contract 3B but ultimately rejected from more detailed

22    analysis because they did not meet environmental or flood risk reduction needs. (*Id.* at 64.)

23    After the issuance of the 2023 Draft SEIS/SEIR, federal, state, and local agencies, interest

24    groups, and individuals submitted approximately one thousand comments in response to the draft.

25    The majority of commentors expressed concern over riparian habitat and tree removal impacts

26    related to Contract 3B. (Doc. No. 20-9 at 21.) Plaintiff Center for Biological Diversity submitted

27    comments that identified many issues it had with the 2023 Draft SEIS/SEIR, including that

28    bioengineering measures were not analyzed as previously represented by Defendant USACE.

13

1  (Doc. No. 20-13 at 22.) The Bureau of Land Management also recommended incorporation of

2  Defendant NPS' best management practices relative to alternative, bioengineered approaches to

3  bank protection and site restoration into the Lower American River project designs where

4  possible, and that a team should be established to "reevaluate diagnostic and treatment methods

5  for erosion control with modern tools including Nature-based solutions." (Doc. No. 20-11 at 4,

6  34.) The Bureau of Land Management opined that that further analysis should include a "robust

7  exploration of NEPA [a]lternatives" as opposed to the "uniform approach to mitigation erosion

8  across many different types of river stretches." (*Id.* at 18.) Further, the Regional Parks

9  Department of the County of Sacramento opined that a "reasonable range of alternatives has not

10  been considered for Contract 3B North, 3B South . . . and that "there needs to be an alternative or

11  two that addresses the issues holistically" such as a "holistic engineering solution" that "reduce[s]

12  impacts to trees, wildlife, and recreation." (Doc. No. 20-12 at 35–36.)

13       In Appendix I to the 2025 Final SEIS/SEIR, Defendant USACE responded to comments

14  submitted in response to the 2023 Draft SEIS/SEIR, as they were required to do. (Doc. No. 20-

15  10.) Defendant USACE confirmed that "[t]he GRR's final alternative measures carried forward

16  into the design development following authorization of the ARCF16 Project in 2016" included

17  "bank protection, launchable rock trenches, and bioengineering solutions." (*Id.* at 317.)

18  Defendant USACE stated in Appendix I that tree and vegetation alone would not be able to

19  provide the resiliency necessary to achieve the erosion protection sufficient for flood mitigation.

20  (*Id.* at 22.) Defendant USACE also cited concerns about fire destroying bioengineering erosion

21  protection measures and the "longevity of bioengineering solutions and the impacts repair and

22  replacement of these solutions would have on the on-site mitigation plants and habitat." (*Id.* at

23  317.) Defendant USACE further opined that bioengineering "will not reduce all of the flood

24  risks" at the American River Erosion Contract 3B site. (*Id.* at 30.)

25       "[A]n agency changing its course must supply a reasoned analysis." *Ctr. for Biological*

26  *Diversity*, 141 F.4th at 994 (*State Farm*, 463 U.S. at 57 (citation omitted)). While agencies are not

27  required to "consider infinite, unfeasible, or impractical alternatives, but they must consider

28  reasonable ones." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir.

1  2022). "The existence of a viable but unexamined alternative renders the environmental review

2  conducted under NEPA inadequate." *Id.* (citation omitted). The "touchstone" of the court's

3  review of an EIS "is whether an EIS's selection and discussion of alternatives fosters informed

4  decision-making and informed public participation." *Ctr. for Biological Diversity*, 141 F.4th at

5  993 (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)

6  (citation omitted)).

7      Defendant USACE itself recognized that bioengineering was one of the final alternative

8  measures that was carried over and considered as part of the site-specific design development

9  phase following the issuance of the 2016 FEIS/FEIR. (Doc. 20-10 at 317.) Further, at multiple

10  stages of the Project's development, including in response to public comments and in the 2015

11  GRR, Defendant USACE represented that bioengineering methods would be considered as one of

12  the alternatives for erosion protection methods and that bioengineering armoring of slopes as a

13  measure to address erosion was screened and met the objective criteria for reduction of the risk of

14  flooding within the study area and to critical infrastructure within the study area. (Doc. Nos. 20-2

15  at 123, 126; 20-5 at 54, 56, 58, 60, 62, 64, 66, 68, 70, 72, 74, 76, 78, 80, 82, 84, 86.) Despite this

16  representation, the 2023 Draft SEIS/SEIR does not discuss the bioengineering armoring of slopes

17  as either a reasonable alternative or an alternative that was eliminated from further study. *Ctr. for

18  Biological Diversity*, 141 F.4th 976, 993 (9th Cir. 2025) (citing 43 C.F.R. § 1502.14(a); 42 U.S.C.

19  § 4332(2)(C) (NEPA requires agencies to analyze a reasonable range of alternatives in the EIS

20  and "for alternatives which were eliminated from detailed study," to "briefly discuss reasons their

21  having been eliminated.")). Indeed, bioengineering as an erosion protection measure alternative is

22  not discussed again in the record until Defendant USACE released Appendix I and Appendix G.

23  (Doc. No. 10; 23 at 21; 48-1 at 22–23.) Importantly, these documents were issued after the

24  comment period for the 2023 Draft SEIS/SEIR had ended on February 23, 2024. (Doc. No. 20-9

25  at 3.) The court is particularly concerned that Defendant USACE omitted bioengineering erosion

26  protection measures in the 2023 SEIS/SEIR as at least an alternative that was "eliminated from

27  detailed study," undermining the opportunity for "informed public participation" during the

28  public review and comment period. *Ctr. for Biological Diversity*, 141 F.4th at 993; *see also*

1   *WildEarth Guardians v. United States Dep't of Agric. Animal & Plant Health Inspection Serv.*

2   *Wildlife Servs.*, 135 F.4th 717, 728 (9th Cir. 2025) (noting that a "NEPA document is an

3   important springboard for public comment and engagement," and that "[f]ollowing NEPA's

4   procedural requirements ensures" that the public will be informed).

5          Unlike instances where a plaintiff proposes an alternative in public comment that the

6   agency ultimately deems unreasonable, here, Defendant USACE itself found on the record that

7   bioengineering armoring of slopes as an erosion protection measure alternative met the Project

8   objective criteria of reduction of both flood risk and damage to critical infrastructure and

9   represented to the public that it would be analyzed. *Cf. W. Watersheds Project v. Bureau of Land*

10  *Mgmt.*, 971 F. Supp. 2d 957, 972 (E.D. Cal. 2013) (finding the agency's brief explanation in the

11  final environmental assessment as to why plaintiff's proposed alternative was not examined in

12  depth sufficient to satisfy the agency's obligation to provide a reasonable explanation under

13  NEPA). Defendant USACE may have revised its position as to the feasibility of the

14  bioengineering armoring of slopes as an erosion protection measure alternative, but the agency

15  did not provide an explanation until after the public comment period had ended, effectively

16  preventing the public from reviewing and commenting on the agency's change of course. Though

17  the court is aware of its mandate to "afford substantial deference to [Defendant USACE]," *Seven*

18  *Cnty. Infrastructure Coal*, 605 U.S. at 180, in its selection and elimination of alternatives,

19  Defendant USACE must also uphold its obligation pursuant to NEPA to analyze a reasonable

20  range of alternatives and to briefly discuss why certain alternatives were eliminated from further

21  study. *Ctr. for Biological Diversity*, 141 F.4th at 993 (citations omitted).

22         Accordingly, Plaintiffs have demonstrated at least a serious question on the merits as to

23  whether Defendant USACE considered a reasonable range of alternatives as required by NEPA

24  and whether Defendant USACE's adoption of the ROD and 2025 Final SEIS/SEIR was arbitrary

25  or capricious in violation of the APA.

26         2.     Irreparable Harm

27         The court now turns to whether Plaintiffs have demonstrated they are likely to suffer

28  irreparable harm in the absence of the court granting the requested preliminary injunctive relief.

16

To obtain a preliminary injunction, Plaintiffs must show that the risk of irreparable harm is "likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Env't Democracy Project v. Green Sage Mgmt., LLC*, No. 22-cv-03970-JST, 2022 WL 4596616, at *3 (N.D. Cal. Aug. 23, 2022) (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (citations omitted)). To obtain preliminary relief, Plaintiffs must "show that they themselves are likely to suffer irreparable harm absent an injunction." *Nat'l Wildlife Fed'n*, 886 F.3d at 822 (citations omitted).

The court agrees with Plaintiffs that they are likely to suffer irreparable harm in the absence of a preliminary injunction. Members from Plaintiff organizations submitted detailed declarations attesting to the harm that would be caused to them personally by the implementation of Contract 3B. (Doc. Nos. 19-4, 19-5, 19-6, 19-7.) For example, a member of both Plaintiff American River Trees and Plaintiff Save the American River Association affirmed he "regularly visit[s] the American River Parkway in the Contract 3B area for dog walking, hiking, wildlife observation, and enjoyment of the water in the shade of the mature riparian forest." (Doc. No. 19-5 at ¶ 5.) He also stated he has visited the Contract 3B area since 2002 and plans "to continue going to the Contract 3B area nearly every day for the foreseeable future to enjoy these areas through [his] retirement." (*Id.* at ¶ 7.) Further, he affirmed that he "personally depend[s] on the remaining mature riparian forest within the [Contract] 3B area for [his] recreational and other interests," and if activity under the Contract goes forward as scheduled, his "interest in this special area of the Lower American River will be irreparably harmed." (*Id.* at ¶ 11.)

A member of both Plaintiff American River Trees and Plaintiff Center for Biological Diversity affirmed that his home for the pasty twenty-eight (28) years is located "about a block away" from the Contract 3B site. (Doc. No. 19-4 at ¶ 5.) He stated that he regularly walks to a beach located within the Contract 3B area, that the "American River Parkway and its wildlife inspires [him] for art, music, and writing," and that the "environmental, aesthetic, recreational, health, and spiritual values [he] derive[s] from the 3B area will be irreparably harmed" in the absence of an injunction. (*Id.* at ¶¶ 16, 30, 31 ). Finally, he affirms that he would "continue to use

17

1    and enjoy all the 3B areas described" in his declaration in "both the short-term and long-term, if

2    the 3B Contract did not prevent [him] from doing so." (*Id.* at ¶ 31.)

3        In their declarations, Plaintiffs identify the near-term contract activities that will harm

4    their interests under Contract 3B. (Doc. Nos. 19-5 at ¶ 5; 19-4 at ¶¶ 19–21.) Plaintiffs discuss how

5    the vegetation clearing activities will inhibit their ability to use the affected portion of the Lower

6    American River for recreation. (Doc. Nos. 19-5 at ¶ 8; 19-4 at ¶¶ 15–21; *see also Sierra Forest*

7    *Legacy v. Sherman*, 951 F.Supp.2d 1100, 1111 (E.D. Cal. 2013) ("To show such an injury, a

8    plaintiff must identify specifically planned tree-cutting, link the proposed tree-cutting to its

9    members' specific interests, and demonstrate how the proposed tree-cutting will harm those

10   interests."). Plaintiffs also discuss their plans to visit the 3B Contract area in the near future, and

11   specifically during when contract activities are scheduled to begin. (Doc. No. 19-5 at ¶ 7; 19-4 at

12   ¶ 31); *see also All. for the Wild Rockies*, 632 F.3d at 1135; *Sierra Forest Legacy*, 951 F.Supp.2d

13   at 1111 ("[Plaintiff] must identify tree-cutting within a particular area of a [] [f]orest that its

14   members plan to use in the future and demonstrate that the proposed tree-cutting will harm their

15   interests.").

16       Finally, Federal Defendants' argument that Plaintiffs will not be irreparably harmed

17   because Defendant USACE "minimized impacts to trees as much as possible while still meeting

18   flood risk reduction performance objectives" and limited the Contract 3B footprint as much as

19   possible is unavailing. (Doc. No. 33 at 39.) Defendant USACE's efforts to reduce the number of

20   affected trees does not change the fact that at least 675 trees, including heritage oaks, will be

21   removed in the 3B Contract area, causing an irreparable environmental injury and impairing the

22   Plaintiffs' ability to enjoy this area for the foreseeable future. *See All. for the Wild Rockies*, 632

23   F.3d at 1127 (noting that the "logical extension" of defendant's argument that plaintiff can "view,

24   experience, and utilize" other areas of the forest "is that a plaintiff can never suffer irreparable

25   injury resulting from environmental harm in a forest area as long as there are other areas of the

26   forest that are not harmed"); *see also League of Wilderness Defs./Blue Mountains Biodiversity*

27   *Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("The logging of mature trees, if

28   indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings

1    nor the paying of money damages can normally remedy such damage.").

2            Accordingly, the court finds that Plaintiffs have demonstrated they will be irreparably

3    harmed in the absence of a preliminary injunction.

4            3.    Balance of the Equities and the Public Interest

5            The last two *Winter* factors merge when the government is the opposing party. *Drakes*

6    *Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S.

7    418, 435 (2009)). "If irreparable environmental injury 'is sufficiently likely,' as in this case, 'the

8    balance of harms will usually favor the issuance of an injunction to protect the

9    environment.'" *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 991 (9th Cir. 2020) (quoting

10    *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 541, 545 (1987)). When a plaintiff has

11    demonstrated serious questions going to the merits, the balance of the equities must tip sharply in

12    plaintiff's favor. *All. for the Wild Rockies,* 632 F.3d at 1134–35. "In other words, the

13    environmental risk were the preliminary injunction not granted must be weighed against the

14    economic loss or other risk were the injunction granted, and the scale must tip sharply on the side

15    of environmental risk." *Bair v. California Dep't of Transp*., No. 10-cv-04360-WHA, 2011 WL

16    2650896, at *8 (N.D. Cal. July 6, 2011).

17            The court understands the importance of the Project, and Contract 3B specifically, in

18    reducing the overall flood risk in the Sacramento metropolitan area. (Doc. No. 20-9 at 56.)

19    However, the Ninth Circuit has recognized the well-established "public interest in preserving

20    nature and avoiding irreparable environmental injury." *All. for the Wild Rockies*, 632 F.3d at 1138

21    (citation omitted). The public interest in preserving the natural landscape along the Lower

22    American River for recreational purposes is especially strong, where, as here, the river is

23    designated for protection under both the federal Wild and Scenic Rivers Act and the California

24    Wild and Scenic Rivers Act. (Doc. No. 19-1 at 30.)

25            The court also recognizes the potential economic hardship to Defendants now that

26    Contract 3B has been awarded. Although Defendants' economic hardship and the overall flood

27    risk in Sacramento are of serious concern, in balancing the equities, the scale tips sharply in favor

28    of preserving the natural landscape along the Lower American River and the at least 675 trees,

some of which are heritage trees, while this case is resolved on the merits. *See Bair,* 2011 WL

2650896, at *8; *Env't Prot. Info. Ctr.,* 968 F.3d at 991. This is especially true given the

narrowness of the injunction in the context of the overall flood mitigation Project. The proposed

injunction will only prevent Defendants from proceeding with vegetation clearing activity as

authorized by Contract 3B. Defendants are not enjoined from proceeding with other parts of the

Project, some of which are already underway. *See Sierra Forest Legacy v. Rey,* 577 F.3d 1015,

1022 (9th Cir. 2009) ("When deciding whether to issue a narrowly tailored injunction, district

courts must assess the harms pertaining to injunctive relief in the context of that narrow

injunction."). Indeed, as Defendants acknowledge, construction on the portion of the Project

affecting the most at-risk sections of the Lower American River has already been completed.

(Doc. No. 23 at 11.) Further construction on portions of the Project affecting other high-risk

portions of the Lower American River is ongoing and will not be impacted by this injunction. (*Id.*

at 12.)

      Accordingly, the courts finds that Plaintiffs have demonstrated that this factor tips sharply

in favor of granting the preliminary injunction.

**B.     Bond**

      Federal Rule of Civil Procedure 65(c) enables a district court to issue a preliminary

injunction "only if the movant gives security in an amount that the court considers proper to pay

the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained." Fed. R. Civ. P. 65. "Rule 65(c) invests the district court 'with discretion as to the

amount of security required, if any.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

(quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). District courts have

"discretion to dispense with the security requirement, or to request mere nominal security, where

requiring security would effectively deny access to judicial review." *People of State of Cal. ex*

*rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended*, 775

F.2d 998 (9th Cir. 1985)). In exercising this discretion, district courts "routinely impose either no

bond or a minimal bond in public interest environmental cases." *City of S. Pasadena v. Slater*, 56

F. Supp. 2d 1106, 1148 (C.D. Cal. 1999) (citing *People of State of Cal. ex rel. Van De Kamp*, 766

1  F.2d at 1325)).

2         Here, Plaintiffs request that no or only nominal bond be required, (Doc. No. 19-1 at 30),

3  while Federal Defendants request the court require Plaintiffs to post $256,815.00, which would

4  cover financial losses due to project delay. (Doc. Nos. 23 at 37; 44 at 3.) The court has reviewed

5  the evidence submitted by the parties and declines to require Plaintiffs to post Federal

6  Defendants' requested bond given that the imposition of a significant bond would impact

7  Plaintiffs' ability to pursue this action and future environmental public interest litigation. (Doc.

8  No. 39 at ¶¶ 2–4) (Plaintiff Save the American River Association is a "non-profit, public benefit,

9  corporation" that "relies extensively on volunteers for its efforts" and is "unable to post anything

10 other than a nominal bond in this litigation."); (Doc. No. 38 at ¶¶ 3, 4) (Plaintiff American River

11 Trees is an "unincorporated association" with "no employees or even a bank account" and "[a]ny

12 bond would pose serious, undue hardship. . . ."); (Doc. No. 40 at ¶¶ 3, 4. 7–9) (Plaintiff Center for

13 Biological Diversity is a "nonprofit conservation organization" whose "funding comes primarily

14 from charitable contributions and grants from private foundations" and  that the imposition of a

15 bond each time it sought injunctive relief "would curtail [its] ability to achieve [its] mission." ).

16 Indeed, "[i]t is well established that in public interest environmental cases the plaintiff need not

17 post bonds because of the potential chilling effect on litigation to protect the environment and the

18 public interest." *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012); *see also*

19 *Earth Island Inst. v. U.S. Forest Serv.*, 2006 WL 3359192, at *1, 4 (E.D. Cal. Nov. 20,

20 2006) (declining to increase a $1,000 bond to a $200,000 bond where plaintiffs demonstrated that

21 "imposition of a bond would pose a hardship chilling their ability to mount environmental

22 challenges"); *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal.

23 2009), *adhered to*, No. 08-cv-03494-WHA, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009) (court

24 did not require bond where plaintiff was a non-profit that would have difficulty posting bond and

25 "the proposed bond requirement would effectively deny access to judicial review"). Instead, the

26 court will require Plaintiffs to post a $1,000 nominal bond.

27 /////

28 /////

**CONCLUSION**

For the reasons explained above,

1.  Plaintiffs' motion for a preliminary injunction (Doc. No. 19) is GRANTED;

2.  Federal Defendants' motion to extend page limits (Doc. No. 34) is GRANTED;

3.  The court ENJOINS any ground or vegetation disturbing activities authorized under Contract 3B of the Project until this court reaches a decision on the merits; and

4.  Plaintiffs must post a $1,000 bond, apportioned amongst themselves, on or before November 27, 2025.


IT IS SO ORDERED.

Dated:   **November 20, 2025**

_____

Dena Coggins
United States District Judge