UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN RIVER TREES, et al.,<br>Plaintiffs,<br>v.<br>CENTRAL VALLEY FLOOD PROTECTION BOARD, et al.,<br>Defendants. | No. 2:25-cv-02384-DC-CSK<br><br><u>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT</u><br><br>(Doc. Nos. 64, 66) |

This matter is before the court on Plaintiffs American River Trees, Save the American River Association, and Center for Biological Diversity's motion for summary judgment (Doc. No. 64), and Defendant U.S. Army Corps of Engineers ("USACE") and U.S. National Parks Service's ("NPS") cross-motion for summary judgment (Doc. No. 66). Pursuant to Local Rules 261(f) and 230(g), the court took the motions under submission to be decided on the papers. For the reasons stated below, the court will grant in part and deny in part Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment.

**BACKGROUND**

This action arises from the federal and California state government approval and implementation of the American River Common Features 2016 Flood Risk Management Project (the "Project"). (Doc. No. 64-1 at 12.) The Project is a flood risk management effort to address

flood protection measures on the Sacramento River, Natomas East Main Drainage Canal, Arcade Creek, Magpie Creek, Sacramento Weir and Bypass, and Lower American River. (*Id.*; USACE-58613).[1] Plaintiffs in this action challenge the review and approval of Contracts 3B North and South ("Contract 3B") and 4B of the Project. (Doc. No. 64-1 at 12.) These Contracts will impact approximately 3.3 miles of mature riparian forest located on the American River Parkway, a greenbelt that extends twenty-nine (29) miles from Folsom Dam in Folsom, California to the American River's confluence with the Sacramento River in Sacramento, California. (USACE-65328; USACE-55145.) Contract 3B will primarily affect the banks of the Lower American River between Howe Avenue and Harrington Way on the north side, and between Watt Avenue and the Mayhew Drain on the south side, in Sacramento, California. (USACE-5006; USACE-12322; USACE-12339–45.) Contract 3B authorizes the removal of 675–715 trees and the trimming of over 1,100 trees in the Contract area, to clear the area for the construction of "approximately 1.8 miles of launchable rock toe, launchable trench, and bank protection." (USACE-65546; USACE 5018–19; USACE-24617.))

**A. Statutory Background**

1. <u>National Environmental Procedure Act</u>

Congress passed the National Environmental Procedure Act of 1969 ("NEPA") "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011) (citation omitted). To accomplish this purpose, "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Id.* (quoting *Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d 1291, 1300 (9th Cir. 2003)). "When 'properly applied, NEPA helps agencies to make better decisions and to ensure good project management.'" *Cascadia Wildlands v. U. S. Bureau of Land Mgmt.*, 153 F.4th 869, 879 (9th Cir. 2025) (quoting

---

[1] In this order, the court cites to pages of the administrative record lodged with the court on February 17, 2026, (Doc. Nos. 62, 63), utilizing the Bates stamp convention employed by the parties, i.e., USACE-xxx and NPS-xxx, omitting leading zeroes.

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 177 (2025)). However, NEPA is a purely procedural statute that does not impose any substantive environmental obligations nor require that agencies reach a particular environmental outcome. *Cascadia Wildlands*, 153 F.4th at 879–80 (citation omitted).

Among NEPA's procedural mandates is the requirement that prior to undertaking "major Federal actions significantly affecting the quality of the human environment," federal agencies must prepare an Environmental Impact Statement ("EIS"). *Barnes*, 655 F.3d at 1131 (quoting 42 U.S.C. § 4332(2)(C)). An EIS must include:

> (i) reasonably foreseeable environmental effects of the proposed agency action;
>
> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
>
> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
>
> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C). "The alternatives analysis 'requires disclosure of the environmental impacts of the proposed action and its alternatives, including their direct, indirect, and cumulative effects.'" *Ctr. for Biological Diversity v. United States Bureau of Land Mgmt.*, 141 F.4th 976, 993 (9th Cir. 2025) (quoting *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022)). The "touchstone" of the court's review of an EIS "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Ctr. for Biological Diversity*, 141 F.4th at 993 (quoting *Audubon Soc'y of Portland*, 40 F.4th at 982) (citation omitted)).

/////

/////

2. Wild and Scenic Rivers Act

Congress enacted the Wild and Scenic Rivers Act ("WSRA") to protect, preserve, and enhance certain rivers and their immediate environments "for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. Rivers are designated under WSRA by Congress or by the state legislature in a state in which they flow after approval by the Secretary of the Interior. 16 U.S.C. § 1273(a). Rivers protected under WSRA are designated as wild, scenic, or recreational. 16 U.S.C. § 1273(b). Like NEPA, WSRA imposes procedural duties on agencies to engage in informed decisions regarding projects that may conflict with the statute's stated aims. 16 U.S.C. § 1278(a). Pursuant to section 7 of WSRA, "no department or agency of the United States shall assist . . . in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration." 16 U.S.C. § 1278(a).

**B. Factual Background**

In 1962, Congress passed the Flood Control Act of 1962, which gave Defendant USACE the authority to study flood risk needs in the American River basin. Pub. L. No. 87-874, 76 Stat. 1173; (USACE-12297). After the 1986 flooding in Sacramento, Congress instructed Defendant USACE to "investigate additional means to reduce flood risk in the city of Sacramento." (USACE-12297.) Based on Defendant USACE's analysis regarding flood risk and mitigation, Congress authorized the American River Common Features ("ARCF") Project under the Water Resources Development Act of 1996 ("WRDA"). Pub. L. No. 104-303, § 101(a)(1), (1996); (USACE-12297). Development of the ARCF Project revealed that additional levee improvements were needed on the American River and Sacramento River downstream of the confluence with the American River to address levee erosion issues, among other issues. (USACE-12297.)

In 2016, Defendant USACE completed the ARCF General Reevaluation Report ("2015 GRR"), (USACE-286; USACE-532), and its accompanying Environmental Impact Statement/Environmental Impact Report (the "2016 FEIS/FEIR"), (USACE-1853). The 2016 FEIS/FEIR analyzed several alternatives to address flooding concerns on the lower American and Sacramento Rivers. The 2016 FEIS/FEIR analyzed two alternatives in detail in addition to a No

Action Alternative: (1) improve levees, and (2) improve levees and widen the Sacramento Weir and Bypass. (USACE-1928–56.) Defendant USACE ultimately recommended the second alternative in the 2016 FEIS/FEIR. (USACE-1855.) In response to the 2016 FEIS/FEIR and the Chief of Engineers' Report to Congress, Congress approved the ARCF Project, which authorized Defendant USACE to construct and improve levees in the Sacramento area. (USACE-66530); 2016 Water Resources Development Act, Pub. L. No. 114-322, 130 Stat. 1628, § 1401(2)(7).

Also in response to the 2016 FEIS/FEIR, various federal, state, and local agencies and interest groups, including Plaintiff Save the American River Association, submitted comments to Defendant USACE. (USACE-3364–453.) These comments generally focused on concerns over (1) access to recreational features during and after construction; (2) placement and justification for rock erosion protection along the American and Sacramento Rivers; (3) effects to vegetation because of the recommended alternative; and (4) future stakeholder coordination. (USACE-3453.) In its responses to submitted comments, Defendant USACE stated that if "some sort of bank protection is determined to be necessary, other options to reduce impacts, including bioengineering[2] measures, will be analyzed." (USACE-3416–48.)

Following Congressional approval of the ARCF Project in 2016, Defendant USACE began detailed design for these erosion protection and levee improvements in the Sacramento Metropolitan area. (USACE-12298; USACE-12311-12.) In 2019, Defendant USACE "held an expert opinion elicitation ("EOE") . . . to refine the design of the project." (USACE-12313.) As a result of the EOE, "designs along the American River were refined to incorporate alternative erosion protection measures to minimize impacts to heritage oaks, riparian habitat, and to create higher-quality onsite mitigation." (USACE-12313.) In 2019, Defendant USACE began design development for Contract 3B. (USACE-19274.) Design development for Contract 4B began in 2022. (USACE-26378.) In October 2022, Defendant USACE issued a Notice of Intent to prepare a Draft SEIS to analyze refinements made to the alternative analyzed and selected in the 2016

---

[2] As defined by Defendant USACE, bioengineering in the erosion protection context is a method that uses plant material and minimal amounts of rock to stabilize the eroded slope and prevent further loss of material. (USACE-432, USACE-438, USACE-409.)

FEIS/FEIR. 87 Fed. Reg. 62832 02 (Oct. 17, 2022); (USACE-12262-63.)

In December 2023, Defendant USACE issued the 2023 Draft SEIS/SEIR pursuant to NEPA and the California Environmental Quality Act ("CEQA"), the California state law corollary to NEPA. (USACE-4936–5874.) The 2023 Draft SEIS/SEIR included a project-level, site specific analysis of Contract 3B's impacts. (USACE-5018–5043.) It also included a discussion of alternatives that were considered but ultimately rejected from detailed analysis as to American River Erosion Contract 3B North and South specifically. (USACE 4997–5000.) Defendant USACE indicated that three alternatives were considered as to Contract 3B North but ultimately rejected due to not meeting environmental or flood risk reduction needs. (USACE 4997–5000.) Likewise, Defendant USACE considered but ultimately rejected one alternative as to Contract 3B South but dismissed it due to its additional environmental impacts. (USACE 4997–5000.) None of the alternatives identified in the 2023 Draft SEIS/SEIR was a bioengineering alternative.

The 2023 Draft SEIS/SEIR identified two alternatives that were analyzed with respect to Contract 3B. The alternatives pursuant to NEPA were the (1) No Action Alternative, and (2) Proposed Action.[3] (USACE-5043.) The No Action Alternative is the authorized project that was described in the 2016 FEIS/FEIR, which "includes 11 miles of launchable trench and bank protection to be constructed on the Lower American River." (USACE-5005.) This alternative included an analysis of launchable trench and bank protection as erosion protection methods. (USACE-5004–05.) Under the Proposed Action, Contract 3B North "would include constructing approximately 1.8 miles of launchable rock toe, launchable trench, and bank protection," while Contract 3B South "would include constructing approximately 1.5 miles of launchable rock toe [],

---

[3] The 2023 Draft SEIS/SEIR also included a No Project Alternative as required by CEQA. (USACE-12310.) The No Project Alternative discussed the baseline conditions as they existed in January 2023, which did "not include additional improvements beyond those already constructed and would result in a continued risk to catastrophic flooding." (USACE-12435.) Defendant USACE noted that under the No Project Alternative, the "existing system would continue to require risk reduction measures to meet current levee design criteria," and the "risk to human health and safety, property, the environment" due to flooding would remain high. (USACE-12435–36.)

launchable trench, bank protection, and tie backs." (USACE-5019.)

Following the issuance of the 2023 Draft SEIS/SEIR, a public comment period was conducted from December 2023 to February 2024, during which approximately one thousand categorized comments were submitted by federal and state agencies, local agencies, interest groups, and approximately 900 individuals. (USACE-12264.) Additional comments were also submitted during the 15-month period leading up to Defendant USACE's issuance of the 2025 Final SEIS/SEIR. (*See e.g.,* USACE-70005; USACE-70037–51.) The majority of commentors expressed concern over riparian habitat and tree removal impacts related to Contract 3B. (USACE-12264.)

In May 2025, Defendant USACE issued the 2025 Final SEIS/SEIR. (USACE 12245–631.) The 2025 Final SEIS/SEIR contemplated the same two alternatives as to Contract 3B as the 2023 Draft SEIS/SEIR: the (1) No Action Alternative, and (2) Proposed Action. USACE-12321–81.) Contract 4B was analyzed in the 2025 Final SEIS/SEIR at a programmatic level of detail, as the selected sites for that action are still early in the planning phase and substantial information is not currently available to accurately describe impacts at a project level of analysis. (USACE-65326-27.) Also issued by Defendant USACE were Appendix I to the 2025 Final SEIS/SEIR, which included comments and responses to the 2023 Draft SEIS/SEIR, and Appendix G to the 2025 Final SEIS/SEIR, which was released in January 2025, and provided a summary of engineering analyses and design efforts as to the planned erosion protection along the Lower American River and Sacramento River. (USACE-14187; USACE-14194; USACE-16588–89, USACE-16596.)

Defendant USACE also sought and obtained a consistency determination under section 7 of WSRA for Contract 3B. The Lower American River was designated a wild and scenic river under WSRA in 1981. (NPS-10416.) Its outstandingly remarkable values are anadromous fish and recreation. (NPS-10416.) The Sacramento County Regional Parks manages the Lower American River under the American River Parkway Plan, while Defendant NPS is the designated federal administering agency for the Lower American River. (NPS-10416.) In March 2025, Defendant USACE completed a WSRA consistency analysis pursuant to section 7. (USACE-

57739.) Defendant USACE recognized that the Lower American River has been designated as a wild and scenic river under WSRA, and that the ARCF Project is an "Other Proposed Federally-Assisted Water Resources Project (Agency Other than the Federal Energy Regulatory Commission)" with the designated portion of the Lower American River. (USACE-57746.) As outlined in section 7, Defendant USACE recognized that federal agencies must determine whether water resources projects planned in rivers under jurisdiction of WSRA are consistent with the act's protection aims. (USACE-57746.) Defendant USACE determined that the section 7 consistency determination rested with Defendant NPS. (USACE-57746–47.) Defendant USACE ultimately concluded that Contract 3B "should be considered consistent" with WSRA and requested "concurrence from [Defendant] NPS within 60 days of the date of this document." (USACE-57820).

On July 7, 2025, Defendant NPS issued its section 7 consistency determination. (NPS-10447.) Defendant NPS found that Contract 3B, with the implementation of certain conditions, "will not directly and adversely affect the [Lower American River's] free-flowing character, water quality, anadromous fishery, or recreation values" and that it is consistent with WSRA. (NPS-10445.) In reaching its conclusion, Defendant NPS relied on the National Marine Fisheries Service Biological Opinion and the 2025 Final SEIS/SEIR. (NPS-10445.) Defendant NPS also noted that at the time the Lower American River was designated under WSRA, the levees existed and were acknowledged during the designation process. (NPS-10445.) Defendant NPS considered that the original EIS on the eligibility and suitability of the Lower American River for designation under WSRA included the need for future levee maintenance. (NPS-10445.)

On June 18, 2025, Defendant USACE issued its record of decision ("ROD"), approving Contracts 3B and 4B and adopting the 2025 Final SEIS/SEIR pursuant to NEPA. (USACE 24669-83) On July 18, 2025, former Defendant Central Valley Flood Protection Board certified the 2025 Final SEIS/SEIR pursuant to CEQA. (USACE-40777.) Former Defendant Central Valley Flood Protection Board issued its notice of determination on July 18, 2025. (USACE-40777.)

/////

**C. Procedural Background**

On August 21, 2025, Plaintiffs filed a complaint alleging four claims against Defendants: (1) violation of WSRA, 16 U.S.C. §§ 1271 *et seq.* against Defendants USACE and NPS; (2) violation of California Wild and Scenic Rivers Act, California Public Resources Code, §§ 5093.50 *et seq.* against Defendant Central Valley Flood Protection Board; (3) violation of NEPA, 42 U.S.C. §§ 4321, *et seq.* against Defendant USACE; and (4) violation of CEQA, California Public Resources Code, §§ 21000 *et seq.* against Defendant Central Valley Flood Protection Board. (Doc. No. 1 at ¶¶ 73–123.)

On October 3, 2025, Plaintiffs filed a motion for a preliminary injunction based on the impending implementation of Contract 3B. (Doc. No. 19-1 at 6.) Plaintiffs sought to enjoin "ground or vegetation disturbing activities" such as site preparation, vegetation removal, and tree felling in the 3B Contract area. (Doc. No. 19-2 at 2.) On November 20, 2025, the court granted Plaintiffs' motion for a preliminary injunction. (Doc. No. 50.) The court found that Plaintiffs raised a serious question on the merits of their claim that Defendant USACE did not consider a reasonable range of alternatives as required by NEPA and that Defendant USACE's adoption of the ROD and 2025 Final SEIS/SEIR was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). (*Id.* at 10–16.) The court also found that the remaining *Winter*[4] factors weighed in favor of granting Plaintiffs' requested preliminary relief. (*Id.* at 16–20.) The court thus enjoined ground or vegetation disturbing activities authorized under Contract 3B of the ARCF Project until the court reaches a decision on the merits.[5] (*Id.* at 22.)

On January 16, 2026, former Defendant Central Valley Flood Protection Board filed a motion to dismiss Plaintiffs' second and fourth claims. (Doc. No. 54.) On February 4, 2026, Plaintiffs filed a notice of voluntary dismissal without prejudice of Plaintiffs' second and fourth claims against Defendant Central Valley Flood Protection Board. (Doc. No. 58.) On February 5,

---

[4] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 20, 24 (2008).

[5] Defendants USACE and NPS filed an interlocutory appeal of the court's order granting preliminary injunctive relief, but they voluntarily dismissed that appeal on July 9, 2026. (Doc. Nos. 55, 70.)

2026, the court dismissed Defendant Central Valley Flood Protection Board from this action without prejudice. (Doc. No. 59.) Defendants USACE and NPS are the only remaining defendants in this action, and Plaintiffs first and third claims are the only remaining claims.

On April 1, 2026, Plaintiffs filed a motion for summary judgment on the remaining WSRA claim brought against both Defendants and NEPA claim brought against Defendant USACE. (Doc. No. 64.) On April 29, 2026, Defendants filed a cross-motion for summary judgment. (Doc. Nos. 66, 67.) On May 27, 2026, Plaintiffs filed an opposition to Defendants' cross-motion for summary judgment and a reply in support of their motion for summary judgment. (Doc. No. 68.) On June 10, 2026, Defendants filed a reply in support of their cross-motion for summary judgment. (Doc. No. 69.)

## LEGAL STANDARD

The APA governs the court's review of agency decisions under NEPA and WSRA, as neither statute provides a private right of action against the United States. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citing 5 U.S.C. § 706). Pursuant to the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"Under the arbitrary and capricious standard, the scope of review is deferential and narrow, and the court is not to substitute its judgment for the agency's judgment." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021) (citation omitted). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. A court may not accept an agency's *post hoc* rationalizations for its action. *Id.* at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.*

## ANALYSIS

### A. NEPA Claim

As discussed above, NEPA is a procedural statute "that requires the federal government to 'take a hard look at the environmental consequences' before acting." *Ctr. for Biological Diversity*, 141 F.4th at 993 (quoting *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006) (citation omitted)). "NEPA does not mandate particular results," rather, it is a "purely procedural statute." *Id.* NEPA requires a federal agency to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (citation omitted). It also ensures that the federal agency "inform[s] the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* (citation omitted).

NEPA requires "preparation of an EIS when a 'major' federal action would 'significantly affect[] the quality of the human environment.'" *Id.* (quoting 42 U.S.C. § 4332(2)(C)). NEPA also mandates that federal agencies "use the EIS to analyze a reasonable range of alternatives to the proposed action." *Id.* (citing 42 U.S.C. §§ 4332(2)(C)(iii), (F), (H)). When analyzing alternatives, a federal agency must disclose the "environmental impacts of the proposed action and its alternatives, including their direct, indirect, and cumulative effects." *Id.* (quoting *Audubon Soc'y of Portland*, 40 F.4th at 980). However, a federal agency only needs to "briefly discuss the reasons" why certain alternatives "were eliminated from detailed study." *Id.* (quoting 40 C.F.R. § 1502.14(a)). "In reviewing the adequacy of an EIS under NEPA, we employ a rule of reason analysis to determine whether the discussion of the environmental consequences included in the EIS is sufficiently thorough." *Audubon Soc'y of Portland*, 40 F.4th at 967 (internal quotation marks and citation omitted). This rule of reason analysis "guides both the choice of alternatives as well as the extent to which the EIS must discuss each alternative." *Id.* (citation omitted).

Plaintiffs make two primary arguments with respect to NEPA. First, Plaintiffs argue that

Defendant USACE violated NEPA's requirement to examine a reasonable range of alternatives, thereby precluding informed decision-making and informed public participation. (Doc. No. 64-1 at 22.) Second, Plaintiffs argue that Defendant USACE violated NEPA by failing to take a "hard look" at the Project's environmental effects resulting from the removal of mature trees, and by failing to disclose in the SEIS the baseline conditions with respect to heritage trees. (*Id.* at 30.) The court will address each of these arguments in turn.

1. <u>NEPA Alternatives Analysis</u>

Plaintiffs argue Defendant USACE failed to comply with NEPA due to its failure to consider a reasonable range of alternatives to the approved Project, and more specifically, Contract 3B. (*Id.* at 22.) First, Plaintiffs aver that Defendant USACE did not present any alternative to the Proposed Action with respect to Contract 3B, because Defendant USACE assessed only a No Action and the Proposed Action alternative. (*Id.*) Plaintiffs assert that the No Action alternative "is not a real option because it lacks any site-specific design that [Defendant] USACE stated was necessary and would occur once Congressional approval was received." (Doc. No. 64-1 at 22) (citing USACE-5004, 3416.) Plaintiffs contend that Defendant USACE's limited assessment of the "No Action" alternative and preferred alternative for Contract 3B lacks "range" and "reversed course on [Defendant USACE's] prior commitment to consider bioengineering as a feasible alternative." (*Id.*) Plaintiffs aver that Defendant USACE's "rejection of a bioengineering alternative represents a dramatic reversal from its prior stance." (*Id.* at 18.) Plaintiffs contend that Defendant USACE's alternatives analysis under NEPA and final adoption of the ROD and 2025 Final SEIS/SEIR is therefore arbitrary and capricious in violation of the APA. (*Id.*)

Defendant USACE argues in opposition that their NEPA analysis "provided a full and fair discussion of significant environmental impacts of the proposed actions and its alternatives." (Doc. No. 67 at 19.) Defendant USACE avers that their consideration of two alternatives in the 2023 Draft SEIS/SEIR and 2025 Final SEIS/SEIR, a No Action Alternative (constructing 11 miles of launchable trench and bank protection along the Lower American River as authorized by Congress) and the Proposed Action (design refinements and modifications including constructing approximately 3.3 miles of launchable rock toe, launchable trench, and bank protection, and tie

backs on the Contract 3B site) was reasonable because the erosion protection alternatives were responsive to design refinements needed to meet the ARCF Project's authorized flood risk reduction performance objectives. (*Id.* at 21.) Further, Defendant USACE argues it should be granted deference with respect to the alternatives they deem feasible to meet the ARCF Project's purpose. (*Id.* at 21–22) Finally, Defendant USACE argues that it never committed to consider a standalone NEPA bioengineering alternative, and that in any event, Defendant USACE did analyze bioengineering during the design phase but eliminated it from further consideration after determining that it did not meet the ARCF Project's purpose. (*Id.* at 22–24.)

The court agrees with Plaintiffs that Defendant USACE represented that certain bioengineering methods met the objective criteria of the ARCF Project, and that Defendant USACE itself represented that bioengineering methods would be considered specifically with respect to erosion control measures along the Lower American River. For example, the 2015 GRR indicates that erosion protection measures for the American River would include placing rock protection on the bank to prevent erosion, constructing a launchable rock filled trench, and that "a bioengineering method, which uses plant material and minimal amounts of rock to stabilize the eroded slope and prevent further loss of material" "would be used in lower velocity reaches." (USACE-432.) Bioengineering armoring of slopes is also listed as one of the "Measures to Address Erosion" in the 2015 GRR. (USACE-413.) The 2015 GRR indicates that bioengineering armoring of slopes as a measure to address erosion was screened and met the objective criteria for reduction of the risk of flooding within the study area and to critical infrastructure within the study area. (USACE-413–16.) Defendant USACE also identified the bioengineering armoring of slopes as one of the "retained" management measures that would be further analyzed. (USACE-416.) Defendant USACE ultimately determined it should be carried into the "final array of alternatives" for erosion protection measures. (USACE-432.)

Further, Defendant USACE repeatedly represented that bioengineering methods would be analyzed where bank protection measures were deemed necessary along the Lower American River. Defendant USACE stated as such in their 2016 responses to public comments on the 2016 FEIS/FEIR. (USACE-3416–48.) Defendant USACE indicated in their responses to submitted

comments that future analyses would examine whether, for any particular site on the Lower American River, "some sort of bank protection is determined to be necessary," and if so, that "other options to reduce impacts, including bioengineering measures, will be analyzed." (USACE-3416–48.)

Despite Defendant USACE's representations to the contrary, a bioengineering alternative was not analyzed in the 2023 Draft SEIS/SEIR. (*See* USACE-4936–5874.) Nor was bioengineering identified as one of the four alternatives that were considered for Contract 3B but ultimately rejected from more detailed analysis because they did not meet environmental or flood risk reduction needs. (*See* USACE 4997–5000.)

After the issuance of the 2023 Draft SEIS/SEIR, federal, state, and local agencies, interest groups, and individuals submitted approximately one thousand comments in response to the draft. The majority of commentors expressed concern over riparian habitat and tree removal impacts related to Contract 3B. (USACE-12264.) Plaintiff Center for Biological Diversity submitted comments that identified many issues it had with the 2023 Draft SEIS/SEIR, including that bioengineering measures were not analyzed as previously represented by Defendant USACE. (USACE-61481–507.) The Bureau of Land Management also recommended incorporation of Defendant NPS's best management practices relative to alternative, bioengineered approaches to bank protection and site restoration into the Lower American River project designs where possible, and that a team should be established to "reevaluate diagnostic and treatment methods for erosion control with modern tools including Nature-based solutions." (USACE-61081–61085.) The Bureau of Land Management opined that that further analysis should include a "robust exploration of NEPA [a]lternatives" as opposed to the "uniform approach to mitigation erosion across many different types of river stretches." (USACE-61067.) Further, the Regional Parks Department of the County of Sacramento opined that a "reasonable range of alternatives has not been considered for Contract 3B North, 3B South . . . and that "there needs to be an alternative or two that addresses the issues holistically" such as a "holistic engineering solution" that "reduce[s] impacts to trees, wildlife, and recreation." (USACE-61127–34.)

In Appendix I to the 2025 Final SEIS/SEIR, Defendant USACE responded to comments

submitted in response to the 2023 Draft SEIS/SEIR, as they were required to do. (USACE-16596–97.) Defendant USACE confirmed that "[t]he GRR's final alternative measures carried forward into the design development following authorization of the ARCF16 Project in 2016" included "bank protection, launchable rock trenches, and bioengineering solutions." (USACE-16883.) Defendant USACE stated in Appendix I that tree and vegetation alone would not be able to provide the resiliency necessary to achieve the erosion protection sufficient for flood mitigation. (USACE- 14206.) Defendant USACE also cited concerns about fire destroying bioengineering erosion protection measures and the "longevity of bioengineering solutions and the impacts repair and replacement of these solutions would have on the on-site mitigation plants and habitat." (USACE- 14206.) Defendant USACE further opined that bioengineering "will not reduce all of the flood risks" at the American River Erosion Contract 3B site. (USACE-16596.)

"[A]n agency changing its course must supply a reasoned analysis." *Ctr. for Biological Diversity*, 141 F.4th at 994 (*State Farm*, 463 U.S. at 57 (citation omitted)). While agencies are not required to "consider infinite, unfeasible, or impractical alternatives, [] they must consider reasonable ones." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022). "The existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate." *Id.* (citation omitted). The "touchstone" of the court's review of an EIS "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Ctr. for Biological Diversity*, 141 F.4th at 993 (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted)).

Defendant USACE itself recognized that bioengineering was one of the final alternative measures that was carried over and considered as part of the site-specific design development phase following the issuance of the 2016 FEIS/FEIR. (USACE-413–16; USACE–16883.) Further, at multiple stages of the ARCF Project's development, including in response to public comments and in the 2015 GRR, Defendant USACE represented that bioengineering approaches would be analyzed for erosion protection methods and that bioengineering armoring of slopes as a measure to address erosion was screened and met the objective criteria for reduction of the risk of

flooding within the study area and to critical infrastructure within the study area. (USACE-413–16; USACE-432; USACE-3416–48.) Despite this representation, the 2023 Draft SEIS/SEIR does not discuss the bioengineering armoring of slopes as either a reasonable alternative or an alternative that was eliminated from further study. *Ctr. for Biological Diversity*, 141 F.4th 976, 993 (9th Cir. 2025) (citing 43 C.F.R. § 1502.14(a); 42 U.S.C. § 4332(2)(C) (NEPA requires agencies to analyze a reasonable range of alternatives in the EIS and "for alternatives which were eliminated from detailed study," to "briefly discuss the reasons their having been eliminated.") (quoting 40 C.F.R. § 1502.14(a)).

Defendant USACE argues that rather than promising to analyze bioengineering as an alternative in the 2016 FEIS/FEIR, Defendant USACE explained that it represented that "during the detailed design development, bioengineering design measures will be considered for viability at each site-specific site where erosion bank protection was deemed necessary." (Doc. No. 67 at 24.) Further, Defendant USACE argues that in any event, Defendant USACE did consider potential bioengineering solutions during the design phase with respect to Contract 3B. (Doc. No. 67 at 25–26.) While that may be true—Defendant USACE's various citations to the administrative record do not shed light on the question of whether bioengineering solutions were reasonably considered during the design process. For example, Defendant USACE cites to a document from Central Valley Flood Protection Board Presentation for the ARCF16 Project Lower American River Erosion Protection Technical Discussion that was held on May 23, 2025. That document reflects that during the spring and summer of 2020, there was some discussion of "bioengineering approaches" with resource agencies but that document provides no reasoned explanation about what was discussed or why those approaches were abandoned. (USACE-39829.) Nor does the document state that bioengineering approaches were deemed "infeasible for Contract 3B" or that they did not meet the ARCF Project's purpose, rather it states that bioengineering approaches were not "prefer[ed]" by resource agencies. (USACE-39829.) Though the presentation concerns Contract 3B and 4B, this specific presentation slide contains no explicit reference to either contract. It also contains images that are titled "Napa Creek Project," and it is not clear to the court that this project is related to Contract 3B and 4B. (USACE-39829.)

Defendant USACE's administrative record citation does support that at certain Contract 3B sites, the reliability of vegetation alone as erosion protection measure was considered, but not specific bioengineering approaches as defined by the agency. (USACE-39819–21; USACE-39829). Defendant USACE's other citations to the administrative record likewise also do not provide a contemporaneous explanation as to why Defendant USACE abandoned bioengineering approaches with respect to Contract 3B during the design phase. (*See* USACE-3773) ("Posters from the March 2008 Scoping Meetings" includes "biotechnical erosion protection" on a poster titled "Potential Solutions: Improvements to levees that address stability, erosion and freeboard"); (USACE-12352) (2025 Final SEIS/SEIR discussing that "[m]inimizing the area of wooded vegetation and number of trees that would be impacted was a primary consideration throughout the design process that led to the proposed design"); (USACE-34287-304) (Contract 3B Design Documentation Report demonstrating significant site-specific erosion protection design analysis, but not independently establishing that an analysis of a bioengineering design occurred).

Indeed, the administrative record reflects that bioengineering as an erosion protection measure was not discussed in any significant detail until Defendant USACE released Appendix I and Appendix G to the 2025 Final SEIS/SEIR. (USACE-16588–89, USACE-16596.) Importantly, these documents were issued after the comment period for the 2023 Draft SEIS/SEIR had ended on February 23, 2024. The court is particularly concerned that Defendant USACE omitted bioengineering erosion protection measures in the 2023 Draft SEIS/SEIR as at least an alternative that was "eliminated from detailed study," undermining the opportunity for "informed public participation" during the public review and comment period. *Ctr. for Biological Diversity*, 141 F.4th at 993; *see also WildEarth Guardians v. U.S. Dep't of Agric. Animal & Plant Health Inspection Serv. Wildlife Servs.*, 135 F.4th 717, 728 (9th Cir. 2025) (noting that a "NEPA document is an important springboard for public comment and engagement," and that "[f]ollowing NEPA's procedural requirements 'ensures'" that the public will be informed) (citation omitted).

Unlike instances where a plaintiff proposes an alternative in public comment that the agency ultimately deems unreasonable, here, Defendant USACE itself found on the record that

bioengineering armoring of slopes as an erosion protection measure alternative met the ARCF Project objective criteria of reduction of both flood risk and damage to critical infrastructure and represented to the public that it would be analyzed. *Cf. W. Watersheds Project v. Bureau of Land Mgmt.*, 971 F. Supp. 2d 957, 972 (E.D. Cal. 2013) (finding the agency's brief explanation in the final environmental assessment as to why plaintiff's proposed alternative was not examined in depth sufficient to satisfy the agency's obligation to provide a reasonable explanation under NEPA). Defendant USACE may have revised its position as to the feasibility of the bioengineering armoring of slopes as an erosion protection measure alternative during the design phase, but the agency did not provide an explanation until after the public comment period had ended, effectively preventing the public from reviewing and commenting on the agency's change of course. Though the court is aware of its mandate to "afford substantial deference to [Defendant USACE]," *Seven Cnty. Infrastructure Coal*, 605 U.S. at 180, in its selection and elimination of alternatives, Defendant USACE must also uphold its obligation pursuant to NEPA to analyze a reasonable range of alternatives and to briefly discuss why certain alternatives were eliminated from further study. *Ctr. for Biological Diversity*, 141 F.4th at 993 (citations omitted). Here, Defendant USACE did not "briefly discuss the reasons" that bioengineering as an alternative that the agency eliminated from detailed study. *See* 40 C.F.R. § 1502.14(a). Defendant USACE's supplementation to the 2025 Final SEIS/SEIR did not cure this violation, as it "frustrat[ed] NEPA's goal of allowing the public the opportunity to 'play a role in . . . the decisionmaking process.'" *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (citation omitted). Accordingly, Defendant USACE violated NEPA by failing to comply with its procedural requirement to "[r]igorously explore and objectively evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination." *See* 40 C.F.R. § 1502.14(a).

2. <u>NEPA's "Hard Look" Requirement</u>

Under NEPA, an agency must take a hard look at the environmental impact of its proposed actions. *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (citation omitted). "Federal agencies must undertake a 'full and fair' analysis of the environmental impacts

of their activities." *Id.* (citation omitted). "To satisfy the 'hard look' requirement, an agency must provide 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Id.* (citation omitted). A reviewing court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 183 (citation omitted). Further, the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Id.* at 185. In reviewing an agency's analysis of the environmental effects of a project in an EIS, the court should "afford substantial deference to the agency as to the scope and contents of the EIS." *Id.* at 192.

Plaintiffs argue that Defendant USACE failed to take a "hard look" at Contract 3B's effects of removing mature forest and heritage trees and that Defendant USACE's conclusions regarding long-term impacts on the biological, aesthetic, and recreation resources in the contract area are arbitrary and capricious. (Doc. No. 64-1 at 30.) First, Plaintiffs assert that the 2025 SEIS/SEIR fails to disclose baseline conditions with respect to heritage trees specifically. (*Id.*) Defendant USACE counters that Plaintiffs cite no authority for their assertion that NEPA requires an analysis as to heritage trees specifically, and that it otherwise adequately addressed the baseline condition for the Contract 3B and 4B sites. (Doc. No. 67 at 32.)

"NEPA requires that the agency provide the data on which it bases its environmental analysis." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011). An agency's assessment of baseline conditions "must be based on accurate information and defensible reasoning." *Great Basin Res. Watch*, 844 F.3d at 1101 (citation omitted). As an initial matter, the court agrees with Defendant USACE that NEPA does not impose a specific requirement on Defendant USACE to establish a baseline for heritage trees. Plaintiffs provide no authority to support their assertion. Further, Defendant USACE reasonably addressed baseline conditions for Contract 3B and 4B in the 2025 Final SEIS/SEIR. The 2025 SEIS/SEIR identified vegetation types located in the Contract 3B and 4B areas including "riparian forest, oak woodland, open water, ruderal herbaceous, wetlands, and limited agriculture," as well as a number of species of trees that are present "adjacent to the channel." (USACE-12507)

(identifying the valley oak, Fremont cottonwood, boxelder, Oregon ash, and white alder as the main tree species in the area). The 2025 Final SEIS/SEIR also identifies that the Contract 3B and 4B areas include 51.32 acres of "riparian forest/scrub" which is composed of "native and nonnative scrub and woodland." (USACE-12508.) While Plaintiffs assert that Defendant USACE should have disclosed the baseline number of heritage trees in the Contract 3B and 4B areas, NEPA's "requisite 'hard look' does not require adherence to a particular analytic protocol." *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (noting that the court will accord an agency "great deference" when reviewing an agency's "methodology and planning strategy"). Defendant USACE's overall accounting of overall vegetation acreage, species composition, and tree size categories provides a reasonable baseline for the impacts analysis. Thus, the court finds that Defendant USACE provided a sufficient baseline assessment. While Plaintiffs argue that Defendant USACE should have specifically quantified heritage trees as part of the baseline analysis, NEPA does mandate that Defendant USACE follow a particular analytic protocol in assessing the baseline conditions in the Contract 3B and 4B areas in the 2025 Final SEIS/SEIR. *See Oregon Nat. Desert Ass'n*, 625 F.3d at 1121.

Next, Plaintiffs argue that the 2025 Final SEIS/SEIR is inadequate because it does not provide the number or location of the heritage trees that will be removed under Contract 3B and 4B. (Doc. No. 64-1 at 32.) However, as Plaintiffs point out, the 2025 Final SEIS/SEIR provides that between 675 and 715 total trees are proposed for removal in the Contract 3B area. (*Id.*) (citing USACE-59518.) The 2025 Final SEIS/SEIR also provides an estimated number of protected and removed trees categorized by size. (USACE-16743; USACE-64825.) Thus, the administrative record establishes that Defendant USACE conducted a "full and fair" analysis with respect to the impact on trees in the Contract 3B construction area. *See 350 Montana* 50 F.4th at 1265. Plaintiffs take issue with this presentation of the relevant information because "it fails to disclose how many of these trees meet the standard for a 'heritage tree.'" (Doc. No. 64-1 at 33.) As stated, Defendant USACE was not required by NEPA to specifically disclose the number of heritage trees that will be affected by Contract 3B. *See Oregon Nat. Desert Ass'n*, 625 F.3d at 1121.

Plaintiffs assert that the conclusions regarding Contract 3B's long-term impacts in the 2025 Final SEIS/SEIR lack a rational basis and are unsupported by the record because the conclusions do not account for heritage tree loss and the amount of time required for mature forest to reestablish itself. (Doc. No. 64-1 at 34.) Defendant USACE concluded in the 2025 Final SEIS/SEIR that the "long term" environmental impacts to aesthetics, water quality, recreation, and vegetation and wildlife are less than significant. (USACE 12445–47; 12468–69; 12480, 12512–14.) Plaintiffs assert that Defendant USACE conflated the length of time required for riparian vegetation to reach self-sustaining status with length of time required for a tree to reach heritage status or maturity. (Doc. No. 64-1 at 34) (citing USACE-59606.) Defendant USACE stated that it reasonably defined long-term impacts to riparian resources as impacts beyond eight years, a time-period that was based on the National Marine Fisheries Service "NMFS" Biological Opinion establishing that riparian habitat would reach self-sustaining maturity within five to eight years. (Doc. No. 67 at 36) (citing USACE-13125–26, USACE-16751.) Plaintiffs raise a valid concern that Defendant USACE's selected definition as to long-term impacts may understate the impacts to the riparian forest in the Contract 3B area. However, this concern does not necessarily render Defendant USACE's analysis of long-term impacts arbitrary. Plaintiffs may disagree with Defendant USACE's selection of time frame for analyzing long-term effects and assert that it should account for the much longer time needed for vegetation to reach maturity, however, Defendant USACE's selection was reasonably based on information contained in the NMFS Biological Opinion, and is entitled to deference. Defendant USACE also adequately considered the impact on salmonoid habitat and reasonably concluded that the planned mitigation measures would reduce the overall impact on salmonoid habitat to a less than significant level. (USACE-12524–25; USACE-13187–93.)

Accordingly, the court finds that Defendant USACE took the required "hard look" at the environmental impact of Contract 3B and 4B in the 2025 Final SEIS/SEIR. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 183, 185.

**B. WSRA Claim**

As outlined above, in March 2025, Defendant USACE completed a consistency analysis

pursuant to section 7 of WSRA. (USACE-57739.) Defendant USACE determined that the section 7 consistency determination rested with Defendant NPS. (USACE-57746–47.) Defendant USACE ultimately concluded that Contract 3B "should be considered consistent" with WSRA and requested "concurrence from [Defendant] NPS within 60 days of the date of this document." (USACE-57820). On July 7, 2025, Defendant NPS issued its section 7 consistency determination. (NPS-10447.) Defendant NPS found that Contract 3B, with the implementation of certain conditions, "will not directly and adversely affect the [Lower American River's] free-flowing character, water quality, anadromous fishery, or recreation values" and that it is consistent with WSRA. (NPS-10445.)

Plaintiffs argue that Defendant NPS's section 7 consistency determination is arbitrary and capricious and not in accordance with WSRA because it ignored the plain language of the statute and the "overwhelming evidence of Contract 3B's adverse effects." (Doc. No. 64-1 at 37.) In response to this challenge from Plaintiffs, Defendants argue that a section 7 consistency determination was not actually required here because the ARCF Project was directly authorized by Congress. (Doc. No. 67 at 38.) Further, Defendants argue that Plaintiffs' position is foreclosed as a matter of law under the Ninth Circuit precedent set in *Oregon Natural Resource Council v. Harrell*, 52 F.3d 1499, 1503 (9th Cir. 1995), *as amended on denial of reh'g* (June 29, 1995) ("*ONRC*").

As the Ninth Circuit summarized in *ONRC*,

> Section 7(a) provides that no agency shall "assist by loan, grant, license, or otherwise" in the construction of a water resources project with an adverse effect on river values; that such prohibition shall not preclude licensing of or "assistance" to developments above a Wild and Scenic River area which will not unreasonably diminish its values; and that no agency shall recommend authorization of, or request appropriations to begin construction of, any such project that would have an adverse effect on the values for which the river was designated as wild and scenic, without advising the Secretary. The first two sentences thus restrict agencies when they act to assist in the construction of a project; the third sentence establishes procedural requirements when they recommend authorization or request appropriations for such projects.

52 F.3d at 1504. In *ONRC*, the Ninth Circuit considered whether the U.S. Army Corps of

/////

Engineers (the "Corps") should have secured consent under section 7 of WSRA[6] of the Secretaries of the Interior and Agriculture through the Bureau of Land Management ("BLM") and the U.S. Forest Service, who administered the WSRA area of the river impacted by the dam project, prior to issuing a record of decision or requesting congressional appropriations. *ONRC*, 52 F.3d at 1501. The Ninth Circuit held that the consent of the administering agencies was not required for the dam project because the project was congressionally authorized and as such the Corps was not an authorizing agency. The Ninth Circuit found that under these circumstances, the Corps's only obligations under section 7 were to submit to Congress a report detailing adverse impacts to the river and to "give the Secretaries notice sixty days in advance of its intention to request appropriations, if and when it decides to make such a request." *Id.* The Ninth Circuit found that the most coherent reading of section 7(a) and its implementing regulations requires that a federal agency giving assistance to others to enable them to take action affecting a Wild and Scenic River must comply with the procedure set out in the first two sentences of section 7,

---

[6] Section 7 of WSRA, 16 U.S.C. § 1278(a), provides in relevant part:

> no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration. Nothing contained in the foregoing sentence, however, shall preclude licensing of, or assistance to, developments below or above a wild, scenic or recreational river area or on any stream tributary thereto which will not invade the area or unreasonably diminish the scenic, recreational, and fish and wildlife values present in the area on the date of designation of a river as a component of the National Wild and Scenic River System. No department or agency of the United States shall recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration, or request appropriations to begin construction of any such project, whether heretofore or hereafter authorized, without advising the Secretary of the Interior or the Secretary of Agriculture, as the case may be, in writing of its intention so to do at least sixty days in advance, and without specifically reporting to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of this chapter and would affect the component and the values to be protected by it under this chapter . . . .

16 U.S.C. § 1278(a).

whereas an agency taking action directed at Congress, which may authorize or appropriate funds for a project affecting a Wild and Scenic River, must comply with the procedures set out in the third sentence. *Id.* at 1505. The Ninth Circuit looked to the legislative history of section 7 and observed that it supports construing section 7 as "distinguishing between federal projects . . . and actions by a federal agency . . . ." *Id.* at 1505–06. The Ninth Circuit further opined that "Congress intended to require the appropriate Secretary's consent where a federal agency is the authorizing agency, and Congress will not be involved, but not where Congress itself is the decisionmaker." *Id.* at 1506. The Ninth Circuit stated that to construe the statute otherwise would be "implausible" because it would effectively give the administering Secretaries the "power to prevent an agency such as [the] Corps, with a congressional mandate to build a dam, from reporting to Congress and requesting appropriations." *Id.*

Here, there is no dispute that Contract 3B is part of a congressionally authorized flood risk management project that is being implemented by Defendant USACE and its state and local partners in California. (NPS-2457.) Specifically, Contract 3B is authorized by Section 101(a)(1)(A) of WRDA, in conjunction with Section 1322(b) of Water Resources Development Act of 2016 and the Bipartisan Budget Act of 2018. (NPS-2457) (citing Pub. L. No. 104303, Sec. 101(a)(1), 110 Stat. 3658, 3662–63 (1996); Pub. L. No. 106-53, § 366, 113 Stat. 269, 319–20 (1999); Pub. L. No. 114-322, § 1322(b), 130 Stat. 1707 (2016); Pub. L. No. 115-123, 132 Stat. 64 (2018)). Congress is unambiguously the decisionmaker here, where it has allocated significant funding through congressional action. Further, Defendant USACE is statutorily barred from authorizing projects that exceed $15,000,000, as the ARCF Project does here. 33 U.S.C. § 701s. The ARCF Project, of which Contract 3B is a part, is estimated to cost "hundreds of millions of dollars." (USACE-281.) Thus, applying the precedent of *ONRC*, Defendants need only comply with the procedures of the third sentence of section 7; namely, that they advise the Secretaries in writing with 60 days' notice of their intention to "recommend authorization of any water resources project that would have a direct and adverse effect on the values for which such river was established" and "report[] to the Congress in writing at the time it makes its recommendation or request in what respect construction of such project would be in conflict with the purposes of

this chapter and would affect the component and the values to be protected by it under this chapter." *See ONRC*, 52 F.3d at 1505 ("[A]n agency taking action directed at Congress, which may authorize or appropriate funds for a project affecting a Wild and Scenic River, must comply with the procedures set out in the third sentence.").

Plaintiffs' attempt to distinguish the dam project in *ONRC* from the project in this case is unavailing. Plaintiffs argue that the ARCF Project is distinguishable because it involves non-federal state and local actors, and funding from the California state government. (Doc. No. 68 at 23.) However, as the Corps was in *ONRC*, Defendant USACE "is the only entity involved in issuing a record of decision, and the only entity involved in constructing the [project]." *ONRC*, 52 F.3d at 1505. Section 7 requires a consistency determination from an administering agency only if a federal agency "assists . . . in the construction of [a] water resources project . . . ." 16 U.S.C. 1278(a). Here, as Defendants point out, and as the administrative record supports, only Defendant USACE is involved in construction, as outlined in the Project Partnership Agreement, and Plaintiffs do not otherwise suggest that the non-federal state and local actors will play a role in construction. (USACE-4484; USACE-4488.)

Next, Plaintiffs argue that Defendants cannot now argue that a consistency determination was not necessary because it is an illegal post hoc justification. (Doc. No. 68 at 25.) This argument is unavailing as well because whether Defendant NPS was required to make a section 7 consistency determination is a question of law, rather than a determination of policy or judgment made by the agency. *See Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 977–78 (9th Cir. 2005) (explaining that whether a consistency determination is statutorily required under section 7 is a question of law, rather than a "determination of policy or judgment which the agency alone is authorized to make") (quoting *SEC v. Chenery Corp.,* 318 U.S. 80, 88 (1943)). Plaintiffs urge this court to disregard Defendants' legal argument concerning whether a consistency determination was statutorily required under section 7. However, even in *ONRC*, the administering agencies (BLM and the U.S. Forest Service) did issue a section 7 consistency determination, and yet the Ninth Circuit did not consider the fact that the administering agencies had issued a consistency determination when deciding whether one was legally required. 52 F.3d at 1503. The same is true

here—the court is not bound by Defendant USACE and NPS's belief at that time that a consistency determination was legally required.

Accordingly, Plaintiffs' WSRA claim fails as a matter of law because Defendant USACE was not legally required to obtain a consistency determination from Defendant NPS under section 7 of WSRA. Thus, the court need not reach Defendants' argument as to whether Defendant NPS's consistency determination was arbitrary and capricious.

**C. Remedy**

To summarize, the court finds that Defendant USACE's alternatives analysis was deficient under NEPA and that the adoption of the ROD and the 2025 Final SEIS/SEIR was arbitrary and capricious to that extent. Plaintiffs request vacatur of Defendant USACE's June 18, 2025 ROD as to Contracts 3B and 4B. (Doc. No. 64-1 at 46.) Defendants request an opportunity to provide supplemental briefing on the issue of remedy. (Doc. No. 67 at 48.) In the Ninth Circuit, vacatur is "the presumptive remedy for agency action that violates the NEPA as reviewed through the APA." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citation omitted). However, given that the deficiency found by the court may not necessarily require vacatur to remedy, the court is inclined to remand this action without vacatur. *See Seven Cnty. Infrastructure Coal*, 605 U.S at 185 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.") Thus, the court will order the parties to provide supplemental briefing on the issue of remedy.

**CONCLUSION**

For the reasons explained above,

1. Plaintiffs' motion for summary judgment (Doc. No. 64) is DENIED as to Plaintiffs' WSRA claim against Defendants USACE and NPS, and GRANTED as to Plaintiffs' NEPA claim against Defendant USACE;
2. Defendants' motion for summary judgment (Doc. No. 66) is GRANTED as to Plaintiffs' WSRA claim against Defendants USACE and NPS, and DENIED as to

Plaintiffs' NEPA claim against Defendant USACE;

3. The parties shall meet and confer to determine the appropriate remedy that is consistent with this order, NEPA, and the APA. If the parties agree on a remedy, the parties shall file their joint stipulation with supporting authority by no later than November 17, 2026; and

4. If the parties cannot agree on a proper remedy, then each party shall file supplemental briefing, no longer than ten (10) pages in length, regarding remedy by no later than November 17, 2026.

IT IS SO ORDERED.

Dated: **November 3, 2026**

Dena Coggins
United States District Judge